TOSCO CORPORATION and Energy Resources Technology Land, Inc., Plaintiffs,

v.

Donald P. HODEL, Secretary of the Interior, Defendant,

Joseph B. UMPLEBY, and Wasatch Development Co., Plaintiffs,

v.

Donald P. HODEL, Secretary of the Interior, Defendant,

Barnette T. NAPIER, Grace A. Savage, Joan L. Savage, Maude B. Farnum, St. Clair Napier Castlin, William H. Farnum, Jr., John R. Farnum, John W. Savage, and Neil S. Mincer, Plaintiff,

v.

Donald P. HODEL, Secretary of Interior, Defendant,

Penelope Chase BROWN, Individually and as a trustee, and Tosco Corporation, Plaintiffs,

v.

Donald P. HODEL, Secretary of Interior, Defendant.

Civ. A. Nos. C–8680, C–8685, C–8691 and C–9202.

United States District Court, D. Colorado.

May 1, 1985.

Donald L. Morgan, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., Richard W. Hulbert, Cleary, Gottlieb, Steen & Hamilton, New York City, James Clark, W.D. Maer, Don Sherwood, Jacques Ruda, Denver, Colo., John W. Savage, Rifle, Colo., for plaintiffs.

Gerald S. Fish, Dept. of Justice, Washington, D.C., Robert N. Miller, U.S. Atty., Marla E. Mansfield, Lowell L. Madsen, Lyle K. Rising, U.S. Dept. of Interior, Office of Regional Sol., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

### OUTLINE

I. SUMMARIZATION OF HOLDINGS

II. INTRODUCTION AND OVERVIEW
 A. The Litigation
 B. Mineral Leasing Act of 1920

III. PRIOR PROCEEDINGS IN THIS AND OTHER OIL SHALE LITIGATION
 A. The Period of the Mineral Leasing Act in 1920 to Department's Change of Policy in 1964
 1. Prior to 1920
 2. Mineral Leasing Act of 1920
 3. 1920's and 1930's
 4. Supreme Court Opinions During the Period and Relevant Administrative Rulings: Wilbur v. U.S. Ex Rel. Krushnic (1930) and Ickes v. Virginia-Colorado Development Corp. (1935)
 5. The Oil Shale Company (1935 Interior Decision)
 6. Union Oil Company (1964 Interior Decision)

 B. The Period 1966–1970. Impact Cases: <u>Oil Shale Corp. v. Udall</u>, (D.Colo. 1966); <u>Udall v. Tosco</u> (10th Cir.1969); <u>Hickel v. Oil Shale Corp</u>. (Sup.Ct. 1970)

 C. The Period 1970–1980. Additional Court Cases and Administrative Proceedings. <u>Oil Shale Corp. v. Morton</u>, (D.Colo.1973); <u>Oil Shale Corp. v. Morton</u>, (10th Cir.1975); <u>Bohme I</u> (Interior Board Decision 1980)

 D. Further Litigation on the Issue of What Constitutes Valid Discovery (Supreme Court 1980)

 E. New Requirement for Valid Discovery Enunciated by Interior: <u>Bohme II</u> (1980 Interior Decision)

 F. Additional Administrative Decisions: <u>United States v. Weber</u> (1980 Interior Board Decision); <u>United States v. Energy Resources Technology Land, et al.</u>, (1983 Interior Board Decision)

 G. Additional Effort by Interior to Invalidate Patents: <u>United States v. Eaton Shale Company</u> (D.Colo.1977)

 IV. OIL SHALE BACKGROUND

 V. THE GEOLOGY OF THE GREEN RIVER FORMATION

 VI. THE OLD CONTEST PROCEEDINGS ARE NO LONGER A PROPER BASIS FOR DENIAL OF PATENTS SINCE THE INTERIOR DECISION IN <u>THE OIL SHALE COMPANY CASE</u>

VII. THE DEPARTMENT'S INTERPRETATION, PRONOUNCEMENTS AND RULES FOLLOWING <u>VIRGINIA–COLORADO</u> HAVE THE FORCE OF LAW, THUS PREVENTING LATER ABROGATION BY INTERIOR IN 1964

 A. Effect of Pronouncements, Construction of Statutes and Decisional Law and Promulgation of Rules by Interior

 B. Summary of Effect of Department of Interior Action from 1935–1961 In Granting Patents Where Claims Had Been Declared Null and Void

 C. Effect of Congressional Inquiry on Mining Issues: Principle of Application of Contemporaneous Construction by Interior

 D. The Department's Actions in 1964 were Done in Violation of Claimants' Entitlement to Due Process

VIII. DISCOVERY ISSUES: ANALYSIS OF <u>ANDRUS</u> v. <u>SHELL OIL CO</u>. AND <u>FREEMAN</u> v. <u>SUMMERS</u>

 A. Discussion of Principal Cases and Effect of Congressional Inquiry

 IX. PERFORMANCE OF ANNUAL ASSESSMENT WORK: EFFECT OF NON-PERFORMANCE

 A. Nature of Locator's Interest in an Unpatented Mining Claim

 B. Requirements of Annual Assessment Work

 C. Burden of Proof as to Annual Work Performance

 D. Performance of Annual Work: Proof and Timeliness

 E. Significant BLM Regulation (1972) Dealing with Performance of Assessment Work

 F. <u>United States v. Locke</u>—The United States Supreme Court Interprets <u>Hickel v. Oil Shale Corp</u>. and the Concept of Substantial Compliance; Annual Work Requirement; Doctrine of Abandonment and Equitable Estoppel

 G. Summary—Substantial Compliance

 X. EFFECT OF INCOMPLETE NOTICE AND OTHER DEFECTS IN PRIOR CONTEST PROCEEDINGS

XI. THE UNITED STATES IS ESTOPPED FROM ASSERTING INVALIDITY OF OIL SHALE CLAIMS BECAUSE OF NONPERFORMANCE OF ASSESSMENT WORK: THE APPLICATION OF LACHES

 A. Estoppel Considerations

 B. Relevant History of Present Litigation

 C. Legal Analysis of Equitable Estoppel

 D. Findings and Conclusions Regarding Estoppel

 E. Application of the Doctrine of Laches

XII. APPLICABILITY OF THE TEN-ACRE RULE

XIII. ORDER

SHERMAN G. FINESILVER, Chief Judge:

These cases are the latest phase in the extensive litigation concerning the validity of mining claims to oil shale deposits located in Garfield and Rio Blanco Counties in Western Colorado.[1] Nearly 100 mining claims are involved covering 15,550 acres. The Department of the Interior (hereinafter "department", "Interior", or "government") seeks to invalidate mining claims and refuses to issue mineral patents to the claim owners, principally asserting that the claims were declared void in departmental contest proceedings some forty years ago. Plaintiffs, who are mining claimants, contend that the department erred in denying patents on this basis, since the contest proceedings themselves were voided and vacated by the Secretary of the Interior in 1935. Plaintiffs assert in this action that the mining claims are valid.

These cases were before us previously on issues involving discovery, performance of annual assessment work and other aspects of mining and administrative law. *Oil Shale Corp. v. Morton*, 370 F.Supp. 108 (D.Colo.1973). On cross motions for summary judgment, we ruled in favor of the plaintiffs on several independent grounds. The defendant appealed, to the Tenth Circuit Court of Appeals which, expressing the desire to avoid piecemeal litigation, declined to rule on the merits. Instead, the court remanded the entire matter to the district court after broadening the factual and legal questions and directing that they be resolved by the trial court. The trial court was also directed to further remand the case to the Department of Interior where necessary and appropriate to conduct evidentiary hearings on any other unadjudicated issues. *Oil Shale Corp. v. Morton*, Order of Remand, (10th Cir. Sept. 22, 1975), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3169, 49 L.Ed.2d 1185 (1976). The administrative proceedings are now concluded.[2] The cases are ready for determination on all issues and once again are before us on cross motions for summary judgment.[2A]

1. Other oil shale cases have been before this court in recent years: *United States v. Eaton Oil Co.*, 433 F.Supp. 1256 (D.Colo.1977); *Amerada Hess Corp., v. Morton*, No. 4361 (D.Colo.1977); *Shell Oil Co. v. Kleppe*, 426 F.Supp. 894 (D.Colo. 1977), aff'd sub nom., *Shell Oil v. Andrus*, 591 F.2d 597 (10th Cir.1979); aff'd, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980); *Mobil Oil v. Equity Co.*, C-4135 (D.Colo.1972).

2. The cases are on appeal from the Interior Board of Land Appeals: *United States v. Bohme*, 48 I.B.L.A. 267, 87 I.D. 248 (1980) ("*Bohme I*"); *United States v. Bohme*, 51 I.B.L.A. 97 (1980) ("*Bohme II*").

Other I.B.L.A. cases: *United States v. Weber Co.*, 68 I.B.L.A. 37, 89 I.D. 538 (1982) ("*Weber*");

*United States v. Energy Resources*, 74 I.B.L.A. 117 (1983) ("*Energy Resources*").

2A. We have considered certain commentaries on the law of mining which, through their masterful insight into the specialized field of mining law, have contributed greatly to mining law jurisprudence. These treatises include *American Law of Mining*, Rocky Mtn.Min. Law Foundation (Mathew Bender and Co.) (2d ed. 1984); *Legal Study of Oil Shale on Public Lands*, prepared by the University of Denver College of Law, Professors Widman and Brightwell, eds., for the Public Land Law Review Commission, Hon. Wayne Aspinall, Chrmn, (1969); *Morrison's Mining Rights* (14th ed.); *Lindley on Mines* (3d ed. 1914); and *American Mining Law*, Bulle-

## I. SUMMARIZATION OF HOLDINGS

This opinion addresses all matters raised in the pleadings and referred to by the appellate court on remand. Due to the length and complexity of the issues raised, the following summary of holdings is set forth.

1. Since passage of the Mineral Leasing Act of 1920, there can be no private ownership of oil shale lands except as provided in the Savings Clause of the Act.

The mining claims in these proceedings (except where otherwise noted) were properly located prior to 1920 and have been maintained in compliance with the laws under which initiated. They are also valid under the Savings Clause of the Mineral Leasing Act of 1920. Therefore, no impediment exists to reducing the claims to patent and passing into the ownership of plaintiffs.

2. The Green River Formation, as the geological exposure along the Green River in Wyoming was known in the 1860's, was publicly recognized along the Colorado River as early as 1874.

It was known, for instance, that the oil shale beds were interspersed with non-oil-yielding material (e.g. sandstone), and that the richest oil shale beds were in the middle portion of the Formation.

It has been judicially recognized that during the period that the oil shale placer mining claims in question were located (prior to enactment of the Mineral Leasing Act of 1920), "the geology of the Green River Formation was obviously well known, uncomplicated, and the beds were conspicuous." *Shell v. Andrus*, 591 F.2d 597, 599 (10th Cir.1979), *affirmed*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

3. Section 28 of Title 30 of the United States Code provides that the Secretary of Interior may void an oil shale claim for lack of substantial compliance with the statute requiring annual assessment work. The Supreme Court has ruled that such "substantial compliance" requires only a good faith effort on the part of the locator to develop the claim and facilitate the eventual extraction of the mineral from the earth, and actual and strict compliance is not necessary. *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) (hereinafter cited as *Tosco or Hickel*). *See also United States v. Locke*, —— U.S. ——, ——, 105 S.Ct. 1785, 1796, 85 L.Ed.2d 64 (1985).

4. Absent questions of abandonment (not present in claims here), nonperformance of assessment work *per se* does not automatically terminate valid oil shale claims that were in existence prior to the passage of the Mineral Leasing Act of 1920. 30 U.S.C. § 28.

5. Rules promulgated by Interior with respect to oil shale claims had the force and effect of law and after being in constant existence for an extensive period of time, could not be capriciously and retroactively repudiated by the department. 5 U.S.C. § 551(4).

5a. Legal precedents and a thirty year span of Interior decisions, rules, standards and directives dealing with the Savings Clause and annual assessment work indicate that the departure post-1961 by Interior from its pre-1961 policy triggered the start of an uncertain and unpredictable course by Interior. Because of contradictory positions taken by Interior since the 1960's, the validity of pre-1920 oil shale claims has been thrown into uncertainty. Furthermore, the recent inconsistent course taken by Interior has clouded mining law jurisprudence and placed it in a state of flux.

6. Public statements by Interior officials to the effect that nonperformance of assessment work would not adversely affect the validity of oil shale claims constitutes a legislative rule having the force and effect of law and continued to have vitality against later actions seeking to cancel claims on the basis of nonperformance. The requirements of this principle are met because the public statements were (a) within the designated powers of the depart-

tin 123, Division of Mines, State of California,

Department of Natural Resources (1943).

ment whose duty it was to administer public lands and applicable mining laws; (b) reasonable; (c) consistent and unequivocal; and (d) emanated from executives of Interior within their area of responsibility. 5 U.S.C. § 551(4).

7. Administrative interpretation of an act or law is to be given special weight when (a) the interpretive rule embodies a construction made contemporaneously with enactment of a statute or judicial decision; (b) a judicial decision necessitates administrative interpretation; or (c) the interpretive regulation or policy is of long standing. 5 U.S.C. § 551(4). These factors are present here where the department has maintained a lengthy practice of holding that nonperformance of annual assessment work will not affect the validity of mining claims.

Interpretation and pronouncements by the Secretary of Interior and rules promulgated thereby following a Supreme Court decision holding that the government had no authority to cancel mining claims for failure to perform annual assessment work (as prescribed in a mining statute) became an integral part of mining law and in fact had force and effect of law to the same extent as though written into the applicable statute. 30 U.S.C. § 28.

8. Oil shale claim holders and their successors in interest were entitled to rely on uniform and announced policy of the Department of Interior removing nonperformance of annual assessment work as ground for challenge, invalidation or denial of a patent.

9. All contest decisions voiding for nonperformance of annual assessment work the oil shale claims involved in these proceedings and owned by plaintiffs, or their predecessors in interest, were unequivocally and permanently vacated by the Interior Department in *The Shale Oil Company*, 55 I.D. 287 (1935).

10. Since *The Shale Oil Company*, 55 I.D. 287 (1935) vacated decisions voiding claims on the basis of nonperformance of assessment work, the Interior Department pursued two consistent and unswerving national policies, namely (a) that pre-1935 contest proceedings had in fact been completely and finally vacated and were of no further effect to invalidate oil shale mining claims or prevent their being patented, and (b) that the performance of $100 of assessment work each year was irrelevant to perfecting or maintaining the validity of a pre-Mineral Leasing Act oil shale placer claims as against the United States (except insofar as necessary to satisfy the requirement that $500 of development work be performed prior to patent).

These policies were evidenced by official public statements, agency regulations and departmental actions. The course of conduct on the part of the Interior Department was neither erroneous, unauthorized nor improper, but represented the implementation of the Interior Secretary's and department's understanding and construction of *Wilbur v. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), and *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). It was also consistent with Interior Department regulations on the effect of nonperformance of annual assessment work which were unchanged until September, 1972.

11. The Interior Department cannot retroactively reverse its official position regarding the ineffectiveness of the old contest decisions and the irrelevance of performing annual assessment work to maintain the validity of oil shale claims. The department *cannot* now deny patents on these claims for nonperformance of assessment work in years prior to 1972.

12. Assessment work contest decisions, here in question, are nullities and invalid from time of judgment because the contests by the department failed to specifically state a principal claim for relief, namely that there was a lack of substantial compliance with assessment work requirements by the claimants. Such an allegation was critical in affording fair notice to holders of mining claims.

13. Given the regulatory and mining law history of oil shale placer mining

claims, the performance of the aggregate amount of $500 of development work by the claim owners constituted substantial compliance with assessment work requirements entitling claim holders to issuance of patents. The long-established doctrine that the United States had no interest in whether assessment work was performed, that being a matter solely to determine priorities under the mining laws between rival private claimants, changed with the Supreme Court's 1970 decision in *Hickel*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193. In that case, the Supreme Court construed the Savings Clause of the Mineral Leasing Act as having created some right in the United States with respect to the performance of work on claims for Leasing Act minerals and it introduced the doctrine of "substantial compliance" with the assessment work requirement of 30 U.S.C. § 28.

In *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) (*"Hickel"*), the Supreme Court set forth three principles: (a) annual assessment work had to be more than "token" but something less than full compliance; (b) annual work defaults were not the evidentiary equivalent of abandonment; and (c) compliance with the assessment work requirement should be "substantial". The Court did not delineate what amount of work was sufficient to "maintain" a claim in circumstances other than those involved in *Krushnic, supra* and *Virginia-Colorado, supra*. Rather than overruling *Krushnic* and *Virginia-Colorado*, it construed them as instances in which the annual work had been performed sufficiently to "maintain" the claims. 400 U.S. at 52, 91 S.Ct. at 199.

In two subsequent cases before the Interior Board of Land Appeals, the Board held that $100 worth of assessment work must be performed each and every year, up to the issuance of Final Certificate, and any default warrants the invalidation of a claim for lack of substantial compliance. *United States v. Bohme*, 48 I.B.L.A. 267, 87 I.D. 248 (1980) (*Bohme*); *United States v. Weber Oil Co.*, 68 I.B.L.A. 37 (1982). This view is clearly inconsistent with the *Hickel* decision, for in *Hickel* the Court plainly held that something measurably *less* than full and literal compliance is sufficient. In both *Krushnic* and *Virginia-Colorado*, there had been an assessment work default of at least one year (several years in the latter case, including 1932–1935, while the case was being appealed), and yet *Hickel* construed those as cases in which there had been "substantial compliance" with the assessment work requirement. In short, *Hickel* necessarily establishes that assessment work need *not* have been performed in every single year.

Both logic and authority support the conclusion that an oil shale claimant who has met the $500 patent work requirement should be held to have substantially complied with the assessment work requirement and thus satisfied the *Hickel* test for issuance of a patent.

*First* under the mining statutes, assessment work and the $500 worth of work needed to obtain a patent were required for the same purposes, and the same work or the same kind of work satisfied both requirements. The purposes were to demonstrate the mineral character of the land, encourage mineral development and to evidence the good faith of the claimant in seeking mineral development rather than agricultural, timber or residential values.

*Second*, the $500 patent work requirement represents a Congressional determination that when that much work has been done, all else being regular, the United States will convey fee simple title to the land embraced within the claim. In other words, that amount of work will satisfy the interest of the United States, as declared by Congress, as to the good faith efforts of the applicant to develop mineral lands for mineral purposes.

*Third*, compliance with work requirements sufficient to divest the United States of all of its interest in the claim forever should logically be sufficient to successfully maintain a claim for subsequent challenge by the United States. The greatest interest that the United States has, or can

grant, is outright ownership; it would be illogical to construe the law to mean that, although the United States recognized that sufficient mineral development work had been done to entitle a claim owner to a patent, the United States still could invalidate a claim if additional assessment work for a given year had not been accomplished at an earlier time.

The proposition that satisfaction of the $500 patent work requirement will maintain a claim within the Mineral Leasing Act finds support in *Hickel*. The Court in *Hickel* referred to *Krushnic* and *Virginia-Colorado* as reflecting "fair treatment for claimants who have substantially completed" the assessment work requirement. 400 U.S. at 52, 91 S.Ct. at 199. This seems clearly to imply that there is a point at which the interest of the United States is satisfied. The Court also stressed that Congress had recognized that discovery alone would not "perfect" a claim within the meaning of the Savings Clause of the Mineral Leasing Act, since a "claimant would not be entitled to a patent unless he had performed $500 worth of work, and in a just sense his claim would not be protected." *Id.* at 55, 91 S.Ct. at 200 (quoting Senator Walsh). The Court read this as vesting in the United States an interest in the performance of annual work. It suggests strongly that Congress thought that once $500 worth of work had been performed, a claim "in a just sense ... would ... be protected." *Id.*

To the same effect, the Court explained that *Krushnic* was a case where "labor in the statutory amount had been performed, including the aggregate amount of $500." *Id.* at 51, 91 S.Ct. at 198. Clearly, that "aggregate amount" had maintained the oil shale claim at issue in *Krushnic*.

The most reasonable interpretation to be given to the Supreme Court intermingling in *Hickel* the annual assessment work concept and the requirement of $500 worth of work to qualify for patent is that the substantial compliance requirement is completed when at least $500 worth of work has been performed for a claim. Whatever interest the United States has in substantial compliance is satisfied once sufficient work has been performed to meet the statutory criterion for the passage of *full title* from the United States to a patent applicant.

14. Applying the substantial performance test approved by the Supreme Court and considering work done on claims in these proceedings, the amount of annual assessment work performed constitutes sufficient compliance with statutory and decisional requirements to entitle claim holders to patents.

15. From a totality of the evidence presented at the contest hearings, the Department of Interior failed to meet its burden of establishing a lack of substantial compliance with the annual assessment work requirement. Thus, its efforts to invalidate claims must fail. The government failed to meet its burden because it relied solely on the absence of recorded affidavits or other recorded evidence of performance of assessment work. There was no legal requirement to file or record affidavits of labor for assessment work prior to 1979 when the relevant provisions of the Federal Land Policy and Management Act of 1976 became effective.

16. The unequivocal holding of the Supreme Court in *Andrus v. Shell Oil Co.* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) restores the ruling of *Freeman v. Summers*, 521 L.D. 201 (1927) to full force.

The following principles evolving from *Freeman v. Summers*, form an integral part of mining law and are applicable here. *First*, a finding of lean surface deposits on the Green River Formation warrants the geologic inference that the claim contains rich valuable deposits below the surface. *Second*, this principle holds true irrespective of whether the Green River Formation is considered as one homogenous mass or whether barren pads exist between the upper geologic formation and the lower formation. *Third*, a lean surface out-cropping or "thin sliver" on the surface of the claim in the Green River Formation constitutes a valid discovery because of the sound geologic inference that rich, workable oil shale

deposits were present at lower depths in the same formation, although divided from the lean surface exposure by other strata containing lean oil shale beds and non-oil yielding sandstone. *Fourth,* a valid discovery is not dependent on a quantum or minimum oil yield from destructive distillation of the outcroppings. *Fifth,* oil shale is a valid mineral. *Sixth,* present profitability is not a requisite to valid discovery and patentability.

17. As articulated in *Freeman v. Summers* and re-enforced in *Andrus v. Shell,* a valid discovery of oil shale exists where the claim is known to be underlain by the rich oil shale beds of the Green River Formation and where a surface exposure or outcrop of marlstone ("shale") appears which yields any oil on destructive distillation. This rule of discovery applied prior to February 25, 1920 and is determinative of the discovery issue in these proceedings.

18. For many years, the official policy of the department was that non-performance of annual assessment work was not a condition for issuing a patent. The department does not *now* have the express or inherent power to abrogate this 30 year-old policy and replace it with a new and totally conflicting position which so drastically affects the rights of so many claim holders.

19. Upon a valid discovery being made and proper location, a mining claim is real property and, although legal title to the land remains in United States, the mining claimant enjoys a valid, equitable, possessory title, subject to taxation, transferrable by deed or devise and otherwise possessing all incidents of real property. This title cannot be unreasonably or unfairly canceled at the unbridled discretion of the Interior Department. Mineral Lands Leasing Act, 30 U.S.C. § 181 *et seq.,* § 21 *et seq.* and § 28. While an administrative agency may reverse itself and change its policies where interests in property are involved, it must do so without being arbitrary or unreasonable.

20. It is recognized that estoppel against the federal government is an ex-

traordinary remedy to be applied with greatest care and circumspection.

The United States is estopped from asserting the invalidity of oil shale claims based on prior contest adjudications of failure to perform assessment work where (a) the Secretary of Interior, in response to Supreme Court decisions, had specifically overruled all departmental decisions purporting to invalidate oil shale claims for failure to perform assessment work, and (b) had dismissed contest proceedings pending against oil shale claims and systematically issued patents for 27 years to other oil shale claim owners whose claims had purportedly been invalidated for failure to perform assessment work prior to the Supreme Court decision. Mineral Lands Leasing Act, 30 U.S.C. § 28 and § 193.

21. The government may be estopped by the conduct of its agents acting within the scope of their authority. However, the government is immune from estoppel when the conduct of its agents is erroneous, illegal or unauthorized. In this case, the agents responsible for the department's 30 year-old policy on oil shale claims *were* acting within the scope of their authority. Consequently, the government is now estopped from asserting the invalidity of mining claims based on old contest proceedings where the invalidation took place over 30 years earlier and where, since that time, the government (a) continuously stated those proceedings were vacated and voided; (b) issued patents to other oil shale claim holders whose claims had purportedly been invalidated for the same reason; and (c) pursued a continuous course of conduct, clearly indicating that it did not recognize the validity of the contest proceedings.

In addition, the result is also prompted by a need to lay to rest perpetual piecemeal title challenges of mining claims to oil shale lands that constitute clouds on claims.

22. The principles of discovery embodied in *Freeman v. Summers,* 52 L.D. 201 (1927) and consistently applied to oil shale claims by the Interior Department until 1961 were neither erroneous, unauthorized nor improper. They involved the formula-

tion, promulgation and maintenance of interpretative and legislative rules that are an integral part of mining law and have the force and effect of law. These rules could not be capriciously and retroactively repudiated by the Interior Department in 1961, and cannot now be retroactively reversed.

23. The Interior Department, acting through its respective Secretaries, cannot retroactively reverse its official pre-1961 discovery requirements for issuance of patents to oil shale claims and now deny patents to these claims on the basis of different, more restrictive standards of discovery.

Prior to 1972 the department took no action to cancel claims on the grounds of failure to substantially comply with assessment work requirements. The Interior Department is now barred by the equitable doctrine of laches from asserting the effectiveness of the old assessment work contest decisions on the grounds of failure to substantially comply with assessment work requirements.

24. Under mining law in existence at the time of passage of the 1920 Mineral Leasing Act, failure to perform annual assessment work did not constitute an immediate forfeiture of the claim; nor did it render an immediate cancellation of the claim.

25. The present profile of mining law as it relates to oil shale through its historical background and as interpreted in *Hickel v. Oil Shale Corp., supra*, requires substantial and not rigid literal adherence to the statutory annual assessment work requirement; further, that to maintain the validity and vitality of the claim, annual assessment work does not have to be performed in every year.

26. As applied to the unique facts in these proceedings, the valid discovery of a mining claim constitutes a *condition precedent* to a grant by the United States of an interest in real property which bestows upon the locator the right to immediate and exclusive possession. 30 U.S.C. § 26 provides in part that "[t]he locators of all mining locations ... on the public domain ... so long as they comply with the laws of the United States ... shall have the exclusive rights of possession and enjoyment...". Therefore, this possessory interest in real property is subject to the above-noted *condition precedent* which involves such questions as discovery of minerals and fulfillment of requisites regarding location procedures for claims. No possessory title passes to the locators until the *condition precedent* has been performed.

Once a valid location has been made and possessory title has passed to the claimant by operation of law, the only way it may become subject to divestiture or forfeiture is through the occurrence of a *condition subsequent,* the occurrence of which may extinguish the claim. But while the claimant has the burden of proving the occurrence of the *condition precedent* which must be met *before* a valid mining claim exists, the party seeking forfeiture or invalidation after the possessory interest has vested has the burden of proving the occurrence of the *condition subsequent,* that is, the failure to perform the annual assessment work. A charge of non-performance of annual assessment work by the department must be proved by "clear and convincing" evidence. The department has the burden of producing evidence and the ultimate burden of proving a default in performance.

From a totality of the evidence presented at the contest hearings, the Department of Interior failed to meet its burden of establishing a lack of substantial compliance with the annual assessment work requirement. Thus, its efforts to invalidate claims fail. By way of explanation, the government failed to meet its burden of establishing nonperformance of annual work because it relied solely on the absence of recorded affidavits or other recorded evidence of performance of assessment work. There was no legal requirement to file or record affidavits of labor for assessment work prior to 1979 when the relevant provisions of the Federal Land Policy and Management Act of 1976 became effective.

27. It is the general rule and recognized principle in mining law that failure to file an affidavit does not work a forfeiture of the claim or constitute evidence that the work in question was not in fact performed. Federal law in existence during the contest period does not require that an affidavit of annual assessment work be filed or recorded in addition to the performance of annual work.

28. To constitute a valid contest of a mining claim the government must file its allegations of nonperformance of annual work while a default is present and prior to resumption of work by the claimant or locator. Such a requirement existed prior to the holding in *Hickel v. Oil Shale Corp., supra,* to wit: that a relocation must take place by a relocator during a period of default and before commencement of resumption of work. In the case where a claimant (a) fails to perform assessment work for one or more years and he resumes annual work prior to contest by the government and (b) substantially prosecutes such work until he has performed one or more years work, his claim is protected and insulated from cancellation. The effect is as though a failure had never occurred.

29. Service of notice of contest proceedings in mining claims were commenced during the early 1930's against virtually all mining claims by the use of registered mail. For the most part, few claim owners or contestees in those contests had an address of record with the department. It is uncontroverted that notice was not sent to the post office nearest the lands in dispute (or to any post office). Since Circular No. —— of The Interior Department did not provide for registered mail service where there was no address of record with the department, notice was not appropriately given and no proper service was effectuated. The decisions in the old contests that purported to invalidate interests in the contested claims were a nullity and invalid since they were rendered in the absence of personal jurisdiction and notice as provided by law.

30. Each co-owner of an association placer mining claim is an indispensable party to any contest or proceedings to cancel the claim. Therefore failure to properly effectuate service of process and joinder of all co-owners marks a deficiency in any action seeking to invalidate the claim for nonperformance of assessment work. Such proceedings are a nullity when all co-owners of a claim are not joined in the proceedings.

All co-owners were not joined and served with notice and process in the cancellation proceedings arising from assessment work contests against mining claims involved in Civil Action No. 8680.

The nonjoinder of indispensable parties under the assessment work contests renders the proceeding ineffective and a nullity as to all co-owners of the claims.

Contest decisions where nonjoinder exists cannot be used as a basis for invalidating the oil shale claims in question or rejecting patent applications arising therefrom.

31. The Department of Interior in 1916 adopted specific criteria to determine the quantity and quality of oil shale necessary to render land mineral in character. (*See* Ex. G–98). These criteria addressed such matters as the vertical thickness of oil shale beds, average oil yield content and the depth of the beds below the surface of the land.

All of the ten-acre tracts at issue in these proceedings were classified as mineral in character in 1916. This classification carries over to the lands involved in this action. The 1916 classification and subsequent application in the processing of patent applications was an integral part of the department's consistent application of the principles of the mining law to the unique geology of the Green River Formation for the 45 year period from 1916 until 1961 when the department determined to deny the patentability of all oil shale mining claims. This change does not find support in law.

Thus, by standards existing at the time of passage of the 1920 Mining Act, the

claims covering the lands in question were classified as mineral. The Savings Clause of the Mineral Leasing Act (section 37) militates against a change in the classification that would impose a different and more stringent standard.

32. Written statements made by mineral examiners during the department's campaign in the 1920's and early 1930's to contest claims do not establish failure of substantial compliance with the assessment work requirement.

33. Without more, affidavits from locators and claim owners obtained by department personnel years ago do not establish failure of substantial compliance with the assessment work requirement.

34. Another principal element of the department's case on the assessment work issue has been the purported absence of physical evidence on the earth indicating assessment work had been done. It is pertinent to note, however, that conditions in the oil shale region preclude reliance upon the results of current physical examination of the earth to determine what work was done in the past.

35. Assessment work excavations and road building performed on or for the benefit of the claims in these contests are subject to being eroded, sloughed in and covered by the growth of vegetation.

36. Mining claim holders have fulfilled necessary requirements for patents or have otherwise established entitlement thereto. Therefore, no valid bases are present to preclude issuance of patents.

## II. INTRODUCTION AND OVERVIEW

### A. The Litigation

In this consolidated proceeding plaintiffs (claimants) seek judicial review and relief with respect to administrative proceedings in the Department of Interior concerning the validity of a number of unpatented oil shale placer mining claims located on the Green River Formation in Colorado. The subject claims were located under the provisions of the Mining Act of 1872 and prior to the enactment of the Mineral Leasing Act of 1920, see 30 U.S.C. § 21, *et seq.* and 30 U.S.C. § 181. The proceedings came before the court on cross motions for summary judgment.

Plaintiffs Umpleby, Napier and Brown, in Civil Action Nos. 8685, 8691 and 9202 seek mandatory orders compelling the department to issue patents on their oil shale claims. Plaintiff *Tosco*, in Civil Action No. 8680, requests a declaratory judgment regarding the validity of its claims. The three cases which are now administratively final specifically involve patent applications for the Carbon and Elizabeth claims (Civil Action No. 8685), Compass claims (Civil Action No. 8691), and Oyler claims (Civil Action No. 9202). The noted claims were rejected in *Union Oil Co. of California,* 71 I.D. 169 (1964) (*"Union Oil I"*). These claims also include three for which no patent application was pending in 1962[3] (No. 8680, the Atlas, Bute, and Camp Bird claims).

In the interest of brevity, the recitation of specific facts respecting plaintiffs' claims are adopted by reference as they appear in the Appendix to the Supreme Court's opinion in *Hickel v. Oil Shale Corporation,* 400 U.S. 48, 59, 91 S.Ct. 196, 202, 27 L.Ed.2d 193 (1970) (hereinafter cited as *Hickel* or *Tosco*) and a prior district court opinion in these cases, *Oil Shale Corp. v. Udall,* [3A] 261 F.Supp. 954 (D.Colo.1966).

By way of background, in 1962 the Department of Interior rejected the patent

---

**3.** Subsequently, in 1977, patent applications were filed for seventy-four of these claims. It is these applications which have not yet been processed by the department, hence the different posture of the Bute, Atlas, and Camp Bird claims on this motion. The old assessment work contest proceedings as to these claims, however, involved procedural irregularities of the kind ruled on in *Union Oil Co.,* 72 I.D. 313

(1965), as to which was sought partial summary judgment as well as the validity of the claims in issue.

**3A.** Honorable Stewart L. Udall was Secretary of Interior in 1961–1969 during the period when the oil shale policy of Interior changed. That change, in part, forms the genesis of the litigation. Honorable Donald P. Hodel became Secretary of Interior in March 1985.

applications of plaintiffs Umpleby, Napier and Brown. The basis for the rejection was the existence of decisions entered in contest proceedings initiated against the claims in the 1930's by the department. The claims were primarily declared void for failure to perform annual assessment work. This action by Interior, acting through its District Manager, reflected a new policy of the department and was a complete departure from the policy of Interior announced in 1935 in *The Shale Oil Company*, 55 I.D. 287 (1935). The prior policy had been rigidly followed for 30 years.

The Manager's decision was affirmed in *Union Oil Co.*, 71 I.D. 169 (1964).

In 1964, the plaintiffs filed these suits in the district court and since that time the litigation has traveled an irregular path in all levels of the district and appellate federal courts. In addition extensive administrative proceedings have taken place.[3B]

## B. *Mineral Leasing Act of 1920*

These proceedings involve an interpretation of the Mineral Leasing Act of 1920 which expressly prevents location of new oil shale claims after the date of its enactment, February 25, 1920. The Act provides that oil shale and other fossil fuels could only be extracted on a lease basis, and the land containing such minerals could not pass into private ownership based on new claims being filed and reduced to patent. Significantly, the Act contains a "Savings Clause", found in Section 37. This clause provides that claims located prior to the enactment of the Act could be reduced to patent and pass into private ownership if "thereafter maintained in compliance with the law under which initiated." 30 U.S.C. § 193. It should be noted that the Savings Clause has been the source of varied interpretations and has prompted considerable litigation.

Supreme Court opinions discussed here as well as administrative, district court and court of appeals' decisions are illustrative of the disputes and uncertainties that have prevailed over the interpretation of the Savings Clause and whether specific claims, like the instant ones which predate the 1920 law, were maintained in compliance with the law. Another area of controversy under the Savings Clause relates to the necessity of performing annual assessment work to maintain oil shale claims and the extent that statutes and decisional law recognize exceptions to rigid compliance.

It is clear from a reading of legal precedents and a span of thirty years of Interior decisions, rules, standards and directives regarding the Savings Clause of the Mining Act that the 1960's departure by Interior from that longstanding policy signaled the beginning of an uncertain and unpredictable course of conduct by Interior. Because of varied positions taken by Interior since the 1960's, the validity of pre-1920 oil shale claims has been thrown into uncertainty. Furthermore, the recent inconsistent course taken by Interior has clouded mining law jurisprudence and placed it in a state of flux. This ambiguous state of mining law prominently appears in the literature.[4]

---

**3B.** Legal descriptions of the claims involved in these actions are on file with the Clerk of the Court, United States District Court for the District of Colorado.

**4.** The confusion and uncertainty surrounding the issue of the validity of pre-1920 oil shale claims and assessment work is evidenced by emerging commentary such as Blair, *Cancellation of Oil and Gas Leases—An Administrative or Judicial Function?*, 51 Geo.L.J. 221 (1963); Blumenschein & Colvert, *Performance of Assessment Work on Unpatented Mining Claims*, 4 Nat. Resources L. 251 (1971); Cooley, *Physical Background—Oil Shale*, 59 Q. of Colo.Sch. of Mines 135 (1964); Craig, *Representations by Public Bodies*, 93 L.Q.Rev. 398 (1977); Crouch, *Title to the Unpatented Mining Claim*, 23 Rocky Mtn. Min.L.Inst. 879 (1977); Delaney, *Water for Oil Shale Development*, 43 Den.L.J. 72 (1966); Flora, *Oil Shale and the Mining Laws*, 27 Dicta 195 (1950); Hill, *Placer Mining Claims—Selected Problems and Suggested Solutions*, 23 Rocky Mtn.Min.L.Inst. 385 (1977); Knutson & Morris, *Locating, Maintaining, and Patenting Groups or Large Blocks of Mining Claims*, 26 Rocky Mtn. Min.L.Inst. 517 (1980); Lohr, *Conclusiveness of Oil Shale Placer Mining Claim Patents*, 43 Den. L.J. 24 (1966); Marsh & Sherwood, *Metamorphosis in Mining Law: Federal Legislative and*

## III. PRIOR PROCEEDINGS IN THIS AND OTHER OIL SHALE LITIGATION

The chronological framework of this litigation is briefly detailed in this section. An in-depth analysis of the pivotal legal and administrative cases follows later.

A. *The Period of the Mineral Leasing Act in 1920 to the Department's Change of Policy in 1964*

1. *Prior to 1920:* Oil shale claims could be located in the same manner as mining claims of other minerals. Unpatented mining claims were recognized as a unique estate in land, entitling the claimant to exclusive possession of his claim for mining purposes. This estate could be enlarged to a fee simple interest if the claim was patented.

2. *Mineral Leasing Act of 1920:* The Act removed oil shale lands from subsequent private appropriation under the mining laws and provided instead for a policy of leasing of oil shale lands from the government. Under the leasing system, private persons cannot acquire ownership of mineral lands but merely have the right to extract minerals. They pay royalties to the government for leasing privileges. Section 37 of the Act (the Savings Clause), 30 U.S.C. § 193 provides a mechanism for preservation of previously located claims, if maintained, under the applicable mining laws.

3. *1920's and 1930's:* All the claims here involved, and other like claims, were declared wholly or partially invalid by the department on the grounds that they had not been properly maintained within the meaning of Sections 28 and 37 of the Mineral Leasing Act. The principal basis of the invalidation was that annual assessment work had not been performed on the claims.

The rationale of the department in denying validity of claims and refusing patents succinctly stated is this: that the Mineral Leasing Act placed the government in the

*Regulatory Amendment and Supplementation of the General Mining Law Since 1955,* 26 Rocky Mtn.Min.L.Inst. 209 (1980); Meek, *Records, Documents and Services of the Colorado Land Office, Bureau of Land Management,* 43 Den.L.J. 83 (1966); Mock, *The Oil Shale Advisory Board,* 43 Den.L.J. 47 (1966); Moran & Ebner, *The Mineral Patent,* 24 Rocky Mtn.Min.L.Inst. 269 (1978); Morris, *The Middle Initial,* 37 Dicta 361 (1960); Nelson, *Assessment Work—Before and After the Oil Shale Case,* 17 Rocky Mtn.Min.L. Inst. 435 (1972); Outerbridge & Sherwood, *Recordation and Filing of Unpatented Mining Claims and Sites with the Federal Government,* 21 Ariz.L.Rev. 433 (1979); Reidy, *Do Unpatented Oil Shale Mining Claims Exist?,* 43 Den.L.J. (1966); Schmidt, *Status of Unpatented Mining Claims,* 59 Q. of Colo.Sch. of Mines 125 (1964); Schopflacher, *The Doctrine of Res Judicata in Administrative Law,* 1942 Wis.L.Rev. 5 (1942); Steadman, *"Forgive U.S. Its Trespasses?": Land Title Disputes With the Sovereign—Present Remedies and Prospective Reform,* 1972 Duke L.J. 15 (1972); Turner, *Problems Incident to Unpatented Mining Claims Assessment Work Requirements,* 3 Rocky Mtn.Min.L.Inst. 455 (1957); Comment, *Andrus v. Shell Oil Co.: The Devaluation of the Value Standard,* 60 Or.L.R. 325 (1981); Comment, *Andrus v. Shell Oil Co.: Portent for the Future?,* 11 Envtl.L. 721 (1981); Comment, *Mining Law: Annual Assessment Work, New Directions, the Need to Include Antiquities Surveys,* 20 Nat. Resources J. 933 (1980); Comment, *The "Associated Minerals" Dilemma and the New Federal Oil Shale Policy,* 39 Colo.L.Rev. 370 (1967); Note, *Government Initiated Contests Against Mining Claims: A Continuing Conflict,* 1968 Utah L.Rev. 102 (1968); Note, *Disputed Oil Shale Claims—Background and Current Conflict,* 51 Minn.L.Rev. 1154 (1967); Note, *Annual Assessment Work as Notice to Prospectors,* 6 Utah L.Rev. 391 (1937); Note, *Marketability and the Mining Law—The Effect of U.S. v. Coleman,* 10 Ariz.L.Rev. 391 (1968); 2 *American Law of Mining* §§ 45.04[1]–45.04[7] (2d ed. 1984); Davis, *Administrative Law of the Seventies* (1976); *Final Environmental Statement for the Prototype Oil Shale Leasing Program,* U.S. Department of the Interior (1973); *Annual Assessment Work Manual,* Don Sherwood, Editor, Rocky Mtn. Min.L.Inst. (1972); *Report on Economics of Environmental Protection for a Federal Oil Shale Leasing Program,* prepared for Director of Natural Resources of the State of Colorado, (January 1971), (Colorado Governor's Oil Shale Advisory Committee); *Legal Study of Oil Shale on Public Lands,* prepared by the University of Denver, College of Law, Professors Widman and Brightwell, Eds., for the Public Land Law Review Commission, Hon. Wayne Aspinall Chmn., (1969); *Hearings Before the Committee on Interior and Insular Affairs, United States Senate, 90th Congress, 1st Session, On the Federal Oil Shale Program,* (February 21, 22, 1967, September 14, 15, 1967).

position of an adverse or rival claim locator. As an adverse locator and claimant the government could raise numerous objections to issuance of a patent including nonperformance of annual assessment work. It was previously thought that these objections were unavailable to the government and could be raised solely by private non-government adverse or rival locators. During this period, however, the government took the view that a claim automatically terminated and inured to the government's benefit whenever there was a lapse in assessment work. The government's position was generally upheld in administrative proceedings in the Department of Interior.

4. *Supreme Court Opinions During the Period and Relevant Administrative Rulings: Wilbur v. U.S. Ex. Rel. Krushnic (1930) and Ickes v. Virginia-Colorado Development Corp. (1935).*

These two Supreme Court decisions held that the department's purported invalidations of oil shale claims for nonperformance of annual assessment work were improper. The first decision, *Wilbur v. U.S. Ex Rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), held that the department could not invalidate oil shale claims for nonperformance of assessment work if the work was resumed before contest proceedings were initiated. The second decision, *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935), went even further holding that the Secretary of Interior did not have jurisdiction to invalidate claims for nonperformance of assessment work since failure to do assessment work inured only to the benefit of rival claimants, not the government.

The case also held that prior to the enactment of the Mineral Leasing Act the government acquired no rights against a claimant by reason of failure of performance of annual assessment work and that the department's challenge in such a context "went beyond the authority conferred by law." *Id.* at 647, 55 S.Ct. at 890.

5. *The Shale Oil Company (1935 Interior Decision):* Following the decision of the Supreme Court in *Virginia-Colorado, supra,* the department took the position that its prior adverse decisions against oil shale mining claims for nonperformance of assessment work had been ineffective to invalidate the claims. The Secretary of Interior's ruling was clearly stated in *The Shale Oil Company,* 55 I.D. 287 (1935), which expressly overruled, vacated and reversed departmental decisions in conflict with *Virginia-Colorado.*

Thus, in an administrative adjudication, *The Shale Oil Company* ruling recognized that proceedings seeking to invalidate mining claims (oil shale) went beyond the authority conferred by law. Significantly, the decision stated that "[t]he above-mentioned decision in the cases of *Francis D. Weaver* and *Federal Oil Shale Company* and other departmental decisions in conflict with this decision are hereby overruled." 55 I.D. at 290.

Thereafter, until the early 1960's patents were regularly and consistently issued on claims that had previously been declared invalid in the late 1920's and early 1930's in default proceedings for failure to perform assessment work. Significantly, patents were issued for a number of oil shale claims where the claims had been previously invalidated.

In the period 1935–1961, Interior issued patents on 106 different applications for total of 768 oil shale claims in Colorado. Five hundred and seven of these claims, covered by seventy-one of the various applications, had been declared null and void prior to *Shale Oil* for nonperformance of assessment work.[5]

6. *Union Oil Company (1964 Interior Decision):* The Interior Department suddenly departed from its established posi-

---

5. See Plaintiffs' Exhibits 95 and 96 (tabulation and map of these claims) and Plaintiffs' Exhibits 97–141, 143, 146–154, 157–17 (files and documents relating to patents on these claims) which show the department's policy that pre-*Virginia-Colorado* voidances of claims for nonperformance of assessment work were considered vacated and no obstacle to patent.

tion, resurrected the old contest proceedings that were previously invalidated, reversed and overruled, and asserted that the prior administrative decisions (contest proceedings in the 1920's and 1930's) had never been set aside and were still effective to invalidate oil shale claims. In part, in this litigation we are reviewing the denial of patents prompted by the sudden change of policy by Interior.

In 1964, the department reversed its position as to the effect of the old assessment work decisions in *Union Oil Co. of California*, 71 I.D. 169 (1964) (*Union Oil*), *Supplemental Decision*, 72 I.D. 313 (1965). The decision held that although the old cancellation decisions were erroneous, nevertheless, they had become administratively final and *Union Oil* by its terms invalidated certain mining claims. On district court appeal, that holding was reversed in *Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo.1966). The *Udall* case was a forerunner to this litigation.

B. *The Period 1966–1970. Impact Cases: Oil Shale Corp. v. Udall, (D.Colo. 1966); Udall v. Tosco (10th Cir.1969); Hickel v. Oil Shale Corp. (Sup.Ct. 1970)*

As noted, in the early 1930's, the department, on behalf of the government, contested a great number of oil shale claims on the ground that annual assessment work had not been performed during certain years and declared claims void because of this noncompliance with 30 U.S.C. § 28.

In *Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo.1966), plaintiffs (oil shale claimants) argued that these voidances of their claims in the 1930's were themselves invalid. They claimed there had been no subject matter jurisdiction for the department to invalidate the claims for failure of assessment work. It was also contended that under established mining law only rival locators could take over mining claims on which assessment work had not been performed. However, nonperformance of annual work did not provide a basis for the voidance of these claims at the instance of the government. Hence, they argued that nonperformance of assessment work was not a requirement for the maintenance of a claim within the meaning of § 37 of the Leasing Act, and the department had no jurisdiction for voiding the plaintiffs' claims on that basis.

The district court upheld the position of the plaintiffs stating that the old contest proceedings voiding the claims were invalid, and the department had exceeded its jurisdiction in voiding the claims for assessment work failure. *Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo.1966). The opinion, in part, was based on a series of Supreme Court opinions including *Wilbur v. Krushnic, supra*, and *Ickes v. Virginia-Colorado Development Corp., supra*. These cases were interpreted by the district court to hold that the Secretary did not have jurisdiction to invalidate claims for nonperformance of assessment work.

On appeal, the trial court's ruling was affirmed. *Udall v. Oil Shale Corporation*, 406 F.2d 759 (10th Cir.1969) (Seth, J.). Appeal to the Supreme Court followed.

In *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) (*Hickel*), the Supreme Court reversed the holding of the district and circuit courts. Justices Harlan, White and Marshall did not take part in the decision. Chief Justice Burger and Justice Stewart dissented.

The Supreme Court plurality opinion by Justice Douglas held: that *Krushnic* and *Virginia-Colorado* had been erroneously applied by the lower courts; that since further location of mining claims was precluded by the Mineral Leasing Act, failure to perform assessment work could not be the basis of any relocation by a rival locator; therefore the United States was the beneficiary of any claims on which assessment work had not been performed. *Id.* at 57, 91 S.Ct. at 201. The Supreme Court concluded that the department had subject matter jurisdiction to void claims if the assessment work performed on them did not amount to "substantial compliance" with 30 U.S.C. § 28. *Id.* The holding of

the lower courts was reversed on an extremely limited ground.

Significantly, the Court did not overrule *Krushnic* and *Virginia-Colorado*, (which fact was the basis for the dissent of Chief Justice Burger and Justice Stewart), but left a "narrow ambit" occupied by those cases in which a claimant who had *substantially complied* with the assessment work requirement could shelter and preserve his claim. *Id.* at 58, 91 S.Ct. at 201.

The Supreme Court went on to hold in *Hickel*, that *Krushnic* and *Virginia-Colorado* were cases that merely reflected "a judicial attitude of fair treatment for claimants who have substantially completed the assessment work required by 30 U.S.C. § 28". *Id.* at 52, 91 S.Ct. at 199. It also held that other pronouncements in those cases were dicta. The court agreed that every default in assessment work should not result in forfeiture and that the department had subject matter jurisdiction over contests involving the assessment work issue. With respect to the effect of *Shale Oil Co.* (1935) and the departmental policy of patenting claims that had been invalidated under the old decisions, the Court stated:

> [t]hese contentions present questions not decided below. Therefore, on remand all issues relevant to the current validity of those contest proceedings will be open, including the availability of judicial review at this time. To the extent that they are found void, not controlling, or subject to review, all issues relevant to the invalidity of the claims will be open, including inadequate assessment work, abandonment, fraud, and the like. Likewise, all issues concerning the time, amount, and nature of the assessment work will be open so that the claimants will have an opportunity to bring their claims within the narrow ambit of *Krushnic* and *Virginia-Colorado*, as we have construed and limited these opinions.

400 U.S. 58, 91 S.Ct. 196, 27 L.Ed.2d 193.

Thus, even though confronted with numerous factual and legal issues, the sole issue decided was whether the Department of Interior has jurisdiction to inquire into the performance of annual assessment work.

The most recent interpretation of *Hickel* is found in *United States v. Locke*, —— U.S. ——, ——, 105 S.Ct. 1785, 1796, 85 L.Ed.2d 64 (1985). In *Locke*, the Court rejected the argument that a filing deadline could be substantially complied with by filing documents one day late. The Court concluded that *Hickel's* "discussion of substantial compliance [was] inapposite to the statutory scheme at issue [in *Locke* ]" (43 U.S.C. § 1744). *Id.* at ——, 105 S.Ct. at 1796.

The assessment work requirement in *Hickel* was simply an indicia of a claimant's specific intent to retain a claim, according to the Court. Thus, full compliance with the assessment work requirement would establish conclusively an intent by the claimant to keep the claim. However, less than full compliance would subject the mine owner to a determination of whether he intended to keep his claim. It would *not* result in an automatic loss of the claim as occurred in *Locke*. *Id.*

In contrast, the Court in *Locke* determined that the intent of the mining claimant was simply not relevant if the necessary filing was not made. Title 43 U.S.C. § 1744 expressly provides that a claim would be lost if the party failed to file, in a timely manner, the documents required by federal law. No such provision is included in the assessment statute under consideration in *Hickel*. *Id.*

Significantly, the majority in *Locke* recognized that substantial compliance, as set forth in *Hickel*, was not a rigid concept. Rather, "less than full compliance would subject the mine owner to a case-by-case determination of whether he nonetheless intended to keep his claim." *Id.*

■ Considering *Hickel, Krushnic* and *Virginia-Colorado* in harmony, the current state of the law regarding the jurisdictional bases of departmental voidances of oil shale claims is this: the Secretary may void

claims for lack of annual assessment work required by Section § 28, but he *cannot* void claims for only a literal or insubstantial non-compliance with the requirement. The claims are protected from invalidation where substantial compliance with the annual assessment work requirement exists "so that the 'possessory title' of the claimant, granted by 30 U.S.C. § 26 will not be disturbed on flimsy or insubstantial grounds." *Hickel, supra,* 400 U.S. at 57, 91 S.Ct. at 201.

C. *The period 1970–1980. Additional court cases and Administrative proceedings. Oil Shale Corp. v. Morton, (D.Colo.1973); Oil Shale Corp. v. Morton, (10th Cir.1975); Bohme I (Interior Board Decision 1980).*

As a result of the Supreme Court ruling in *Hickel,* the case was remanded to the district court where it was designated as *Oil Shale Corp. v. Morton.* Following briefing of issues tried in 1966 but not previously decided the proceeding culminated in an opinion found at 370 F.Supp. 108 (D.Colo.1973). The district court ruled as follows: (1) the assessment work decisions relied on in *Union Oil* 71 I.D. 169 (1964) had been rescinded and vacated in *The Shale Oil Company* decision 55 I.D. 287 (1935); (2) the longstanding and widely publicized position of the department after 1935 to the effect that the old assessment work decisions were nullities and that performance of assessment work was not necessary to maintain the validity of an oil shale claim as against the United States constituted a rule of law which the department could not retroactively repudiate; (3) the department was estopped from asserting the validity of the old assessment work decisions; and (4) the original *Union Oil* decisions should be set aside for procedural deficiencies.

On appeal the Court of Appeals vacated the district court holdings and, while expressing no view as to its merits, remanded the case to the district court so that all

legal and factual issues could be ascertained before further appeal and that where necessary other issues be remanded to the Department of Interior for factual hearings at administrative proceedings. *Oil Shale Corp. v. Morton,* Order of Remand (10th Cir. Sept. 22, 1975), *cert. denied,* 426 U.S. 949, 96 S.Ct. 3169, 49 L.Ed.2d 1185 (1976).

### *Bohme I (1980) Interior Board Decision*

Following the Court of Appeals remand, the department initiated contests before an administrative law judge on assessment work issues. Discovery issues were held in abeyance pending the Supreme Court's decision on the point.

The Board also held that in assessment work contests, the department's burden of proof on assessment work was only to make out a prima facie case, the ultimate burden of establishing performance of annual work shifted to contestees (claimants).

On appeal, the Interior Board of Land Appeals in *United States v. Bohme,* 48 I.B.L.A. 267, 87 I.D. 248 (1980) (*Bohme I*), completely rejected the ruling of the administrative law judge [5A] that with respect to assessment work (a) only a reasonably persistent effort to perform annual assessment work is required under the applicable statute; (b) rigid compliance is not required; and (c) occasional failures of annual work are not fatal to validity of the claim. We note that the interpretation of *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) by the Interior Board of Land Appeals is totally at odds with the holding of the administrative law judge on the same legal point based on the same set of facts. Later in 1980, the Supreme Court resolved the matter of discovery in *Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) ("*Shell*").

*Bohme I* and *Bohme II,* discussed below, form part of the basis for cross motions for

**5A.** Where applicable by reference we incorporate findings of fact found in decision of Honorable Harvey C. Sweitzer, Administrative Law Judge (*Bohme I*) dated July 19, 1979.

summary judgment pending before us in this litigation.

### D. *Further Litigation on the Issue of What Constitutes Valid Discovery (Supreme Court 1980)*

Another facet to this litigation is the case of *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). That case is analyzed in Article VIII but because it interacts with this case brief comment here is necessary.

In 1964, the department also reversed its policy with respect to the important case of *Freeman v. Summers*, 52 L.D. 201 (1927) and instituted contests against certain claims. The basis of the contests was the allegation that there was no discovery on the claims because oil shale was not presently profitable to mine and that lean exposures of oil shale on the surface of the claims would not suffice to infer the existence of underlying rich deposits. After a long administrative hearing, the Chief Hearing Examiner of the department held that he was bound by *Freeman*. The Interior Board of Land Appeals upheld the department's position overruling *Freeman*. *United States v. Winegar*, 81 I.D. 370 (1974). On appeal, the U.S. District Court for the District of Colorado reversed the Board and upheld *Freeman* on several grounds and also held that the department, in any event, was estopped from taking the position that oil shale was not a valuable mineral. *Shell Oil Co. v. Kleppe*, 426 F.Supp. 894 (D.Colo.1977). The Tenth Circuit Court of Appeals affirmed without deciding the estoppel question. *Shell Oil Co. v. Andrus*, 591 F.2d 597 (10th Cir.1979) (Seth, J.). The Supreme Court affirmed. *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). The Supreme Court interpreted *Freeman* as having two distinct issues:

(1) whether a finding of lean surface deposits warranted the geological inference that the claim contained rich "valuable" deposits below; and (2) whether present profitability was a prerequisite to patentability. Both issues were decided in fa-vor of the oil shale claimant: the geological inference was deemed sound and the fact that there was "no possible doubt that [oil shale] constitutes an enormously valuable resource for future use by the American people" was ruled sufficient proof of "value".

446 U.S. at 667, 100 S.Ct. at 1938.

The Court concluded "that the original position of the Department of Interior, enunciated in the 1920 instructions issued by the Department of Interior and in *Free-man v. Summers, supra*, is the correct view of the Mineral Leasing Act as it applies to the patentability of those claims." 446 U.S. at 673. The Supreme Court rejected the rationale and holding found in *United States v. Winegar*, 81 I.D. 370 (1974) and fully endorsed the opinions of the appellate and district courts.

### E. *New Requirement for Valid Discovery Enunciated by Interior: Bohme II (1980) Interior Decision*

Following *Shell*, the Interior Board of Land Appeals issued a supplemental decision in the *Bohme* case, *United States v. Bohme*, 51 I.B.L.A. 97, 87 I.D. 535 (1980) (*Bohme II*), holding that "oil shale is now a prospectively valuable mineral with respect to which present marketability need not be shown" and that "as we read *Freeman v. Summers*, an exposure of the *Parachute Creek Member*, even though of limited extent, can be geologically inferred to embrace sufficient quantity of high grade oil shale so as to constitute a valuable mineral deposit". (Emphasis added).

The Interior Board of Land Appeals concluded that certain claims (Northeast and Southeast) were null and void for lack of valid discovery. We emphasize the fact that the adherence and reference to the Parachute Creek Member requirement by the Board is noted for the first time in *Bohme II* (1980). Nowhere does it appear in prior departmental decisions, directives or public announcements. To say the least, it is of recent vintage (no where previously submitted to this Court or for that matter

ever submitted to the Supreme Court in the related case of *Andrus v. Shell* ).

### F. Additional Administrative Decisions: United States v. Weber (1980 Interior Board Decision); United States v. Energy Resources Technology Land, et al, (1983 Interior Board Decision)

In 1981, the department initiated further administrative contests raising the assessment work and discovery issues in addition to issues alleging improper posting and marking, abandonment, lack of good faith, fraudulent location and invalidity based on previous decisions.[5B] On appeal (*United States v. Weber Oil Co., et. al.,* 68 I.B.L.A. 37, 89 I.D. 538 (1982) (*Weber*), the Board adhered to its rulings in *Bohme I* and *Bohme II* regarding the assessment work and discovery issues. The additional issues were dismissed on failure of burden of proof on the critical issue of discovery. The Board stated:

> The Parachute Creek member does outcrop, totally uncovered by the barren Uinta formation, at places where erosion has cut through the Uinta formation, such as along streams and drainages, thereby exposing the rich oil shale of the Parachute Creek member. As discussed below, some of the present claims contain such outcrops, and there is no question that there has been "discovery" on these claims.
>
> However, the principal surface deposits of oil shale found in the Uinta formation are not outcroppings of the rich Parachute Creek member, but are instead "tongues" of marlstone of inferior quality. Although these tongues of lean marlstone are thought to meet the Parachute Creek member at depth, they do so at great lateral distance from the surface outcroppings, on the order of tens of miles. Thus, these tongues of marlstone cannot be followed to depth to the rich

deposits of the Parachute Creek member within the limits of any mining claim. 68 I.B.L.A. 45.

### G. Additional Effort by Interior to Invalidate Patents: United States v. Eaton Shale Company (D.Colo.1977)

In another case involving oil shale, the question presented was whether prior contest decisions invalidating oil shale placer claims for lack of assessment work constituted *res judicata* and whether a patent properly issued by Interior could be invalidated by direct action filed in the federal district court.

In *United States v. Eaton Shale Company,* 433 F.Supp. 1256 (D.Colo.1977), the action was brought by the United States to invalidate a land patent issued in 1951 on the ground that six oil shale placer mining claims on which the patent was premised did not exist at the time of its issuance. The government's attack on the validity of the patent was based, in part, upon a 1931 contest decision initiated by the Commissioner of the General Land Office (GLO) declaring the claims null and void for lack of performance of assessment work.

In rejecting the government's position, the district court found that the patent was issued with full knowledge by the government adjudicators of the 1931 GLO decision holding the claims null and void. The district court in its opinion reviews relevant court and administrative proceedings, including the Supreme Court decision in *Hickel.* In ruling that the government could not cancel a patent properly issued by authorized government employees, the district court applied principles of estoppel and laches. In addition, the court also found that the original claimant had neither abandoned nor relinquished the mining claims and that the 1931 adverse contest decision had no effect on the validity of the claims.

---

**5B.** Justice Stevens has noted, "[I]t is asserted that the Bureau is using every technical construction of the statute to suck up active mining claims much as a vacuum cleaner, if not

watched closely, will suck up jewelry or loose money." *United States v. Locke,* —— U.S. ——, —— n. 12, 105 S.Ct. 1785, 1794 n. 12, 85 L.Ed.2d 64 (1985) (Stevens, J. dissenting).

The district court further found (a) that the administrative file did not indicate that the government effectuated proper service of process on claim holders; (b) that proper notification to the claim holders of the contest against the claims was not given in the 1931 contest proceedings; and (c) that the Commissioner of the General Land Office had previously held that the charges and proceedings under that notice were ineffective.

The ruling in *Eaton Shale* was never appealed. The holding of the case certainly adds to the body of law in this field and establishes reasonable limits to the acts of the Secretary of Interior even though interests in public land are involved.

## IV. OIL SHALE BACKGROUND

For an adequate understanding of the nature of the natural resources involved, a discussion of oil shale is necessary.

Oil shale is a fine-grained sedimentary rock.[6] It is not technically oil nor is its organic content oil. The rock is marlstone. The solid organic matter is a rubbery substance called kerogen. If properly processed, and where distillation takes place, kerogen will yield a fluid hydrocarbon substance called shale oil. These sediments normally contain a measurable quantity of oil per ton of rock identified as oil shale.

Shale oil can be refined into products similar to those derived from crude petroleum. Chemically the primary difference between kerogen and crude petroleum is geometric. By heating kerogen to between 500 and 900 degrees Fahrenheit and proper processing, the molecular structure yields a viscous oil (shale oil)—high in sulfur and nitrogen content. Other products are gases, water and coke. Thus, 25 to 75 percent of organic matter in oil shale can be converted to oil and gas.[7] Shale oil can be refined into most of the conventional petroleum products such as fuels for internal combustion engines, boilers or furnaces. Sodium minerals are also by-products of some shale oil operations.

Billions of barrels of untapped petroleum resources are locked in oil shale rock. In the United States alone, oil shale resources probably contain more than 2,000 billion barrels of petroleum (42 U.S. gallons per barrel).[8] The oil shale deposits of the United States can be considered collectively as an enormous potential low-grade source of oil, hydrocarbon gas or solid fuel. About 80 billion barrels of oil from the more accessible higher grade deposits of the central Rocky Mountains can be considered available with demonstrated methods of extraction, and at costs approaching the present-day costs of petroleum of comparable quality.

The richest and highest grade oil shale deposits extend through the Green River Formation, which comprises some 2,600 sq. miles in Colorado, 4,700 sq. miles in Utah and 9,200 sq. miles in Wyoming. The most extensive deposits of high grade oil shale are in the Piceance Basin in Colorado. Here a rich oil shale layer is 50 to 100 feet thick.

The oil shale in the Piceance Basin alone has been estimated to have a potential of 1,300 billion barrels. The disputed mining claims cover 338,000 acres of land in the basin. This land contains about 100 billion barrels.[9] Another 380,000 acres containing over 100 billion barrels are already in private hands. The federal domain, which has

---

**6.** The Supreme Court defined oil shale as "a sedimentary rock containing an organic material called kerogen which, upon destructive distillation, produces a substantial amount of oil." *Andrus v. Shell Oil Co.*, 446 U.S. 657, 659 n. 3, 100 S.Ct. 1932, 1934 n. 3, 64 L.Ed.2d 593 (1980). *See also Final Environmental Statement for the Prototype Oil Shale Leasing Program*, U.S. Department of Interior, v. 3, at 5–38 (1973).

**7.** *See California Geology*, at 240 (December 1971).

**8.** This constitutes approximately twenty-five times the total oil production in this country throughout all of its history. *See* Interim Report—Oil Shale Advisory Board to Secretary of Interior, Feb. 1, 1965, II. Background Information.

**9.** *Final Environmental Statement, supra*, v. II. at IV–1.

the most extensive and richest deposits, covers about 600,000 acres and is estimated to contain nearly one trillion barrels of oil.[10] Approximately 75 percent of the oil shale lands in northwestern Colorado are federally owned.

## V. THE GEOLOGY OF THE GREEN RIVER FORMATION

The richest and highest grade oil deposits are found in the Green River Formation which principally extends through Colorado and to a lesser degree in Utah and Wyoming.

Current geological theory postulates that the Green River Formation was deposited during the prehistoric Eocene era in Lake Uinta, a large, deep and stable body of fresh water. Layers of organic material, such as vegetation and aquatic life, and layers of inorganic matter settled in the lake over millions of years. The result was laminated rocks ("marlstone") of lateral persistency; that is, they were rarely folded or faulted or unevenly bedded.

The Green River Formation is intertongued (interlocked) with the Uinta Formation which developed during the latter stages of Lake Uinta. This was caused by streams entering the lake depositing primarily inorganic material. Thus, as the lake filled in, the rocks developed in an intertongued relationship, containing organic materials in some places (the Green River Formation), but not in others (the Uinta Formation). This intertonguing is illustrated by the diagram from the U.S. G.S. Bulletin 1394–F (Ex. D–209d in Contest 659).

After Lake Uinta completely filled in, erosion cut into the rocks. This erosion exposed laterally persistent rich shale beds of the Green River Formation in escarpments (long cliffs separating two comparatively level or more gently sloping surfaces) along the Colorado and White Rivers and in various valleys. In other areas, erosion has exposed only thinner oil shale deposits formed during the latter stages of the lake. In some areas no oil shale is exposed.

The geology of the Green River Formation was known at the time of the enactment of the Mineral Leasing Act of 1920 and for that matter public awareness of the Green River Formation antedates this century. The terminology "Green River Formation" was first used in the 1860's because of the excellent exposure of the formation along the Green River in Wyoming. The formation was recognized in Colorado along the Colorado River as early as 1874.

Judge Seth in *Shell Oil Co. v. Andrus,* 591 F.2d 597 (10th Cir.1979), *aff'd, Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) adds this bit of history to the Green River Formation and recognition that oil shale in this Formation was treated differently by the department than for other minerals:

The record before us does demonstrate that the value element attributed to substantial oil shale deposits to support claims was expressly treated differently than for metallic minerals by the Department of the Interior for the period 1915 to 1960. *This was clearly the case as to the Green River Formation on which the subject oil shale claims are located. The mining laws were thus interpreted differently for oil shale by departmental practice, official instructions and decisions.*

The record shows the ebb and flow of interest in oil shale during the period of 1915 to the present time. It shows the intense interest in it as a source of oil for the Navy and to replace "foreign" oil in 1918. This was a period of decline in domestic crude oil production relative to demand, and dependence on foreign oil increased. The Department of the Interior by its publications and policies strongly encouraged the location of claims on oil shale deposits in the pre-1920 period. *In 1913 there was a USGS Bulletin published on the Green River Formation oil shale, and others followed.* It was a period of the creation of Naval reserves for oil, and for oil shale. The oil shale reserves for the Navy were

---

**10.** *California Geology, supra; Final Environmental Statement, supra.*

created in Colorado and Utah by presidential order in 1916. There was then in Great Britain a method in use for extracting oil from the shale, and no problems were contemplated.

*Id.* at 599 (emphasis added).

In 1916, the U.S. Geological Survey classified large areas of the Green River Formation in Colorado and additional survey areas in Utah and Wyoming as valuable mineral lands. The lands so classified include all the mining claims in these contests.

Prior to 1920, geologists generally understood that the oil shale deposits and intertongued rocks not containing organic materials had been deposited over a long period of time in a prehistoric lake. Geologists conceptually divided the Green River Formation into three principal geologic strata or "members" (upper, middle and lower). This division was primarily based upon the presence or absence of substantial amounts of rich oil shale. The geologists recognized that the middle member of the Formation (later to become known as the Parachute Creek Member) contained the highest concentration of rich oil shale. In addition, they understood that the middle member was overlain and underlain by members lacking rich oil shale. Thus it was realized prior to 1920 that even the oil-yielding portions of the Formation did not consist of uninterrupted strata of oil shale.[11]

## VI. THE OLD CONTEST PROCEEDINGS ARE NO LONGER A PROPER BASIS FOR DENIAL OF PATENTS SINCE THE INTERIOR DECISION IN THE OIL SHALE COMPANY CASE

An issue in this case is whether nonperformance of annual assessment

work adversely affects oil shale claims existing before passage of the Mineral Leasing Act of 1920. In our view, the decision of the department in *The Shale Oil Company,* 55 I.D. 287 (1935) clearly answers the question. Unequivocal pronouncements by the department for twenty-five years after that precedent setting decision served to effectively establish that nonperformance of assessment work would not adversely affect oil shale claims existing before the passage of the Mineral Leasing Act.[12]

To clearly understand the import of the decision and the department's pronouncements on the point, developments after the effective date of the Act are helpful.

Shortly after the Mineral Leasing Act went into effect, the department initiated proceedings voiding claims on which the annual assessment work had not been performed. The department's policy is succinctly set forth in the *Krushnic Interior Department Case,* 52 I.D. 295 (1928), where the Secretary of Interior held that even though assessment work had been resumed before any government challenge was initiated, the claim owner's interest in the claim terminated automatically if he failed to perform the assessment work by the proper time.

The Secretary ruled that the government was not in the same position as a private party under 30 U.S.C. § 28; further, that the government was not in the posture of a rival locator and would not be required to relocate the claim in order to terminate the original locator's interest.

On appeal, the position taken by the Secretary was rejected by the Supreme Court

---

**11.** The location of a valid claim is dependent on a valid discovery of a "valuable mineral". Judicial recognition of the geology of the Green River Formation is noted in these words:

> The Government in these proceedings has acknowledged that these claims met the discovery requirements under the 1916 to 1920 standards applied by the Department of the Interior. This was because there had been an administrative determination that valid loca-

tions could then be made on the Green River Formation oil shale beds if all other elements of a proper location were present. *The geology was obviously well known, uncomplicated, and the beds were conspicuous.*

*Shell Oil Co. v. Andrus,* 591 F.2d 597, 599 (10th Cir.1979) (Seth, J.) (emphasis added).

**12.** Thereafter, understandably, many of the department's rulings were unappealed.

and the department's view of *automatic* forfeiture for failure to perform assessment work was disapproved in *Wilbur v. U.S. Ex. Rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930). The *Krushnic* case held that a claimant did not forfeit his claim for failure to do assessment work if the claimant resumed work before "at least some form of challenge on behalf of the United States to the valid existence of the claims has intervened." 280 U.S. at 318, 50 S.Ct. at 105.

Thereafter the department narrowly interpreted *Krushnic* to mean that the government could void a claim for failure to perform the work *if the government challenged the claim before work resumed.* This policy was expressed in the case *Federal Shale Oil Company*, 53 I.D. 213, 220 (1930), and was used from 1930–1934 as justification for voiding thousands of claims.

Under the procedure followed by Interior during the relevant period, claimants were notified to appear at departmental hearings at which time the claim was subject to contest. Few claimants appeared at the hearings. Likewise, few claimants appealed subsequent departmental decisions voiding claims.

The department's annual reports for the years 1932, 1933 and 1934 reflect that contest proceedings were filed against more than 22,000 claims covering more than 2,700,000 acres and that such filings were suspended in April of 1933 pending the outcome of *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). The unanimous opinion in *Virginia-Colorado* unequivocally held that the government had no authority to cancel a mining claim for failure to perform assessment work, even though the work had not been resumed at the time of challenge. The Court also held that the department had no authority to cancel claims solely on the ground that the assessment work had not been done. The opinion however, did not clearly delineate the government's authority under the Mineral Leasing Act.

From the time the opinion in *Virginia-Colorado* was issued in 1935 until 1960, the department repeatedly and consistently took the position that *Virginia-Colorado* was the final word on the issue and that the government could gain no interest in a mining claim by establishing failure of performance of assessment work nor could this be a basis for invalidating a claim or denying a patent.

Reflective of this posture by Interior is the benchmark decision of *The Oil Shale Company*, 55 I.D. 287 (1935), in which the *Virginia-Colorado* rule was implemented. In this case the Secretary expressly held that the adverse proceedings, and the previous decisions of the General Land Office canceling certain oil shale claims for failure to perform assessment work were *void.*

In the decision, the Secretary interpreted *Virginia-Colorado* in these words:

> In view of this opinion of the court [i.e. *Virginia-Colorado* ], the adverse proceedings and decision of the Commissioner therein in the instant case must be held *as without authority of law and void.* The above-mentioned decision of the Department in the *Virginia-Colorado Development Corporation* case and the instructions of June 17, 1930, are *hereby recalled and vacated.* The above-mentioned decisions in the cases of *Francis D. Weaver* and *Federal Oil Shale Company* and other Departmental decisions in conflict with this decision are hereby *overruled. The Commissioner's decision is reversed and the record in the case remanded with instructions to reinstate the application and entry in toto and dispose of the same unaffected by the default in the performance of assessment labor, and if all else is found regular, to clearlist the application for patent.*

*The Shale Oil Company*, 55 I.D. at 290 (emphasis added).

Thus, the Secretary of Interior completely and with finality nullified a principal decision of the General Land Office which had declared a claim void for failure to perform assessment work. The Secre-

tary's order makes use of key and unequivocal words. Each word and phrase has legal significance. The language used, considered together with the express intention of the Secretary, renders the order immune from attack or modification at a later time.

We here analyze the order of the Secretary in *Shale Oil Company*, 55 I.D. 287 (1935). Initially we note that the decision recalled and *vacated* the contests and challenges to those claims involved in the *Virginia-Colorado* case, and it *overruled* decisions in conflict therewith. The decision also by its terms *reversed* the order of the Commissioner cancelling claims for failure to perform assessment work and the decision expressly stated that those proceedings were *void*. It ordered *reinstatement* of the claims and completely abrogated nonperformance of annual assessment work as a requisite to patents. In short, the order of the Secretary *recalled* and *vacated* the contests and challenges to the claims involved in *Virginia-Colorado*, *overruled* those decisions and all other inconsistent departmental holdings.

*Shale Oil Company, supra* is significant in that it represents a complete reversal of an express policy implemented and used in prior department decisions as the basis to declare thousands of claims void for failure to perform assessment work.

This litigation presents the question of the authority and jurisdiction of the Secretary to completely change a significant precedent-setting departmental decision (i.e., *Shale Oil Company* ), and *sua sponte* change a constant governmental policy that affected thousands of mining claims. In the context of this case, we expressly hold the Secretary of Interior and other decision makers in Interior were without authority or jurisdiction to deviate from the plain holding in *Shale Oil Company* which was followed by a constant unswerving departmental policy relating to nonperformance of annual assessment work as an impediment to the validity of a claim or request for issuance of a patent. The Secretary's jurisdiction in this area of importance of nonperformance of annual work ceased with the decision in *Shale Oil Company* in 1935.

The meaning and language of *Shale Oil Company* is absolute and quite clear. One may analogize the Secretary's jurisdiction and authority to that held by a judicial body, i.e., a judge in a judicial proceeding. A judge who rules or decrees that a prior proceeding is void and vacates an earlier decision and in unequivocal terms cancels and recalls that decision no longer has jurisdiction, *sua sponte*, to later rescind the earlier decision, restore its vitality and enter contrary orders many years later. This is especially true where, as in this, an interest, possessory title and estate in real property is involved.

The Secretary of Interior is vested with no greater jurisdiction than a judge when we apply principles of finality to adjudicative power or decision making to enter final orders in a case or controversy. Furthermore, those principles of finality, such as *res judicata*, play such an important role in our judicial process that the *res judicata* effects of a final judgment on the merits will not be ignored, even if the final judgment "may have been wrong or rested on a legal principle subsequently overruled on another case." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981) *citing Angel v. Bullington*, 330 U.S. 183, 187, 67 S.Ct. 657, 659, 91 L.Ed. 832 (1947); *see also Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Wilson's Executor v. Deen*, 121 U.S. 525, 534, 7 S.Ct. 1004, 1007, 30 L.Ed. 980 (1887).

As fully and finally as a court or an adjudicative body can speak, the Secretary of Interior entered an affirmative and positive order that absolutely terminated an impediment to obtaining a patent, i.e., nonperformance of annual work. From time of issuance of the order in 1935, the jurisdiction and authority of the Secretary was spent and abrogated. In other words, the principle of nonperformance of assessment work could not be retriggered by the Secre-

tary in an unprecedented and arbitrary fashion that changed with the ebb and flow of the times, nor could he originate a new national mining policy in the manner attempted in 1964. No precipitating event preceded the change of policy. The Secretary of Interior is trustee in and to public lands. He serves in the national interest in regard to these lands. The power of the Secretary to control lands is not unlimited, however. Adherence to legal principles such as finality of proceedings, *res judicata,* and congressional intent in applicable legislation, forms the parameters of permissible action that could be taken by the Secretary. In addition, congressional inquiry and activity in the very question involved here likewise forms the legitimate boundaries of departmental action that may be taken. The extensive congressional inquiry as to points relevant here is discussed, *infra.*

There is irrefutable evidence that at the time *Shale Oil Company* was issued by Interior in 1935, the department was of the view that the *Shale Oil Company* completely nullified unappealed decisions of the type reversed in *Virginia-Colorado.* A view of Interior's communications, public announcements and correspondence fortifies our findings and conclusions on this point.[13]

After *Shale Oil Company* in 1935, the department pursued a constant course of conduct and official departmental action in routinely issuing patents on claims which had, prior to the decision in *Shale Oil Company,* been declared null and void for nonperformance of assessment work.[14]

In the period 1935 to 1961, Interior issued patents on 106 different applications for a total of 768 oil shale claims in Colorado. Five hundred and seven of these claims, covered by seventy-one of the various applications, had been declared null

and void prior to *Shale Oil* for nonperformance of assessment work.

Following *Shale Oil Company,* department administrators routinely processed patent applications without regard to performance of annual work. It was publicly observed and departmentally recognized that prior Interior decisions based solely on nonperformance of assessment work were ineffective to invalidate oil shale mining claims. The department's further position was that all such decisions were nullities, regardless of whether the decisions had been issued upon default of answer or whether appeals had been pursued to the Secretary. Simply stated, the question of performance of annual assessment work was not an issue or relevant matter in the issuance of patents during the period 1935–1961. In this case, we believe that the department is bound not only by principles of *res judicata,* but also by virtue of the fact that as an administrative agency it has in this matter combined its functions of rulemaking and adjudication. In an adjudicating capacity, the department issued its holding in *Shale Oil Company* in 1935 that it would no longer refuse to issue patents for failure of assessment work or based on the contest proceedings. Compounding that action, the department, in its rulemaking capacity, embarked on a thirty-year course of rulemaking and policymaking actions endorsing the *Shale Oil Company* holding and quasi-judicial acts and the issuance of patents with respect to oil shale claims. The Department of Interior is *not* the sole repository of the totality of mining law that has evolved over the last century. The basic rules of jurisprudence and established mining law cannot be arbitrarily disregarded by the department. Other principles of mining law and national policy cannot be blindly ignored. Decisions and orders by adjudicating bodies within the Department of Interior contribute, in part, to

---

**13.** *See* Plaintiffs' Exhibit 309, depositions of William Shafer, Consultant of House Interior and Insular Affairs Committee since 1965 and BLM official for ten years previous thereto, at Record pp. 4919–4923, for statement of operating procedures in Interior and BLM as of 1955–1956

respecting patenting of oil shale claims invalidated in pre-*Virginia-Colorado* contests.

**14.** *See* Hansen 1 BLA—70–208 (GFS(M) BLA–1970–10 (Dec. 2, 1970).

mining law in general. In a greater sense, however, they must be interpreted in a manner that is consistent with the totality of mining law and within the spirit and tenor of congressional intent.

The record is clear that the national and Interior policies were expressed in correspondence, public pronouncements, annual reports and in official departmental action that included *actual* processing of patent claims[15].

From 1935 to 1961, cabinet executives on the highest level, including the Secretary of Interior, publicly advised oil shale locators, claimants, attorneys involved in mining law, members of Congress, Department of Navy personnel and the general public that all of the pre-1935 adverse decisions against oil shale claims for nonperformance of assessment work were null and void and were no impediment to patent. It was consistently announced and publicly reported that nonperformance of assessment work did not adversely affect the oil shale claims that had been challenged, irrespective of whether the adverse decisions had been rendered upon default or whether efforts had been made to appeal adverse decisions of the Land Commissioner to the Secretary of Interior or to the Courts.

Shortly after the *Shale Oil* decision, inquiries began to reach the department as to the meaning and effect of that decision. Illustrative responses are chronicled here.

In a letter dated July 17, 1935, the Commissioner of the General Land Office responded to such an inquiry, which had been received from Representative Edward Taylor of Colorado, as follows:

Under date of June 24, 1935, the Department, in the case of the *Shale Oil Company*, Denver mineral application 042552, recalled and vacated its decision in the *Virginia-Colorado Development Corporation* case and overruled its previous decisions in conflict with the deci-

sion of the Supreme Court. The Supreme Court having held that there is no authority of law for a proceeding by the Government against oil shale placers on the grounds stated above, and *the Department having overruled all its conflicting decisions, it seems obvious that any declaration that such claims were null and void, heretofore made by this office solely upon that ground, are without legal effect and void.*

Plaintiffs' Exhibit # 175, Record p. 2011 (emphasis added)

On October 31, 1935, Acting Secretary of Interior West wrote to the Secretary of the Navy on this point. He stated:

The adverse proceedings involving all of the said claims [oil shale claims located within the Naval Oil Shale Reserves in Colorado and Utah] were based upon a charge that annual assessment work had not been performed upon the claim or claims involved for a stated assessment year and that work had not resumed thereon.... *All previous action taken upon such charges in the cases referred to therefore is without effect and void.*

Plaintiffs' Exhibit # 176, Record p. 2013 (emphasis added).

As an example of the opinions given claim owners' attorneys by the Land Office Commissioner, the following letter, dated April 7, 1936, is representative:

In view of the Supreme Court's decision and the action taken by the Department [i.e. *Shale Oil* ], *it is clear that a declaration holding a mining claim to be null and void because of failure to perform the annual assessment work is without effect and that the owner of the claim would still be entitled to resume work on the claim in the same manner as if no adverse decision had been made.* The decisions of this office in the cases referred to in your letter were based solely on the ground of failure to

---

15. By way of anology *see Kelly v. United States Department of Interior,* 339 F.Supp. 1095, 1100 (E.D.Cal.1972); *cf. Grain Elevator, Flour and Feed Mill Workers v. N.L.R.B.,* 376 F.2d· 774 (D.C.Cir.), *cert. denied,* 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967); *Morrison Mill Co. v. Freeman,* 365 F.2d 525 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1024, 87 S.Ct. 741, 17 L.Ed.2d 673 (1967).

perform the annual assessment work on the claims.

Plaintiffs' Exhibit # 183, Record p. 2029 (emphasis added).

The same position was held in 1940, as can be seen from the following memorandum from the Land Office Commissioner to the Denver Registrar, dated March 30, 1940:

> In view of the rulings made in the case of *Ickes v. Virginia-Colorado Development Corporation,* decided June 3, 1935, and in the case of *Shale Oil Company,* decided June 24, 1935, *the previous decisions of the Department declaring oil shale placer mining claims forfeited because of the failure of the claimants to perform the annual assessment work or to resume work before a charge to the valid existence of the claim was made, were held to be without force and effect.*

Plaintiffs' Exhibit # 82, Record p. 1792 (emphasis added).

In 1946, Acting Secretary of Interior Chapman responded to an inquiry from Senator Myers respecting the validity of certain oil shale claims declared invalid in 1931 for assessment work failure. In a letter dated March 21, 1946, the Acting Secretary stated:

> However, in the case of the *Oil Shale Company* (55 I.D. 287, 290), decided on June 24, 1935, the Department recalled and vacated its action in the *Virginia-Colorado Development Corporation* case (53 I.D. 666), and overruled its action in other cases, including this one.

Plaintiffs' Exhibit # 204, Record p. 2070.

The Associate Solicitor of the Interior Department wrote the following memo to the Regional Solicitor at Denver on December 3, 1959, setting forth the Department's position regarding the pre-1935 contests:

> In view of the Supreme Court decisions mentioned, the Department, in its decision of June 24, 1935, in the *Shale Oil Company* case (55 I.D. 287) held that in that case the Commissioner's decision was without authority of law and void; recalled and vacated certain cited departmental decisions and the departmental instructions of June 17, 1930 (53 I.D. 131); and overruled "other Departmental decisions in conflict with this decision". *Thus in effect the decision of June 24, 1935 (Shale Oil) recalled and vacated all departmental decisions declaring oil shale placer claims null and void solely for failure of the claim owner to do the assessment work, thus leaving the claims as if they had never been contested.*

Plaintiffs' Exhibit # 215, Record p. 2103 (emphasis added).

Finally, as late as 1963, the following statement is found in a letter from an Assistant Secretary of Interior to Senator Anderson:

> Following the 1935 decision of the Supreme Court ... the Department dismissed those contests which were based solely on the charge of assessment work ... The files contained numerous letters, memoranda, and instructions showing that the position of the Department as stated in the *Shale Oil Company* case, was unchanged until about 1958. During this time all prior adverse decisions, based on assessment work, were ignored, and many patents were issued without any questions being raised as to the finality of the *Shale Oil* decision in canceling all prior decisions which were based on assessment work alone.

Plaintiffs' Exhibit # 211, Record p. 2087 (Letter dated August 29, 1963).

These examples, culled from the scores of statements in correspondence and memoranda introduced into evidence and appearing in the record, are representative of the Interior Department's unswerving position respecting the effect of the *Shale Oil Company* opinion from the date of that opinion until the rejection of plaintiffs' patent applications.

In addition to these pronouncements and the patenting of similarly situated oil shale claims during this period, the department dismissed all pending contests challenging

the validity of oil shale claims for nonperformance of assessment work.

In a letter from the Commissioner of the General Land Office to the Denver Registrar on July 29, 1935, the following directive was issued:

[F]rom the foregoing [the *Shale Oil* decision] it is clear that the adverse proceedings in this case are invalid for any purpose. Accordingly, contest No. 11823 is dismissed and the case is closed. Advise the parties hereof. Several contest cases involving oil shale placers are now pending in your office. In view of the decisions referred to hereinabove, you are instructed to close out on your records and transmit to this office all contest cases involving solely the question of a failure to resume work on oil shale placers prior to the date of challenge by the United States to the valid existence of the claims, where no answer has been filed by the claimants. In all cases involving only the question of annual assessment work where answer has been filed by any of the contestees you will transmit the records to this office without action.

Plaintiffs' Exhibit #72, Record p. 1743.

This correspondence was followed by other memoranda of similar import. For example on March 30, 1940, the Commissioner again wrote the Denver Registrar giving similar instructions:

[I]n the case of *Shale Oil Company*, mineral entry Denver 042552, decided June 24, 1935, the previous decisions of the Department declaring oil shale placer mining claims forfeited because of the failure of the claimants to perform the annual assessment work or to resume work before a charge to the valid existence of the claims was made, were held to be without force and effect. *In view thereof, you are instructed to close on your records all contest cases involving solely the question of a failure to perform annual assessment work and failure to resume work on oil shale placers prior to the date of a challenge by the United States to the valid existence of*

*the claim.* A list of these cases should be transmitted to this office.

Plaintiffs' Exhibit #82, Record p. 1792 (emphasis added).

Similar letters were sent to the Registrars in Salt Lake City, Utah, Cheyenne, Wyoming and Evanston, Wyoming, on August 9, 1940. Plaintiff's Exhibits #85, 87 and 89, Record pp. 1811, 1813 and 1815.

As an example of the results of these instructions, the following memorandum was sent from the Regional Field Examiner, Salt Lake City, Utah, to the Supervisor, Branch of Field Examination, General Land Office on June 5, 1942:

When I took charge of this Region *in January, 1935, there were 4,203 pending oil shale cases. In practically all of these cases adverse proceedings had been directed on the ground that the required assessment work had not been done on the claims* .... As a result of various conferences held between myself and the Director of Investigations, and as a result of some correspondence, *I was finally authorized by the then Director of Investigations on August 21, 1935, to close all of these cases in which adverse proceedings had been directed on the ground that the assessment work had not been performed, and to keep open only those cases in which adverse proceedings had been directed on the ground of non-discovery.* The cases were examined in detail, and as a result, all except 67 were closed during the months of January and February 1936.

Plaintiffs' Exhibit #91, Record p. 1817 (emphasis added).

Abruptly, in the early 1960's the department departed from its national policy, consistent practice and widely circulated position. Surprisingly, it asserted that the prior administrative decisions (the contest proceedings in the 1920's and 1930's) had never been set aside, and were still effective to invalidate oil shale claims. This complete change of policy occurred during the period the Honorable Stewart Udall was serving as Secretary of Interior. The impact of this peculiar and unorthodox change of de-

partmental and national policy as it affects mining claims and entitlement to patents is examined in Section VII, *infra.*

However, at this point we emphasize our holding that the act of the Secretary was void in 1969 as being beyond statutory power or authority. The opinion in *Udall v. Oil Shale Corp.,* 406 F.2d 759 (10th Cir.1964) (Seth J.) unequivocally held that there was a lack of authority on the part of the Secretary to cancel the claims in question.

In reaching its decision, the Court of Appeals felt itself bound by the prior Supreme Court decisions and by the absence of Congressional action. The Court of Appeals stated that the Supreme Court "completely invalidated them [cancellation proceedings] as if no contests had been commenced". *Id.* at 765.

While in an extremely limited way the Supreme Court reversed *Udall v. Oil Shale Corp., supra,* in *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), the language in the Tenth Circuit opinion illuminates the question of the Secretary's power, authority and jurisdiction and recognizes that the acts of the Secretary in the case at hand were completely void.

The *Udall* opinion quotes from *West v. Standard Oil Co.,* 278 U.S. 200, 220, 49 S.Ct. 138, 144, 73 L.Ed. 265 (1928) in which the court stated:

> The broad power of control and supervision conferred upon the Secretary does not clothe him with any discretion to enlarge or curtail the rights of the grantee, nor to substitute his judgment for the will of Congress as manifested in the granting act. *Payne v. Central Pacific Railways Co.,* 255 U.S. 228 [41 S.Ct. 314, 65 L.Ed. 598] ...

406 F.2d at 764.

From the review and analysis of holdings in *Udall v. Oil Shale Corp.,* (10th Cir.), *supra; Hickel v. Oil Shale Corp.,* (Sup. Ct.), *supra; Shell Oil Co., v. Andrus,* (Sup.Ct.), *supra;* and *Shell Oil,* (10th Cir.), *supra,* and decisional and statutory law, we hold that the purported administrative

proceedings to cancel the claims in question were invalid and of no effect.

In summary by virtue of official action in an adjudicated matter, the Secretary completely invalidated the post-1920 cancellation proceedings in 1935 settling the matter once and for all.

VII. THE DEPARTMENT'S INTERPRE-
 TATION, PRONOUNCEMENTS,
 AND RULES FOLLOWING VIR-
 GINIA–COLORADO HAVE FORCE
 OF LAW THUS PREVENTING LA-
 TER ABROGATION BY INTERIOR
 IN 1964

A. *Effect of Pronouncements, Construction of Statutes and Decisional Law and Promulgation of Rules by Interior*

The federal Administrative Procedure Act (APA) was not in effect at the time the pronouncements involved here were issued by the department in 1935 and thereafter. However, the Act's definition of a "rule" seems to aptly cover Interior's policy dealing with nonperformance of annual assessment work. As noted, the policy was promulgated by the department after the *Shale Oil* decision of 1935.

The APA in part states:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure or practice requirements of an agency ...

5 U.S.C. § 551(4).

 Whether we characterize the rules set forth by the department following *Shale Oil* as " legislative" or "interpretive", we arrive at the conclusion that they had the force and effect of law and could not be capriciously and retroactively repudiated by the department in 1964.

The statements of department constituted a legislative rule in that they were (a) within the granted and delegated powers of the department to administer the public

lands and the mining laws, (b) reasonable, (c) unequivocal, and (d) emanated from executives of the department within their areas of responsibility. *See* Davis, *Administrative Law,* § 5.03 at 229 (1958). This type of administrative rule has the force and effect of law and is binding on the issuing agency. *Accardi v. Shaugnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States v. Short,* 240 F.2d 292 (9th Cir.1956).

■ If we consider the department's pronouncements and actions to establish an interpretive rule, its force and effect as law is also supported by appropriate decisional precedent. An agency's interpretation of its own rules and applicable statutes is "binding on the Courts". *F.C.C. v. Pottsville Broadcasting Company,* 309 U.S. 134, 143 n. 6, 60 S.Ct. 437, 441 n. 6, 84 L.Ed. 656 (1940). Further, as Professor Davis points out, administrative interpretations are to be given authoritative weight where as here: (1) the interpretative rule embodies a construction made contemporaneously with the enactment of the statute or judicial decision (or where a judicial decision necessitates administrative interpretation) or (2) when the interpretative regulation or policy is of long standing. Davis, *supra,* § 5.06 at 324.

The announced policies of Interior from 1935 to 1964 were interpretative in nature. They unequivocally and absolutely interpreted (1) the assessment work statute, (2) the *Virginia-Colorado* decision and (3) its own ruling in *Shale Oil.* As to the first two elements, the circumstances described by Davis are present and warrant our regarding the department's interpretation as especially authoritative. As to the third, and most critical item, the department was interpreting its own actions. These interpretations of applicable mining jurisprudence and precedents are of binding effect and set the boundaries of legitimate agency action and authority. *Pottsville Broadcasting, supra.*

We find that interpretation and pronouncements by the Secretary and rules promulgated thereby following *Virginia-Colorado* in conformity with the applicable mining statute had the force and effect of law to the same extent as though written into the statute. *See Archambault v. United States,* 224 F.2d 925 (10th Cir.1955).

■ At the very least, construction of an act by the agency charged with its administration should be given persuasive effect. *Alexander v. Richardson,* 451 F.2d 1185 (10th Cir.1972); *Ute Indian Tribe, et. al. v. Probst,* 428 F.2d 491 (10th Cir.1970).

Finally, the departmental rule and policy enunciated after *Shale Oil,* which vacated the old contests, dismissed ongoing contests, and removed what had been theretofore considered obstacles to patent, was both a substantive and procedural rule and was binding on the department and this court under the holding of *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

In addition to the promulgation of the departmental rules respecting the effect of the old contest proceedings, the department issued regulations, pursuant to its authority to administer the mining laws, setting forth the consequences of nonperformance of assessment work. The version of 43 C.F.R. § 3851.3 in force and effect until 1972 provided:

§ 3851.3 Failure to perform assessment work.

Failure to make the expenditure or perform the labor required upon a location made before or since May 10, 1872, will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representative have resumed work after such failure and before relocation.

Its companion section, 43 C.F.R. § 3851.4 stated:

§ 3851.4 Determination of right of possession between rival claimants. The annual expenditure of $100 in labor or improvements on a mining claim, required by section 2324 of the Revised Statutes (30 U.S.C. 28), is, with the exception of certain phosphate placer locations, validated by the act of January 11, 1915 (38 Stat. 792; 30 U.S.C. 131), under which

regulations were issued March 31, 1915 (Circ. 396), 44 L.D. 46, solely a matter between rival or adverse claimants to the same mineral land, and goes only to the right of possession, the determination of which is committed exclusively to the courts.

Thus, based on these regulations and departmental policy and rules discussed above, mining claimants, mining industry, Congress, the Navy Department and the public at large were justified in their belief that assessment work was solely a matter between rival claimants to the same mineral location, and only affected rights of possession thereof.

The Interior Board of Land Appeals recognized the policy of the department in *United States v. Bohme*, 48 I.B.L.A. 267, 87 I.D. 248 (1980):

In the nearly 30 years following *Virginia-Colorado* and the *Shale Oil Co.*, *supra*, the Department was of the official view that default in assessment work was exclusively a matter between rival claimants. That official view was widely disseminated among miners, members of the state and federal legislatures, and governmental agencies, and the interested public.

On the strength of these departmental rules, it was reliably believed, as recently as December 2, 1970, that the old contests had been vacated and were no obstacles to obtaining patents for oil shale claims.

The post-*Hickel* version of the regulations, in effect since 1972 state:

§ 3851.3 Effect of failure to perform assessment work.

(a) Failure of a mining claimant to comply substantially with the requirement of an annual expenditure of $100 in labor or improvements on a claim imposed by section 2324 of the Revised Statutes (30 U.S.C. 28) will render the claim subject to cancellation.

(b) Failure to make the expenditure or perform the labor required upon a location will subject a claim to relocation unless the original locator, his heirs, as-

signs or legal representatives have resumed work after such failure and before relocation.

37 C.F.R. § 17836 (Sept. 1, 1972).

By unequivocal pronouncements, interpretations and regulations having the force of law in the period immediately following *Shale Oil Company*, 55 I.D. 287 (1935), Interior overruled all departmental decisions in conflict with *Virginia-Colorado* and *Shale Oil*, *supra;* abandoned its policy of challenging oil shale claims for failure of assessment work; announced a new policy; and issued nearly seventy-five patents on oil shale claims previously declared void for assessment work nonperformance in the three decades following 1935.

All claim holders otherwise entitled to patents were beneficiaries of the clear, broad-based, consistent and uniform policy of the department which removed nonperformance of annual assessment work as a ground for challenge, invalidation or denial of patent.

■ In our view, contrary to a recently developed position of the department, no administrative appeal was necessary to remove the nonperformance impediment. We expressly hold that *all* claim holders and their successors in interest were entitled to rely on the uniform and announced policy of the department regarding the effect of nonperformance of assessment work.

■ The department's directives, notices, correspondence, public announcements and policy itself effectively removed any cloud upon mining interests that may have been created by nonperformance of assessment work. The department could not, thirty-five years later, abrogate its announced policy and rules, reverse its direction, and substitute a new national policy completely in conflict with its unswerving prior policy. While an agency may reverse itself and change its policies, it must do so without being arbitrary or un-

reasonable.[16] The authority to change departmental regulations and policies does not relieve a department head from the obligation of following such regulations and policies *until they are officially and publicly changed and sufficient notice is given to interested parties of pending change.* Our holding takes on additional force because mining claims constitute an interest in real property and carry with it possessory rights that cannot be nullified without basic aspects of fairness and due process of law. As was recently pointed out by the Supreme Court, due process requires that "those within [a] statute's reach [be afforded] a reasonable opportunity both to familarize themselves with the general requirements imposed and to comply with those requirements." *United States v. Locke,* —— U.S. ——, ——, 105 S.Ct. 1785, 1800, 85 L.Ed.2d 64 (1985). Thus, at a *minimum,* the parties should have been given notice of the department's changes and an opportunity to comply with those changes.

The question is not the power of the Secretary of Interior to change regulations and policies of his department; but the basic notion of procedural due process that require government officials to follow the law as it exists until that law is changed, and to notify individuals of the change in law before it is applied against parties to their detriment. *Shell Oil Co. v. Andrus,* 591 F.2d 597, 603 (1979), *aff'd., Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

B. *Summary of Effect of Department of Interior Action from 1935–1961 In Granting Patents Where Claims Had Been Declared Null and Void*

As a result of *Wilbur v. Krushnic, supra,* and *Virginia-Colorado, supra,* numerous oil shale claims that had been invalidated by earlier contest proceedings were restored to their previous validity. Significantly, until 1962, the department issued patents on many oil shale claims without commencing action to vacate adverse decisions in the earlier contest proceedings. Numerous oil shale patents were issued in spite of the fact that Interior's records clearly indicated that the claims had been declared null and void in prior contests. The chart graphically shows the frequency and consistency of the issuance of patents and the substantial acreage affected.

Oil shale patents issued during the year 1951 to 1961 are as follows:

| | Patents for Oil Shale Claims | Acreage | | Patents for Oil Shale Claims | Acreage |
| ---- | ---- | ------ | ---- | ---- | ----- |
| 1951 | 15 | 13,155 | 1956 | 5 | 1,756 |
| 1952 | 1 | 2,394 | 1957 | 5 | 7,825 |
| 1953 | 7 | 4,809 | 1958 | 14 | 5,554 |
| 1954 | 9 | 7,385 | 1959 | 10 | 7,445 |
| 1955 | 22 | 36,826 | 1960 | 3 | 2,030 |
| | | | 1961 | 3 | 5,446 |

Decisions and adjudications in Interior until the 60's clearly indicate that the *Shale Oil Company* case was unequivocally considered to have reversed and set aside all prior adverse contest proceedings based on the failure to perform assessment work. During this period, the GLO and BLM disregarded all such earlier contest decisions in processing and adjudicating applications for patents. *See Udall v. Oil Shale Corp.,* 406 F.2d 759 (10th Cir.1969); *aff'd sub nom, Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970); *see also Union Oil Company of California,* 71 I.D. 169 (1964); Lohr, *Conclusiveness of United States Oil Shale Placer Mining Claim Patents,* 43 Den.L.J. 24, 37 (1966); Schmidt, *Status of Unpatented Claims,* 59

16. *Wilbur, ex rel. v. Krushnic,* 280 U.S. 306, 316, 50 S.Ct. 103, 104, 74 L.Ed. 445 (1930); *see also*

*Belk v. Meagher,* 104 U.S. (14 Otto) 279, 283, 26 L.Ed. 735 (1881).

Q. of Colo.Sch. of Mines, 125–126 (July 1964).

A number of cases arose in the federal courts after the Interior Department changed its policy with respect to the validity of oil shale claims that had been the subject of unappealed contest proceedings. The Solicitor's opinion in *Union Oil Co. of Calif., supra,* approved the position of the Land Office Manager, Bureau of Land Management, Denver, Colorado, that claims declared invalid in 1930–1933 contests based on failure to perform annual assessment work were invalid, and these early decisions of invalidity could not now be challenged. He held that principles of administrative finality, estoppel by adjudication and *res judicata* prevented challenge of the old contest proceedings, unless the claimants or their predecessors had not been afforded proper notice of the hearings. On this basis, numerous pending patent applications were rejected by the Bureau of Land Management. *Gabbs Exploration Co. v. Udall,* 315 F.2d 37 (D.C.Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 61, 11 L.Ed.2d 56 (1963) held that these early contest proceedings should not be reviewed in the absence of a jurisdictional defect, where the claimants or their predecessors did not seek immediate review of adverse decisions.

*The Oil Shale Corp. v. Udall,* 261 F.Supp. 954 (D.Colo.1966) filed in 1964, rejected the Interior Department's new theory. In that case Judge William E. Doyle, then presiding in this court, reasoned that the *Krushnic* and *Virginia-Colorado* decisions held that the department had acted without jurisdiction in the earlier contest proceedings, and that these unappealed proceedings were not *res judicata.* The Tenth Circuit affirmed *The Oil Shale Corp.,* in 406 F.2d 759 (1969). However, the Supreme Court reversed the lower courts on the ground that the holdings of *Krushnic* and *Virginia-Colorado* must be confined to cases of substantial compliance with the annual assessment requirement. *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). The Supreme Court remanded the case for a determination of (a) whether the Interior Department could change its policy retroactively; (b) whether the old contest proceedings were open to direct judicial review; and (c) whether there had been substantial compliance with the assessment requirement. This brings the case up to date.

C. *Effect of Congressional Inquiry on Mining Issues: Principle of Application of Contemporaneous Construction by Interior*

■ It is well established that Interior is not free to activate new policies and changes affecting interests in oil shale lands when critical prior policies were followed for many years, publicly announced and carefully defined by departmental practice, official instructions and decisions. Prior policies and procedures are given additional legitimacy when Congress conducts extensive inquiry and study in the field and makes no effort to change the body of law on the subject. Thus, the announced policy, procedure and decisions of Interior voiding and invalidating performance of annual assessment work as a requirement to vitality of mining claims in 1935 became an integral part of the general mining laws and were beyond executive authority to change at will.

The case of *Shell Oil Co. v. Andrus,* 591 F.2d 597 (10th Cir.1979), *aff'd, Andrus v. Shell,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) is instructive on the point.

In an opinion by then Chief Judge Seth, the Court of Appeals for the Tenth Circuit held that policy change made by the Department of Interior, which in 1920 said that oil shale was "a valuable deposit" and then, in 1961 and 1974, said that oil shale was not "a valuable mineral deposit" could not invalidate the shale oil placer mining claims in issue *Id.* at 604. The opinion articulates the principle that different treatment afforded oil shale claims as to the "valuable mineral deposit" element of a mining location became a part of the general mining laws by reason of its adoption

and approval by both houses of Congress during intensive investigations of this very question and their affirmative resolution of the issue; further that the changes sought to be made by the department as to 1920 standards of discovery and "valuable mineral deposits" incorporated in the mining laws were beyond executive authority to change. Because of its relevance and clarity we quote from the opinion at length.

We must hold that the Department is not free to so change the application of the general mining laws as to the oil shale locations here under consideration. The different treatment afforded all oil shale claims as to the "valuable mineral deposit" element of a location became a part of the general mining laws by reason of its adoption and approval by both Houses of Congress during the intensive investigations of this very question and their affirmative resolution of the issue. The general mining laws were thus adjusted to accommodate the then very important practical and legal problem.

We do not put this in the category of Congressional reenactment after an administrative interpretation....

Instead of reenactment, and silence on the issue, as an acceptance of interpretation, we regard the events hereinabove described as an affirmative-adoption of the very basic application of the mining laws to make it part of the statutory method for development of the oil shale reserves. It was obviously considered to be part of such an exploitation as the reserves were considered very essential. It is equally apparent that other events transpired to forestall the use of oil shale as a source of oil. These events included a large increase in domestic oil production and cheap foreign oil. Some of these events and the subsequent variations thereon came about through the actions of the Government. Thus Congress may have been wrong in its estimate as to the timing of oil shale development, but that is no reason to now change the mining laws without the benefit of Congressional consideration. In short, the changes here sought to be made by the Department as to 1920 standards incorporated in the mining laws are well beyond executive authority.

This is no more than an application of the doctrine developed over the years in the reenactment cases but in the presence of the added significant element described above at some length—the extensive participation by Congress in the specific issue.

*Id.* at 604.

The importance given to "contemporaneous" construction by the administrative officials must not be overlooked, and reference must be made again to [*United States v.*] *Leslie Salt* [350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956)]. Thus the officials in Interior from top to bottom considered the application of the mining laws to shale oil. This was "new," not, of course, as a new law but a new mineral. It was a "contemporaneous" construction also in the sense of an application of the law to a new situation, an application calling for a standard to be applied. It was in 1920 a "contemporaneous construction" to be given the specific consideration suggested by the Court. It is even more significant because of the attempted retroactive application to 1920 of this new and totally different position.

We do not reach the retroactive aspect as a separate issue. The doctrine relating to retroactive application of policy changes and statutory construction by agencies with the need for a "compelling reason" is considered in *Logan v. Davis,* 233 U.S. 613 [34 S.Ct. 685, 58 L.Ed. 1121]; *Rough Rider,* 41 L.D. 242, and in *James v. Bell,* 52 L.D. 197.

The combination of circumstances we have before us presents a unique situation which, as we have said above, constituted an addendum to the mining law which cannot be removed short of Congressional action. It is simply an application of the doctrine arising in the reenactment cases referred to above ith special emphasis on the added element of affirmative action by Congress. The af-

firmative action by Congress on the point here is overwhelming.

*Id.* at 605.

We find the rationale of *Shell Oil v. Andrus, supra,* persuasive and adopt it.

 As we detail below, a locator or owner of an unpatented mining claim properly located has a vested property interest. A mining claim, in the language of the Supreme Court is "real property in the fullest sense".[17] Legal title to the land remains in the United States, but the claimant enjoys a valid, equitable, possessory title, subject to taxation, transferrable by deed or devise and otherwise possessing the incidents of real property.[18] This property interest was recognized once again by the Supreme Court in *United States v. Locke,* —— U.S. ——, ——, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985).

This interest in land cannot be arbitrarily, unreasonably or unfairly dissolved or terminated at the whim of the department. The ambivalence of the department in its changing position on need to perform assessment work and other aspects of validity of oil shale lands has consigned the claims of plaintiffs and their predecessors to limbo. This agency's attitude has not reflected administrative fairness. It is time that the unsettled and uncertainty in the title status of the instant and other like claims be finally resolved and put to rest. In our adjudication of the issue we have endeavored to give meaning to established mining law and apply that law to matters in question here. Hopefully this approach will assist in stabilizing and clarifying the title status of unpatented oil shale claims. It should be remembered that we are not embarking on a search into a new legal field. Development of the body of mining law has taken place in this region before the turn of the century and persuasive precedents exist to guide us.

In its opinion in *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) the Supreme Court held (as it relates to old assessment work decisions) "on remand all issues relevant to the current validity of those contest proceedings will be open, including the availability of judicial review at this time". *Id.* at 58, 91 S.Ct. at 202.

D. *The Department's Actions in 1964 Were Done in Violation of Claimants' Entitlement to Due Process*

As we have discussed above, following the Supreme Court's decision in *Virginia-Colorado* and the Interior Department's ruling in *Shale Oil Company,* Interior overruled all decisions which had been in conflict with those cases. Furthermore, it abandoned its policy of challenging oil shale claims for failure to perform assessment work. Seventy-one patents were issued for 507 claims which had previously been declared void for failure to perform assessment work. The department also issued rules and regulations regarding the effect of failing to perform assessment work. These rules and regulations conformed to the holdings of *Virginia-Colorado* and *Shale Oil Company.*

 At a minimum, due process requires that "those within [a] statute's reach [be afforded] a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements." *United States v. Locke,* —— U.S. ——, ——, 105 S.Ct. 1785, 1800, 85 L.Ed.2d 64 (1985). The department's sudden change in policy in 1964 was done without informing the claimants of the change or affording them the chance to comply with the change. We therefore conclude that the actions of the department violated claimants' right to due process.

---

**17.** *Forbes v. Gracey,* 94 U.S. (4 Otto) 762, 767, 24 L.Ed. 313 (1876); *see also Bradford & Morrison,* 212 U.S. 389, 395, 29 S.Ct. 349, 350, 53 L.Ed. 564 (1909); *Elder v. Wood,* 208 U.S. 226, 28 S.Ct. 263, 52 L.Ed. 464 (1908).

**18.** *See Shell Oil Co. v. Andrus,* 591 F.2d 597 (10th Cir.1979), *aff'd,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

VIII. DISCOVERY ISSUES: ANALYSIS OF *ANDRUS V. SHELL OIL CO.* AND *FREEMAN V. SUMMERS*

A. *Discussion of Principal Cases and Effect of Congressional Inquiry*

As discussed previously in this opinion, the early mining laws, Act of July 4, 1866, Act of May 10, 1872 and Act of June 22, 1874, now generally 30 U.S.C. § 22 *et seq.*, state that citizens may enter and explore the public domain and search for minerals. If they discover "valuable mineral deposits," they may obtain title to the land on which such deposits are located. In 1920 Congress substantially changed this procedure and enacted the Mineral Leasing Act. 41 Stat. 437, as amended, 30 U.S.C. § 181 *et seq.* The Act withdrew oil shale and several other minerals from the general mining law and provided that thereafter these minerals would be subject to disposition only through leases. The Savings Clause of the Act, however, preserved "valid claims existing at date of the passage of this Act and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery." 30 U.S.C. § 193.

There are two requisites to establishing a patent, namely, (1) a valid location of a mining claim and (2) discovery of a valuable mineral deposit. 30 U.S.C. §§ 22, 23, 25, 29, 35 and 37 (1976). As noted above, the Supreme Court held that oil shale is a valuable mineral. *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). Thus, the second requisite is firmly established and no longer open to question. In this regard it may be persuasively argued that the government has previously conceded that discovery requirements for these and similar claims have fully complied with the 1916–1920 standards. Authority for this proposition is found in *Shell Oil Co. v. Andrus, supra.*

In *Shell Oil v. Andrus*, 591 F.2d 597 (10th Cir.1979), *aff'd*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980), the circuit court, speaking through Judge Seth, noted the acknowledgement by the government of valid discovery requirements. The court stated:

The Department by 1920 had thus determined that oil shale deposits, if demonstrated to contain sufficient oil, were "valuable mineral deposits" although there was no immediate market.

*The Government in these proceedings has acknowledged that these claims met the discovery requirements under the 1916 to 1920 standards applied by the Department of the Interior. This was because there has been an administrative determination that valid locations could then be made on the Green River Formation oil shale beds if all other elements of a proper location were present. The geology was obviously well known, uncomplicated, and the beds were conspicuous.*

*Id.* at 599 (emphasis added).

The matter cannot rest there, however, because the government argues that validity of discovery has not been established. We reject this premise. Arguendo, a valid discovery of oil shale has not been made. Therefore our inquiry at this point involves resolution of two questions: (1) whether the claims in question contain valuable deposits and (2) how proof of these deposits can be established. Two cases are precedential, namely, *Andrus v. Shell Oil Co., et al., supra,* and *Freeman v. Summers*, 52 L.D. 201 (1927).

In *Andrus v. Shell Oil, supra,* the Supreme Court observed that *Freeman v. Summers* "involved two distinct issues: (1) whether a finding of lean surface deposits warranted the geological inference that the claim contained rich 'valuable' deposits below; and (2) whether present profitability was a prerequisite to patentability." 446 U.S. 657, 667, 100 S.Ct. 1932, 1938, 64 L.Ed.2d 593 (1980).

Both issues were answered in the affirmative and the claimant prevailed in the litigation. The Supreme Court has spoken with finality on this point.

The parties to this action, however, do not agree as to the standard for valid dis-

covery of oil shale and whether valid discovery of oil shale has been made here. The standard urged by the department involves a requirement of exposure of the Parachute Creek Member. The department has taken the position that under *Freeman v. Summers,* a valid discovery exists only when an exposure of the Parachute Creek Member can be geologically inferred to contain a sufficient amount of high grade oil shale to designate it as a valuable mineral deposit.

Plaintiffs argue that a showing of the Parachute Creek Member is not necessary. They contend that the test is whether a showing of lean shale on the surface in the area of the Green River Formation justifies the inference that rich oil shale beds exist further below.

Query: Which of these standards must apply to constitute a valid discovery and must a mining claim contain an exposure of the Parachute Creek Member that can be followed to a depth with a reasonable assurance that paying minerals will be found?

Under the department's contention a valid discovery is made only if there is an exposure of the Parachute Creek Member of the Green River Formation that can be followed laterally to a depth where it connects with the principal and valuable oil bearing formation. The department's contention is that *Freeman* specifically rejected any discovery made by finding of an isolated bed of mineral not connected with or leading to substantial prospective values.

We reject the new standard urged by the department, namely, that for a valid discovery there must be an exposure of the Parachute Creek Member. *Freeman* makes no such requirement. If allowed, the department's position would be to engraft an unqualified and unwarranted extension of the express requirement enunciated in *Freeman* and clearly reaffirmed by the Supreme Court in *Andrus v. Shell, supra.*

Our holding on this point is based on departmental decisions, standards, rules and actions preliminary to *Freeman* and congressional and judicial review that followed. In *Andrus v. Shell, supra,* the Supreme Court not only approved the interpretation we give to *Freeman v. Summers,* but also gave its imprimatur to our analysis of the geologic characteristics of the Green River Formation. We give meaning here to the plain meaning of *Andrus v. Shell.* To give credence to the government's position would be to clearly disregard *Andrus v. Shell* as precedent. We refuse to take that course of action, nor is it warranted. A complete analysis of *Freeman* is necessary to understand its impact on this litigation.

*Freeman* did not initially involve the department as a litigant but was a private contest in which the department intervened. *Freeman* concerned a homestead entry of claimant (Summers) which was contested by several parties (Freeman) who held oil shale claims on the same ground. The homestead entry of Summers was at odds with prior claims owned by Freeman. The protests of Freeman were initially dismissed on the grounds that there had been no discovery of a valuable mineral. The decision was authored by E.C. Finney, a top Interior Administrator, who held high level positions in Interior during the period in question. Mr. Finney was a key figure and architect of impact oil shale decisions. He was also involved in the decision making process in establishing oil shale policy in Interior. As will be seen, he testified before a Congressional inquiry on the question central to this case.

The initial *Freeman* decision, rendered in January, 1924, held:

> It is the contention of the contestant in this case that oil shale values do not materially change throughout a certain stratum. It is evident from the testimony that the strata of oil shale or rock exposed on the Summers homestead by nature or the efforts of the contestee (sic) or those in his service, or his predecessors in title, are not and probably

never will be valuable as oil shale deposits because of the thinness of the strata or the leanness as to oil content.

If there were a probability of these strata increasing materially in thickness or oil content with distance from the surface, as in the case of certain precious metals, then a valid discovery might be claimed under the rule laid down that an actual disclosure of commercial ore is not essential to effect an adequate discovery ... The contestant's own contention and one that is well supported in fact shows that all beds of oil shale are in place, each of a thickness which does not vary materially and of a certain oil content which varies but slightly. While there appears to be no question but that immense shale beds underlie this land at a considerable depth, it is just as clear that the higher strata exposed on the Summers place, and on which discovery is claimed, do not now constitute valuable deposits and by development in the future could not be expected to show such value as to make them merchantable. Hence it is our opinion that on such deposits a discovery cannot be predicated on which to base a valid mineral claim to the land.

On appeal to the Commissioner of the General Land Office this decision was reversed by the Commissioner on the basis that the lands had a higher prospective value for mining than for agriculture. The decision was further appealed and on December 20, 1924, E.C. Finney, First Assistant Secretary of Interior, then issued a decision reversing the Commissioner.

Mr. Finney principally found that the oil shale exposed on the claims had no value and that there was no evidence that the deeper potentially valuable beds would become valuable. He also found that geologic inference cannot support a discovery because there is no physical connection between the lean beds and the rich beds. Freeman petitioned for a rehearing which was denied by Finney in May 1925. Thereafter Freeman filed an additional petition for rehearing. On July 29, 1925 Finney, acting on that petition, ordered a new trial stating "that the protestant should be afforded the opportunity, at a further hearing to be ordered for that purpose, with notice to the entryman, to present such additional evidence as he may desire as to what, if any, oil shale deposits were actually and physically exposed within the limits of each of the claims here involved, prior to February 25, 1920, together with evidence as to the thickness of such deposits, their depth beneath the surface, and their oil content in gallons per ton and barrels per acre ...".

At the later hearings held in 1926, Freeman presented testimony that a natural exposure of oil shale had been found on each of the claims in 1918 and had been tested. Also testimony was presented that the 2,700 foot thickness of sedimentary rocks in the Piceance Creek Basin was a single bed or stratum, and in effect, one homogenous mass that could be mined from top to bottom.

An initial draft of a proposed order and decision was prepared and circulated among high level officials of the department. The draft, which ultimately was rejected by the Secretary, states as follows:

[T]he ultimate conclusions of the Department are that the shale beds whose oil content was tested and shown by contestant subsequent to the date of the approval of the leasing act had not been connected with discoveries made prior thereto by evidence of sufficient weight and creditability to command respect; that the evidence does not show what actual exposure of oil shale the discoverer or locators found and relied upon as a discovery upon any of the claims; that the finding merely of oil shale upon the land in question is insufficient to induce or warrant the belief, under the existing state of knowledge on the subject, that the same are valuable deposits and a fortiori was insufficient at the time those locations were made. It follows that the former decisions must be and are hereby adhered to.

Ex. 22, p. 154.

Mr. Finney, now First Assistant Secretary of Interior and author of the 1924

decision, had the responsibility to pass on the proposed decision before it was presented to the Secretary of Interior. It should be noted that he earlier had found the oil shale claims valid (this was in the draft of his 1924 decision). While he did not comment on it in his draft, and it was not critical to the opinion, Mr. Finney outlined the mining claimants homogenous mass theory. He certainly indicated his awareness of the state of the knowledge of the geology of the area in question, i.e., the Green River Formation. But contrary to the recently developed contention of the department, Finney rejected the concept that for a valid discovery to exist the oil shale that is exposed has to contain a certain quantum of oil yield per ton. This concept and requirement is of recent origin by the department and never was a requirement of *Freeman.*

The draft decision by Mr. Finney in *Freeman v. Summers,* recognizing oil shale as a valuable mineral and its abundance in the Green River Formation, was signed by the Secretary of Interior on September 30, 1927. Because of its importance, we quote the opinion at length:

From the foregoing it follows that the law requires as a prerequisite to a valid location that mineral be discovered within the limits of the claim located; that the mineral indications shall be such as to warrant a prudent man in the further expenditure of time and money, with a reasonable prospect of success. In order to warrant that proceeding, he must have discovered mineral in such situation and such formation that he can follow the vein or the deposit to depth, with a reasonable assurance that paying minerals will be found. In other words, the discovery of an isolated bit of mineral, not connected with or leading to substantial prospective values, is not a sufficient discovery; but a mining locator is not expected to find at the surface or in a shallow working a body of mineral which can be immediately mined and reduced at a profit. It is sufficient, as already stated, if he finds mineral in a mass so located that he can follow the vein or the mineral-bearing body, with reasonable hope and assurance that he will ultimately develop a paying mine.

In this case it appears from the evidence submitted at the original hearing and rehearing that actual discoveries of mineral were made either on the surface or in shallow workings. The existence of oil shale in northwestern Colorado is a matter of common knowledge, and the deposits have been the subject of exploration and study for a number of years....

There have been filed with the department photographs and other exhibits, descriptive of this Green River Formation, and which support the allegations of contestants as to its presence in the immediate area in which these particular claims are located.

The oil shale deposits of the United States have, as heretofore stated, been well known for a number of years, and have been the subject of much exploration, study, and investigation. They have been recognized by the Department and by Congress as a very valuable natural mineral resource. They have been the subject of treatment in a large number of experimental reduction plants, one of which was provided for by Congress and is now in operation.

While at the present time there has been no considerable production of oil from shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, there is no possible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.

It is not necessary, in order to constitute a valid discovery under the general mining laws sufficient to support an application for patent, that the mineral in its present situation can be immediately disposed of at a profit....

*The evidence in this case shows that in this particular area of Colorado the lands contain the Green River Formation and that this formation carries oil*

*shale in large and valuable quantities; that while the beds vary in the richness of their content, the formation is one upon which the miner may rely as carrying oil shale which, while yielding at places comparatively small quantities of oil, in other places yields larger and richer quantities of this valuable mineral.*

*In other words, having made his initial discovery at or near the surface, he may with assurance follow the formation through the lean to the richer beds*
*. . . .*

After careful consideration of the entire record the department has reached the conclusion that the locations are valid and, if otherwise regular, are entitled to pass to patent under the general mining laws. Prior departmental decisions in this case are accordingly recalled and vacated, the decision of the Commissioner of the General Land Office affirmed, and the homestead entries 018825 and 018827 of George L. Summers held for cancellation, because made upon lands covered by prior valid mineral locations. Motion sustained.

52 L.D. 201, 204–207 (1927) (emphasis added).

It is significant from the review of the *Freeman* opinion that Mr. Finney had thorough knowledge of the physical characteristics of the mining area in question. There had been significant and substantial evidence presented on these points at numerous hearings leading up to the decision: (a) that there were barren beds of rock between the surface outcroppings and that there was no physical connection between the surface outcroppings and the richer underlying beds; (b) that there was no surface exposure of the rich underlying beds; and (c) that a discovery of lean outcroppings can be followed through the various formations to the rich beds. The opinion is not based on any homogeneous mass theory and resolution of this question is not necessary to the vitality of the clear meaning of *Freeman*.

Finney's initial 1924 decision was completely reversed in the 1927 decision of *Freeman v. Summers*. The 1927 decision constitutes an absolute acceptance of geologic inference as proof of the rich oil shale beds existing beneath. It unequivocally accepts as evidence of a valid discovery lean surface outcroppings which can be followed through the various formations to the rich mineral oil shale beds.

The decision in *Freeman* was unqualifiedly followed by the department after 1927. It was freely and openly cited by officials of the department as the authority of its procedure relating to requisites of a valid discovery. For example, a mineral report filed by Assistant Mining Engineer C.C. Mackle on January 23, 1929, states:

[T]he Gem claims lie in rolling country and in the upper horizon of the Green River Formation in which occur minor beds of lean oil shales and major beds of barren sandstones. The formation on the Gem claims is quite similar to that exposed on the claims involved in the *Freeman-Summers* case ... Hence a valid discovery has been made not only in natural outcrops, but also in cuts on the claim.

Ex. 545, p. 4.

A mineral report by Examiner Oral T. Barry dated November 29, 1930, concludes:

The lean oil shales of the Green River Formation are exposed, in view of the decision in the *Freeman-Summers* case, it is sufficient to constitute a valid discovery.

Ex. 171, p. 2, Requests 128.1–.10.

Furthermore, high level department officials ordered a number of claim contests brought between 1925 and 1927 charging insufficient discovery to be dropped following the *Freeman* decision.

Department standards for the examination of applications for patent of oil shale claims continued until the end of September, 1930. By that time, 1,171 patents had issued on oil shale claims. At the end of September, 1930, the processing of patent applications stopped while Congress investigated charges made by Ralph S. Kelly

who was Chief of the Field Division of the General Land Office of Interior. The letter attacked department policies as to the issuance of patents to oil shale claims.

He alleged that the officials of the Department of Interior had improvidentially, erroneously and unlawfully, transferred to individuals in private companies considerable areas of potentially and immensely valuable oil shale lands. The Attorney General of the United States conducted an investigation and published a report on October 27, 1930, which concluded that the charges by Kelly were without foundation. The memory of Teapot Dome, a Wyoming circumstance, was fresh in the minds of the public and hearings on Kelly's charges were held before the Senate Committee on Public Lands and Surveys in January and February of 1931. (Ex. 23) Kelly had specifically attacked the discovery ruling in *Freeman*. He argued that it was contrary to precedent and that external business pressures had a bearing in the issuance of the ruling. In addition to Kelly's charges, there were news articles alleging that patents were falsely granted on the basis of locations that were misrepresented. Other charges were widely circulated in the public press.

The Senate held hearings on Kelly's charges. (At the hearings, it was made clear that even the richest beds of oil shale could not then, or prior to 1920, be marketed at a profit but that it had potential value.) The principal focus of the Senate inquiry was the basis of Finney's ruling that a valid discovery had been made on claims in question, including his reliance on geological inference and the homogenous mass geologic theory. Finney particularly denied reliance on the assumption that there were no barren beds of rock between the surface outcrop and the underlying rich beds in the following response to a Senate question:

Now, in the preparation of that decision, I accepted Mr. Duncan's statement of fact, but I considered the record, and I had in mind this showing made at this general hearing, because I sat through it all, as you see, and took some active part in it, but I did not find, Senator, as Mr. Kelly seems to erroneously think, that this was a solid mass of mineral from the grass roots down....

I did not accept in total the theory advanced by Larwill and Russell because I knew there were different beds of shale....

Now, Mr. Kelly had the idea, apparently that I accepted lock, stock and barrel the theory that every bit of this was rich oil-bearing shale. I did not so understand it and I don't think my decision holds that.

Ex. 23, pp. 135–136 (Finney testimony).

At no time did Finney testify that he believed there were barren beds of shale, only that the miner could with assurance follow the formation through the lean to the richer beds. Significantly he denied that he had accepted the homogenous mass theory. As to the state of the geologic art existing at the time, he stated "I assume that those geologists were telling us the truth and were giving us information as to the geology of the region." Ex. 23, p. 128.

Apparently, Mr. Finney's responses satisfied the concerns of the Senate Committee. Senator Walsh, the principal interrogator, voiced these observations near the conclusion of the Senate hearings after Finney had set forth the basis upon which he had drafted the *Freeman* decision:

I can understand that perfectly well and I can understand likewise the theory that there being a little strata on the surface, but the richer strata being exposed in cuts and canyons elsewhere, I can very well understand that contention, the discovery being made on the little strata on the top, although there are intervening barren strata, that the contention may very justifiably be made, that having discovered a little strata at the top, he may take into consideration what he learns from the exposures even miles away, of the existence of the rich strata below. That I can understand perfectly well. I

take it you had that in mind in writing your opinion.

*Id.* at 175.

At the Congressional hearings, no one, including Kelly, contended that oil shale was not a valuable resource. The committee inquired of Finney as to whether oil shale could be presently mined at a profit and was told that it could not. It should be kept in mind that the principal objective of the Congressional inquiry was to determine whether the *Freeman* rule of discovery had support in fact and law. At one point in his interrogation, Senator Walsh noted: "[t]here is abundant evidence apparently that there is on the (Freeman) claim valuable oil shale. That is quite aside from the question, however, as to whether discovery was made, because the contention, the real bone of contention, is that most of this is valuable at depths." Ex. 23, p. 10.

At this point we perceive these principles impacting mining law were crystalized in the *Freeman* case. *First,* a finding of lean surface deposits warrant the geologic inference that the claim contains rich valuable deposits below the surface. *Second,* this principle holds true irrespective of whether the author of the *Freeman* decision (Finney) accepted the Green River Formation as one homogenous mass or recognized that there were barren beds between the upper formation and the lower formation. Finney accepted a lean surface outcropping or "thin sliver" on the surface of the claim in the Green River as constituting a valid discovery. *Third,* a valid discovery was not dependent on a quantum oil yield from distillation of the outcroppings. *Fourth,* oil shale is a valuable mineral and present profitability is not a requisite to patentability. [We enlarge on this observation at a later point in the opinion where we interpret in detail the Supreme Court holding in *Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) ].

After the hearings, Senator Nye advised Secretary of Interior Worth that patenting of oil shale claims (under the rule of *Freeman* ) should be resumed. Through 1960 the Interior Department continued to re-

gard discoveries based on lean outcrops and under the *Freeman* rule as adequate under the mining law.

Significant Congressional action affecting the patenting of oil shale claims came in 1956 with the passage of the Act of July 20, 1956, 70 Stat. 592, 30 U.S.C. § 122. This Act facilitates the patenting of oil shale claims preserved under 30 U.S.C. § 193 by eliminating the requirement that the applicant must also obtain any outstanding patent to the surface rights. However, Congress did not specifically address the problem of discovery.

In 1956–57, the discovery doctrine of *Freeman* was reconsidered by the Bureau of Land Management. In this connection, on October 26, 1956, several evaluation engineers in Colorado requested clarification on what constituted a proper discovery. The engineers referred specifically to 27 claims on which only lean outcrops were exposed. The Regional Solicitor's Office gave the following advice regarding these 27 claims on February 10, 1957:

> The 27 claims ... are comparable to the claims discussed in *Freeman v. Summers,* ..., the Parachute Creek member containing the rich beds of oil shale underlies the claims at considerable depth. The discovery pits reveal thin strata of oil shale containing oil content ... we recommend that the Bureau of Land Management not contest the validity of the 27 claims on the theory that no discovery of valuable minerals have been made.

Ex. 756.

In 1961 the department took an entirely different position on discovery standards requisite for patents. The issuance of patents was abruptly and without notice terminated and the department issued complaints contesting all existing oil shale claims. The department, in effect, was attacking the principal holdings of *Freeman,* i.e., geologic inference and valuable mineral concept. These contests marked a complete deviation by the department from the rules, instructions, interpretation and stan-

dards which had unequivocally existed from 1915.

This effort to change 40 years of consistent administrative practice was squarely before the Supreme Court in *Andrus v. Shell Oil Company*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). (See discussion of district court and circuit court opinions in Sections V and VII.) The main thrust of the department's effort was directed against the findings of *Freeman* that "[i]t is not necessary, in order to constitute a valid discovery under the general mining law ... that the mineral ... can be immediately disposed of at a profit." 52 L.D. at 206.

However, in its Supreme Court brief in *Andrus v. Shell Oil Co.*, the department also attacked the "geologic inference" of *Freeman* and argued that the decision was based on an "erroneous interpretation of the mining laws" in that "claims founded on geologic inference will be struck down".

The Supreme Court agreed that one of the "two distinct issues" decided in *Freeman* was "whether a finding of lean surface deposits warranted the geologic inference that the claim contained rich 'valuable' deposits below." 446 U.S. at 667, 100 S.Ct. at 1938. As we have already noted, the Supreme Court concluded that "[b]oth issues were decided in favor of the oil shale claimant: the geologic inference was deemed sound and the fact that there was 'no possible doubt ... that [oil shale] constitutes an enormously valuable resource for future use by the American people' was ruled sufficient proof of 'value'." *Id.* at 667, 100 S.Ct. at 1938. The Supreme Court quoted a summary of the discovery doctrine of *Freeman* given by Senator Walsh in the 1931 Senate hearings: "[the decision means] that the prospector having found at the surface the layer containing any quantity of mineral, that is of oil-bearing shale or kerogen, that that would be a discovery in view of the beds down below of richer character." 446 U.S. at 669, 100 S.Ct. at 1939.

The Supreme Court observed that following the Senate hearings, the patenting of oil shale lands under the standards enunciated in *Freeman* was at once resumed. The court noted that "[r]arely has an administrative law decision received such exhaustive congressional scrutiny. And following that scrutiny, no action was taken to disturb the settled administrative practice; rather Senator Nye advised the Interior Department to continue patenting oil shale claims." *Id.* at 673, n. 12, 100 S.Ct. at 1941, n. 12. The Supreme Court concluded that "[t]o hold now that *Freeman* was wrongly decided would be wholly inconsistent with (Congressional) intent. Moreover, it would require us to conclude that Congress in 1930–31 closed its eyes to a major perversion of the mining laws. We reject any such conclusion." *Id.* at 671, 100 S.Ct. at 1940. The Court also stated that "[t]he original position of the Department of Interior, enunciated in the 1920 instructions and in *Freeman v. Summers*, is a correct view of the Mineral Leasing Act as it applies to the patentability of those claims." *Id.* at 673, 100 S.Ct. at 1941.

The Supreme Court's affirmance of *Freeman* cannot be limited in application to acceptance of oil shale as a valuable mineral deposit. Significantly the Supreme Court gave as reasons to supporting its order, the consistent and settled administrative practice of the Department of Interior as well as exhaustive Congressional scrutiny and approval. We submit that these reasons are applicable to the so-called "thin sliver" or lean outcropping rule of discovery formulated by Finney in 1924–1927. Significantly the rule was a principal issue in *Freeman* and was the subject of the Senate searching inquiry. Further, the department applied this interpretation consistently for nearly 40 years in its evaluation and issuance of patents to oil shale claims. This long standing, consistent policy is given additional credence by the holding in *Andrus v. Shell Oil Company, supra,* by the Supreme Court and affirmation of the expansive rulings by the district court and 10th Circuit Court of Appeals in *Shell Oil v. Andrus,* 591 F.2d 597 (10th

Cir.1979). The department's interpretation of the *Freeman* rule of discovery as contended in this litigation is not supportable. It cannot be sustained. We emphasize that whether *Freeman* was at variance with the established law prior to 1927 (date of issuance of *Freeman*) or whether it was based on an erroneous concept of the known geology, it was, until 1960, the basis for an unswerving, consistent direct policy of the department. The decision has the scrutiny, approval and imprimatur of Congress and express approval by the Supreme Court in *Shell*. The rule of discovery established in *Freeman v. Summers, supra,* constitutes a special principle of mining law and has unique application to oil shale placer claims, not only with respect to the marketability aspect of discovery but to the acceptance of geologic inference as to the existence of rich shale beds below the surface.

Thus, if there is exposed a lean surface outcrop and "thin sliver" of oil shale at any point on the claim it constitutes a valid discovery. Further, the geologic indicator is proof of the mineralized character of the entire 160 acre claim when the mineralization of that acreage is in question.

The failure of Congress even to propose legislation that would alter the requirements of discovery under *Freeman* manifests its approval of that rule. A review of the legislative history and subsequent administrative and Congressional action under the Mineral Leasing Act of 1920 indicates that Congress intended and did, in fact, ratify a liberalized version of the traditional rule of discovery, as embodied in *Freeman*. It is difficult to discern the congressional intent from the debates proceeding the enactment of the Mineral Leasing Act of 1920. However the 1920 Instructions, promulgated only three months after the law was enacted, disclose that oil shale was regarded as sufficiently valuable to be a legally discoverable mineral despite the lack of prospects for immediate profitable development. This administrative ruling should be accorded considerable and persuasive weight, since it is a contemporaneous construction by those who are intimately familiar with the legislative history and who are charged with the enforcement of the act. *United States v. Leslie Salt Co.,* 350 U.S. 383, 396, 76 S.Ct. 416, 423, 100 L.Ed. 441 (1956); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *United States v. Shreveport Grain and Elevator Co.,* 287 U.S. 77, 84, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932); *United States v. Philbrick,* 120 U.S. 52, 59, 7 S.Ct. 413, 417, 30 L.Ed. 559 (1887); *Brennan v. Udall,* 379 F.2d 803, 806–807 (10th Cir.) *cert. denied,* 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967).

As related above, in 1930–31, a major investigation was conducted by Congress into the Department of Interior's policy of patenting oil shale lands. The inquiry included an evaluation of the several facets of the discovery rule of *Freeman* and the implications it held for further patenting of oil shale lands. The failure of Congress to modify or overrule the *Freeman* doctrine when presented with an opportunity to do so is a further indication of Congress' intent. *Shell Oil v. Andrus, supra; Corn Products Refining Co. v. Commissioner of Internal Revenue,* 350 U.S. 46, 53, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955); *United States v. Leslie Salt Co., supra,* 350 U.S. at 397, 76 S.Ct. at 424; *Norwegian Nitrogen Products Co. v. United States, supra,* 288 U.S. at 313, 53 S.Ct. at 357; *Kay v. FCC,* 443 F.2d 638, 646–647 (D.C.Cir.1970). As was contemplated by Congress, the Department of Interior resumed patenting oil shale lands under the principles set out in *Freeman v. Summers, supra.*

That Congress should take a special attitude toward oil shale lands and ratify in *Freeman* exceptions to traditional discovery rules is explained by the unusual role of oil shale as a natural resource in contrast to other locatable minerals. As the Congressional hearings and debates have disclosed, oil shale was perceived as highly valuable and crucial to the national security and welfare. Congress believed that commercial development of oil shale would soon be feasible, because of its per-

ception of the rapid depletion of existing sources in oil. That attitude has persisted in varying degrees throughout the years and its vitality continues to this date. Consequently, various means have been sought to foster the development of oil shale. One such technique was Congressional approval of the rules of discovery set forth in *Freeman*. This interpretation was solidified by the Supreme Court in *Shell* and the discovery rules of *Freeman v. Summers* are an integral part of the jurisprudence of mining law as it relates to oil shale. Interior is bound by this clear expression as well as principles of mining law.

This long, stormy and somewhat complicated congressional and administrative involvement in the disposal of oil shale lands demonstrates congressional and Supreme Court approval of the *Freeman* rule of discovery. It is timely that the department should apply the approved rule that has been unequivocally approved by the Supreme Court in *Shell Oil Co. v. Andrus, supra*. An attempt by the Interior Board of Land Appeals to overrule or enlarge on requisites set forth in *Freeman* or *Shell* by strained pre-*Freeman* reasoning distorts the Congress' mandate, intention and the strongly worded imprimatur of the Supreme Court. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Fribourg Navigation Co., Inc. v. Commissioner of Internal Revenue*, 383 U.S. 272, 283, 86 S.Ct. 862, 868, 15 L.Ed.2d 751 (1966); *Cammarano v. U.S.*, 358 U.S. 498, 511, 79 S.Ct. 524, 532, 3 L.Ed.2d 462 (1959); *Service v. Dulles*, 354 U.S. 363, 380, 77 S.Ct. 1152, 1161, 1 L.Ed.2d 1403 (1957); *Corn Products Refining Co. v. Commissioner, supra; National Labor Relations Board v. Gullett Gin Co.*, 340 U.S. 361, 365–366, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951); *Willmette Park District v. Campbell*, 338 U.S. 411, 417–418, 70 S.Ct. 195, 198–199, 94 L.Ed. 205 (1949); *Crane v. Commissioner*, 331 U.S. 1, 7–8, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947); *Brooks v. Dewar*, 313 U.S. 354, 360–361, 61 S.Ct. 979, 981–982, 85 L.Ed. 1399 (1941);

*Helvering v. R.J. Reynolds Tobacco Co.*, 306 U.S. 110, 116, 59 S.Ct. 423, 426, 83 L.Ed. 536 (1939); *Brennan v. Udall, supra*. The "re-enactment rule" enunciated in these cases should not be used in the absence of clear evidence that Congress was aware of the administrative regulation at the time of its review of the rules of discovery. *Rothenberg v. United States*, 233 F.Supp. 864, 866–867 (D.Kan.1964), *aff'd.*, 350 F.2d 319 (10th Cir.1965); *see also* Davis, *Administrative Law* § 5.07 (1958). Here, it is clear that Congress refused to modify the *Freeman* rule despite full knowledge of its existence and meaning. The Supreme Court gave full force to this course of congressional inaction in *Shell Oil Co. v. Andrus, supra*. Thus, the re-enacted rule is applicable here.

For the fundamental reasons outlined, we hold that there is no persuasive authority to adopt the *new* discovery rule suggested by the department. As the Supreme Court concluded in *Andrus*, there need not be an exposure of the Parachute Creek Members for a valid discovery to occur.[19]

In addition, we find that the 3 gpt minimum oil yield requirement announced by the Interior Board of Land Appeals in its decision in *Weber v. United States, supra*, as well as in other I.B.L.A. proceedings subsequent to 1982 is without precedent and is invalid. This purported standard, recently developed, is arbitrary and capricious and is not based on controlling law.

## IX. PERFORMANCE OF ANNUAL ASSESSMENT WORK: EFFECT OF NONPERFORMANCE

For the following reasons, we have concluded that the claims involved in this matter cannot be invalidated because of the assessment work requirement:

1. The department's consistent post-1935 practice created a rule of law binding on the department, which it cannot now retroactively repudiate. According to this rule, the old assessment work contest decisions were nullities and per-

---

**19.** *See supra* 18 and accompanying text.

formance of assessment work on oil shale claims was not necessary to preserve those claims as against the United States;

2. Compelling reasons dictate that this is an appropriate case in which the defenses of equitable estoppel and laches should be applied against the government in order to prevent the department from relying on the old assessment work contest decisions or asserting an assessment work objection to the validity of the claims; and

3. The department's rules and practices, including the requirement that a claim for failure to perform assessment work must be initiated during the existence of a default in the work. In addition, the department's regulations until 1972 stating that the department had no concern with the performance of assessment work and that the only risk of nonperformance was that of relocation by another claimant during a period of default, preclude a challenge on the basis of noncompliance with the assessment work requirement.

■ Anyone of these reasons, alone or in concert with another is sufficient to validate a claim. However, our ruling does not rely on these reasons alone. We also conclude that there has been substantial performance of the assessment work requirement, as recognized in *Hickel v. Oil Shale*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). We are aware that our conclusion reverses the findings of Judge Sweitzer with regard to the Elizabeth and Carbon Claims and the Interior Board of Land Appeals with regard to the Oyler claims, as well as the Elizabeth and Carbon claims. We have carefully reviewed the evidence and are of the opinion that there has been substantial performance of the assessment work requirement for each of these claims.

A. *Nature of a Locator's Interest in an Unpatented Mining Claim*

Initially it should be observed that a locator or owner of an unpatented mining claim has a vested interest in real property.

*Wilbur v. U.S. Ex. Rel Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) describes the interest held by a locator of a mining claim. This was emphasized in *Wilbur v. United States*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930). *See also United States v. Locke*, — U.S. —, —, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985).

When the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the rights of present and exclusive possession. The claim is property in the fullest sense of the term; and may be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States. The right of the owner is taxable by the state; and is "real property" subject to the lien of a judgment recovered against the owner in a state or territorial court.... The owner is not required to purchase the claim or secure patent from the United States but so long as he complies with the provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent....

*Wilbur v. United States*, 280 U.S. 306, 316–317, 50 S.Ct. 103, 104, 74 L.Ed. 445 (1930).

This interest in land cannot be arbitrarily, unreasonably or unfairly dissolved or terminated at the election of the department by inconsistent, and at times conflicting rules and policies of the department. *Shell Oil Co. v. Andrus, supra.*

*How Failure to Perform Annual Work Affects the Interest*

The interest of the locator can only be divested for substantial reasons. The interest, however, must be maintained in compliance with the laws under which initiated as provided in Section 37 of the 1920 Mining Act. Maintenance of the claim includes performing annual work. The purpose of this requirement is to assure good faith and diligence in the development of the claim. It also serves to prevent promiscuous location of mining claims without the performance of work to maintain them.

Rationale for the rule is that performance of annual work serves as notice to other potential locators to refrain from occupying, locating or developing the property.

The obligation to perform annual assessment labor under the mining law in existence at the time of the 1920 Mineral Leasing Act takes the form of a condition subsequent. This relates to the possessory title from the United States and right of exclusive possession. *Union Oil Co. v. Smith,* 249 U.S. 337, 349, 39 S.Ct. 308, 311, 63 L.Ed. 635 (1919); *Black v. Elkorn Mining Co.,* 163 U.S. 445, 450, 16 S.Ct. 1101, 1103, 41 L.Ed. 221 (1896). We discuss the application of conditions subsequent at a later point in the opinion.

In describing how failure to perform annual work operates on mining claims, an authoritative and classical treatise in wide use at the time of enactment of the 1920 Act states:

> The penalty for failure to comply with the requirement of the law, in respect to the performance of annual labor, is found in section twenty-three hundred and twenty-four of the Revised Statutes:—
>
>> Upon a failure to comply with these conditions, the claim or mine upon which such failure occurs shall be open to relocation in the same manner as if no location of the same had ever been made.
>
> The term "forfeiture" does not appear in the statute, but the courts employ it as a comprehensive word indicating a legal result flowing from a breach of *condition subsequent, subject to which the locator acquires his title.*
>
> In a previous section we have noted the distinction between forfeiture and abandonment, and have there enumerated the leading characteristics of both. We have heretofore observed the reluctance with which the courts enforce this penalty. They have settled the doctrine that the forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to

have work performed or improvements made to the amount required by law.

> While it is often said that a forfeiture can be shown only upon "clear and convincing evidence", the proof is made as required whenever it is shown by a preponderance of the evidence that the full amount of annual labor or improvements was not made or expended within a given year.
>
> The courts do not incline to the enforcement of this class of penalties, which have always been deemed in law odious.
>
> Of course, while a claim is subject to relocation for failure to perform the requisite annual labor, no forfeiture is worked, and the estate of the locator is not divested until there has been a peaceable entry for the purpose of perfecting the relocation. The right of the original claimant is terminated only by the entry of a new one.

2 Lindley on Mines § 645 (3d ed. 1914) (emphasis added).

It is clear that under mining law in existence at the time of passage of the 1920 Mineral Leasing Act, failure to perform annual assessment work did not constitute an immediate forfeiture of the claim; nor did it render an immediate self-destruct or sudden death effect on the claim. This never was the law and presently finds no support in the reported cases.

B. *Requirements of Annual Assessment Work*

The General Mining Act of 1872 provided that, once a claim had been located "and until a patent has been issued therefore, not less than $100 worth of labor shall be performed or improvements made during each year." 30 U.S.C. § 28. Upon a showing that at least "$500 worth of labor has been expended or improvements made upon the claim by [the claimant] or grantors . . .", the claimant was entitled to a patent which operated to pass full fee title to the claimant. 30 U.S.C. § 29; *Freese v. United States,* 639 F.2d 754 (Ct.Cl.) *cert. de-*

**1182**

*nied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981).

Under the Mineral Leasing Act of 1920, lands previously open to location and patent became available solely on a lease basis. However, previously located valid claims which were still in existence on February 25, 1920, were protected by a savings clause, 30 U.S.C. § 193, which allowed such claims to continue to qualify for patents so long as "thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery."

Prior to *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) (*Hickel*) the provisions regarding annual assessment work were construed to relate solely to the right of other miners to challenge and relocate claims upon which the annual work had not been performed. The government had no direct interest in the matter, being concerned only with assuring that mineral-bearing lands were kept open for private development. 30 U.S.C. § 22; *see also Krushnic, supra; Barklage v. Russell,* 29 I.D. 401 (1900); *McEvoy v. Megginson,* 29 I.D. 164, (1899). *See generally* 2 Lindley on Mines § 624 at 1531 (3d. ed. 1914). Furthermore, determination of the right of possession as between rival claimants was a matter committed to the courts alone. *Barklage, supra.*

Therefore, so long as the annual assessment work was performed, the locator of a claim could hold possessory title indefinitely. Also, a patent could be sought by making application to the proper land office upon the completion of $500 work of annual work, pursuant to 30 U.S.C. § 29. It is significant that the claim could be mined indefinitely without an application for patent.

In *Hickel,* the Supreme Court ruled that rival claimants were not the only parties who could challenge a claim for failure to perform annual assessment work. The United States, as beneficiary of all invalid claims, also had a right, through the Department of Interior, to challenge claims

for failure to perform the annual work. With regard to the amount of work necessary to maintain a claim, the Court announced its doctrine of "substantial compliance":

We agree with the Court in *Krushnic* and *Virginia-Colorado* that every default in assessment work does not cause the claim to be lost. Defaults, however, might be the equivalent of abandonment; and we now hold that token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28, is not adequate to "maintain" the claims within the meaning of § 37 of the Leasing Act ... [W]e conclude that [*Krushnic* and *Virginia-Colorado*] must be confined to situations where there had been substantial compliance with the assessment work requirements of the 1872 Act, so that the "possessory title" of the claimant, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial grounds.

400 U.S. at 57, 91 S.Ct. at 201.

Since *Hickel,* the Department of Interior has construed 30 U.S.C. § 28 strictly, as requiring actual performance of $100 worth of assessment work *each* successive year until a final certificate of patent is issued. The department considers any default of the terms of 30 U.S.C. § 28 to constitute failure to substantially comply with Section 28 and thereby warrants invalidation of the claim.

We reject this rigid interpretation of *Hickel.* The Supreme Court outlined a more practical and flexible standard of performance of annual work "so that the 'possessory title' of the [mining] claimant will not be disturbed on flimsy or insubstantial grounds." 400 U.S. at 57, 91 S.Ct. at 201.

In *Hickel,* the Supreme Court unequivocally held that something measurably less than rigid and literal compliance would satisfy the statutory requirements. "[W]e now hold that token assessment work,[19A] or assessment work that does not substantially satisfy the requirements of 30 U.S.C.

**19A.** We equate *token assessment work* to mean minimal, nominal or slight work.

§ 28, is not adequate to 'maintain' the claims within the meaning of § 37 of the Leasing Act." 400 U.S. at 57, 91 S.Ct. at 201. This interpretation of 30 U.S.C. § 28 was reiterated in *United States v. Locke,* — U.S. —, —, 105 S.Ct. 1785, 1796, 85 L.Ed.2d 64 (1985). The Court made clear in *Locke* that less than full compliance with the statute would not result in an automatic loss of the claim. Rather, "it would subject the claimant to a case-by-case determination of whether he nonetheless intended to keep his claim." *Id.*

■ It is significant that the Court, in interpreting *Krushnic* and *Virginia-Colorado* on the question of substantial compliance, was dealing with annual assessment work defaults of at least one year (several years in *Virginia-Colorado,* including 1932–1935, while the case was being appealed). The Court in *Hickel* interpreted those cases as falling, nonetheless, within the ambit of substantial compliance with the annual assessment work requirement. It found that its decisions in *Krushnic* and *Virginia-Colorado* reflected "a judicial attitude of fair treatment for claimants who have substantially completed" the annual work requirement. 400 U.S. at 52, 91 S.Ct. at 199. It is clear from *Hickel* and its interpretation of *Krushnic* and *Virginia-Colorado* that assessment work need not have been performed in every single year.

The present profile of mining law, through its historical background and as interpreted in *Hickel,* merely requires substantial and not rigid adherence to the statutory annual assessment work requirement. Further, to maintain the validity and vitality of the claim, work does not have to be performed in every year. This imprimatur of the Supreme Court merely follows long-established mining law and is not a new concept.

The author of the leading mining law treatise at the time of the enactment of the 1920 Mineral Leasing Act states that the $100 annual work requirement must only be performed in good faith. Although he criticizes the practice, he notes that "[t]here is probably no single provision of the law which is evaded to a greater extent than this one." 2 Lindley on Mines, § 624 at 1532 (3d. ed. 1914).

■ We construe the "substantial compliance" standard in *Hickel* as requiring less than actual and strict compliance.[19B] Substantial compliance called for in 30 U.S.C. § 28 and in those cases interpreting it (e.g. *Hickel*), demands primarily a good faith effort on the part of the locator to develop the claim and facilitate the eventual extraction of the mineral from the earth. *Cf., Smelting Company v. Kemp,* 104 U.S. (14 Otto) 636, 26 L.Ed. 875 (1882) and *Lawson v. Page,* (ALJ Opinion). Furthermore, the United States is well-endowed with a rich history of mining law that has evolved in the western United States since the early 1800's. Decisional law considering the question whether actual or substantial compliance with mining statutes is required is clear on the point that substantial compliance is sufficient and that such compliance is measured primarily by a good faith standard. *See, e.g., Continental Oil Co. v. Natrona Service, Inc.,* 588 F.2d 792 (10th Cir.1978) (interpreting the Supreme Court's opinion in *Union Oil Company v. Smith,* 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919) as requiring substantial compliance with the element of possession and working); *Rasmussen*

---

**19B.** We incorporate here paragraph 13 of *I. Summarization of Holdings.* We have carefully considered the position of the Secretary on the question of work performance on claims (Motion/Brief for Summary Judgment of Defendant). Admittedly, the annual work was not performed on certain claims for noted years. However, this is not dissimilar to facts in *Wilbur v. U.S. Ex Rel. Krushnic,* 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and *Ickes v. Virginia-Colorado Development Corp.,* 295 U.S. 639,

55 S.Ct. 888, 79 L.Ed. 1627 (1935). There, the validity of claims were not affected by the absence of work for some years. The analysis set forth in this opinion establish a workable rather than a rigid yardstick for determination of annual work. This gives meaning to *Hickel v. Oil Shale Co.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970) (*Hickel*) and is within the spirit and tenor of applicable statutes, Congressional expression, decisional law and precedents.

*Drilling v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144 (10th Cir.1978), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (affording indulgence to a miner who attempts to comply with laws regarding the perfection of a valid location in good faith); *Lombardo Turquoise Milling & Mining Co., Inc. v. Hermanes,* 430 F.Supp. 429 (D.Nev.1977) aff'd 605 F.2d 562 (9th Cir. 1979) (noting that under Nevada law, senior locators held to standard of substantial compliance with statutes regarding certificate of location); *Inman v. Ollson,* 213 Or. 56, 321 P.2d 1043 (1958) (noting well-established rule that substantial compliance with mining laws is all that is generally required); *Scoggin v. Miller,* 64 Wyo. 206, 189 P.2d 677 (1948) (defendants did not forfeit rights under placer mining claims where they made good faith effort to comply with statutory requirements).[19C] The Court made clear in *United States v. Locke,* —— U.S. ——, ——, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985) that less than full compliance with the statute would not result in an automatic loss of the claim. Rather, "it would subject the claimant to a case-by-case determination of whether he nonetheless intended to keep his claim." *Id.*

A review, therefore, of American mining law indicates that the possessory title of the claimant will not be disturbed, despite minor variances with statutory requirements, if a good faith performance of the annual work is manifested.

██ Finally, we note that sections 28 and 29 of Title 30, regarding annual assessment work requirements and the ultimate receipt of a certificate of patent upon the completion of $500 worth of work, form integral parts of the same mining law and therefore must be construed in harmony with each other. In our view, an oil shale claimant who has fulfilled the $500 patent work requirement has substantially complied with the annual work requirement. If the $500 payment is sufficient to exact a patent from the United States, a logical deduction from this is that expenditure of this amount should fulfill annual work requirements. Therefore, compliance with the $500 requirement set forth in 30 U.S.C. § 29 substantially satisfies the requirements of section 28.

This reasoning is bolstered by the holding of the Supreme Court in *Krushnic* in which it stated that "[w]henever $500 worth of labor in the *aggregate* had been performed, other requirements aside, the owner became entitled to a patent, even though in some years annual assessment labor had been omitted." 280 U.S. at 317, 50 S.Ct. at 104 (emphasis added) *See also Hickel, supra; Andrus v. Shell Oil Co.,* 446 U.S. 657, 658, n. 1, 100 S.Ct. 1932, 1934, n. 1, 64 L.Ed.2d 593 (1980); *Virginia-Colorado,* 295 U.S. at 645. Based upon the Supreme Court's rulings in *Locke, Hickel, Virginia-Colorado* and *Krushnic,* we hold that substantial compliance with the annual work assessment requirement only requires a claimant to perform something more than nominal or token work.

We reject any contention that Sections 28 and 29 individually impose separate requirements and therefore should be considered irrelevant to each other.

Under Section 28 the payment of the annual $100 assessment requirement grants the locator *possessory rights* in the development of the claim and allows demonstration of the mineral character of the land by the locator. Fee title still remains in the United States. However, under Section 29 a requirement to receive a patent in the land is conditioned on performance of not less than $500 worth of development work for each claim. If this payment is made and other requirements are present, the United States is under a duty to convey fee simple title to the applicant and the title of the government is divested. The award of the patent constitutes the delivery of fee simple title to the patent holder.

### C. Burden of Proof as to Annual Work Performance

Once a challenge is made to the validity of an oil shale claim due to an alleged

19C. *But cf., Rogers v. United States,* 575 F.Supp. 4 (D.Mont.1982) [refusing to apply a substantial compliance standard to the plain language of 43 U.S.C. § 1744(c) ].

failure to perform annual assessment work, who bears the burden of establishing whether that work was in fact done?

A successful challenge to a mining claim involves the divestiture of an interest in real property. An accepted principle of the law is that forfeitures are not favored. *See, e.g., City and County of Denver, Acting By and Through Board of Water Commissioners v. Bergland,* 517 F.Supp. 155 (D.Colo.1981), aff'd in part, rev'd in part, 695 F.2d 465 (10th Cir.1982); *United States v. Smith,* 497 F.Supp. 459 (D.Iowa, 1980), *rev'd* 659 F.2d 97 (8th Cir.1981).

Under well-established mining law jurisprudence, the burden of establishing nonperformance of annual work is on the one who asserts it. *See, e.g., Hammer v. Garfield Mining & Milling Co.,* 130 U.S. 291, 9 S.Ct. 548, 32 L.Ed. 964 (1889); *Zerres v. Vanina,* 134 F. 610 (9th Cir.1905); *Tiggeman v. Mrzlak,* 40 Mont. 19, 105 P. 77 (1909); *Gear v. Ford,* 4 Cal.App. 556, 88 P. 600 (1906); *Goldberg v. Bruschi,* 146 Cal. 708, 81 P. 23 (1905); *Callahan v. James,* 141 Cal. 291, 74 P. 853 (1903); *Crown Point Gold-Mine Co. v. Crismon,* 39 Or. 364, 65 P. 87 (1901); *Beals v. Cone,* 27 Colo. 473, 62 P. 948 (1900), *appeal dism'd,* 188 U.S. 184, 23 S.Ct. 275, 47 L.Ed. 435 (1902); *Harris v. Kellogg,* 117 Cal. 484, 49 P. 708 (1897); *Quigley v. Gillett,* 101 Cal. 462, 35 P. 1040 (1894); *Hall v. Kearny,* 18 Colo. 505, 33 P. 373 (1893).

Commentators on mining law likewise recognize the strong showing which must be made by a party seeking forfeiture of a mining claim:

> The burden of proving a forfeiture rests upon the person asserting it. The courts will construe the law liberally to prevent a forfeiture, which is to say that a statute or rule providing for forfeiture will be strictly construed, and the person claiming a forfeiture under it must show that the case comes within the strict letter of the law. Forfeiture will not be presumed. To the contrary, a forfeiture must be established by clear and convincing evidence, and every reasonable doubt will be resolved in favor of the validity of a mining claim and against the finding of a forfeiture.
>
> A person asserting a forfeiture of a mining claim for failure to perform annual labor has the burden of showing that the required expenditure was not made.

2 America Law of Mining § 46.03[6] at 46–24, 25 (2d ed. 1984). *See also* 54 Am. Jur.2d. *Mines and Minerals* § 69 (1971) (doubt is to be resolved against the one seeking forfeiture).

■ Given the stated reasons and based on sound, basic mining principles, we hold that the Department of Interior, as a contestant, has the burden of establishing nonperformance of the assessment work when that matter is in question. We draw no distinction whether the contestant is the government or a private party. Logic and persuasive mining law precedent dictates no different treatment.

To uphold the department's position would engraft unwarranted exceptions to established mining law. The end effect would be that rules of forfeiture as it relates to interests in real property would be construed one way when private parties are involved. A completely different principle would be applied when the government (acting by and through the Department of Interior) seeks forfeiture. Nothing prompts such a result and distortion of mining law.

As we have set forth in decisional law outlined above, there is nothing unfair about this requirement. Traditional mining law has always put this burden on a rival claimant. Since the enactment of the 1920 Mineral Leasing Act made location by rival claimants impossible, it is only natural that the same burden should be imposed on the government (department), who now stands in the shoes of a contestant or rival claimant.

The reliance of the department on *Foster v. Seaton,* 271 F.2d 836 (D.C.Cir.1959), is misplaced. This case is cited by the government for the proposition that the government need only establish a prima facie case in order to switch the burden to

the claimant to establish the validity of its claim by a preponderance of the evidence. *United States v. Catlin Bohme, et al.,* 48 I.B.L.A. 267, 87 I.D. 248 (1980). We consider *Foster* to be wholly inapplicable as precedent on this point for several reasons. *First,* in *Foster,* the court was considering the appropriate burden of proof in an action attacking a claim on the grounds that valid *discovery* had not been made. However, possessory title only vests in the claimant *after* discovery has been successfully completed. Attacking the validity of a claim in its inception, before possession has passed to the claimant, is not the same as asserting forfeiture of a valid title for failure to perform annual work. Placing the burden on the claimant to prove valid *discovery* does not carry the overtones of unfairness which would exist where a possessory owner is forced to establish the validity of his possessory title against one seeking forfeiture. *Second,* the court in *Foster* apparently relied on *United States v. Strauss,* 59 I.D. 129 (1945) as evidencing a long-established Department of Interior policy regarding the appropriate burden of proof. We are of the view that the *Strauss* case does not represent established Interior policy, but rather deviates from it. Interior cases decided subsequent to *Strauss* state that the burden of attacking discovery is on the government and that this reflects department policies. *See, e.g., Estate of Victor E. Hanny,* A–26280 (March 5, 1952); *T.J. Rochon,* A–26203 (July 18, 1951); *Marshal D. Draper,* A–25800 (April 19, 1950). *Third,* in *Foster,* the Savings Clause of the 1920 Mineral Leasing Act was not at issue. As stated previously, the Mineral Leasing Act of 1920 cut off the right to discover new claims which could ultimately be patented and instead only allowed such lands to be leased. The Act, however, preserved the right to obtain patents on claims validly discovered prior to the 1920 Act and properly maintained according to the requirements of prior law. 30 U.S.C. § 193. Therefore, in the present action, the government is in no danger of being placed in the position of affirmatively attacking an unknown number of future claims since the right to make new claims was cut off almost sixty-five years ago. *Fourth, Foster* also involved the present marketability of sand and gravel. We find this to be a significant distinction since oil shale has been held to be in an altogether different category and subject to different treatment in mining law. *See Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

The rationale for imposing the burden of proof on the one attacking the validity of the claim for failure to perform assessment work may also be explained in terms of *conditions precedent* and *subsequent.*

Briefly, a *condition subsequent* is a provision or condition which cuts off an existing legal right, entitlement or benefit. Upon its occurrence, a *condition subsequent* operates to defeat or annul a right or benefit.

On the other hand, a *condition precedent* requires certain performance or condition which must take place before a legal right can vest. The condition must occur or be performed before a right, entitlement or benefit comes into existence and becomes binding. *See, e.g., Wien Consolidated Airlines, Inc. v. C.I.R.,* 528 F.2d 735 (9th Cir.1976); *see generally* 3A Corbin on Contracts § 739, at 442 (1960).

As applied here, the valid discovery of a mining claim constitutes a *condition precedent* to a grant by the United States of an interest in real property which bestows upon the locator the right to immediate and exclusive possession. Title 30 U.S.C. § 26 provides in part that "[t]he locators of all mining locations ... on the public domain ... so long as they comply with the laws of the United States ... shall have the exclusive rights of possession and enjoyment ...". *See also Hickel, supra; Belk v. Meagher,* 104 U.S. (14 Otto) 279, 26 L.Ed. 735 (1881). Therefore, this possessory interest in real property is subject to the described *conditions precedent* such as discovery of minerals within prescribed limits and fulfillment of location procedures. No possessory title passes to the locators

until these *conditions precedent* have been performed.

Once a valid location has been made and possessory title has passed to the claimant, the only way it may become subject to divestiture or forfeiture, is through the occurrence of a *condition subsequent,* such as nonperformance of annual work. In other words, the locator of a claim holds it subject to a *condition subsequent,* the occurrence of which may extinguish the claim. In *United States v. Locke,* — U.S. —, —, 105 S.Ct. 1785, 1794, 85 L.Ed.2d 64 (1985), the Supreme Court noted the common law distinctions between "abandonment" and "forfeiture" of a claim. The Court stated that abandonment of a claim occurs only when it has been shown the claimant intended to relinguish a claim. In contrast, forfeiture of a claim would occur when there had been a showing of noncompliance with the law. *Id.* However, proof of noncompliance with a law will result in a forfeiture only if the law is a *condition subsequent* to continued possession of the property and the party claiming a breach of that condition sustains his burden of proof. But while the claimant has the burden of proving the occurrence of the *condition precedent* which has to be met before he can hold a valid claim, the party seeking forfeiture *after* the possessory interest has vested has the burden of proving the occurrence of the *condition subsequent,* that is, the failure to perform the annual assessment work.

Experts in mining law have long recognized the benefits of using *conditions precedent* and *subsequent* in determining the validity of mining claims. In his 1914 classic treatise on mining, Professor Curtis H. Lindley stated that "[annual labor] is not a condition precedent to the obtaining of a patent." 2 Lindley on Mines § 624 at 1532 (3d ed. 1914). Congress enacted the 1920 Mineral Leasing Act in full awareness of the status of the mining law at that time. It is logically assumed that Congress did not intend to abrogate so many years of mining law, but intended, instead, to engraft these well-established mining principles (such as *conditions precedent*

and *subsequent* and the disfavor of forfeiture) in the 1920 Act. To require, instead, that the original claimant has the burden of proving his completion of annual work or losing title, would be to distort a long history of mining law and that, Congress did not do.

Recent commentators have also recognized the use of the principles of *conditions precedent* and *subsequent* in describing the status of a miner's possessory title:

When the location of an unpatented mining claim has been perfected, it has the effect of a grant by the United States of the right of present and exclusive possession. This grant is subject to certain *conditions* precedent, the most important of which are the discovery of minerals within the limits of the claim and compliance with the requirements of law regarding location procedures. It is now coming to be recognized that the grant is also subject to certain *conditions subsequent,* such as the condition that the ground claimed must remain mineral in character. As in the case of other grants by the United States, no title passes until the conditions precedent have been performed, but once title passes, the claim may be forfeited or may become subject to forfeiture upon the occurrence or non-performance, as the case may be, of the *condition subsequent.*

2 American Law of Mining § 46.05(1) (2d ed., 1984) (emphasis added).

In a treatise prepared under the auspices of the State of California in an effort to provide a comprehensive compendium on United States mining law, it is recognized that "[the] burden of proving the nonperformance of annual assessment work rests upon him who asserts it" and that "[t]he burden of proof of showing failure to make the annual expenditure is upon the party alleging it ...". *See* 1 American Mining Law § 389 at 496 (1943).

For the foregoing reasons, and based on treatises and decisional law, we conclude that the government must bear the burden

of proof in establishing grounds for forfeiture or cancellation of a claim, based on the failure to perform annual assessment work, and that it must sustain this burden by clear and convincing evidence. We thus conclude that the Interior Board of Land Appeals (I.B.L.A.) in *Bohme I, Weber* and *Energy Resources* allocated the burden of proof in an impermissible manner.

We are aware of the general rule that when an administrative agency has made an error of law, the duty of the reviewing court is to correct that error and then remand the case to the agency to allow it to examine the evidence and make its findings of fact in the proper legal light. *See, e.g., N.L.R.B. v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. and General Pipefitters of New York and Vicinity, Local Union No. 638,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977); *City and County of Denver By and Through Boards of Water Commissioners v. Bergland,* 517 F.Supp. 155 (D.Colo.1981), *aff'd in part, rev'd in part,* 695 F.2d 465 (10th Cir.1982).

■ We are of the view, however, that this matter more properly falls within the rationale of a narrow line of cases holding that, where applying the correct legal standard at the hearing level could lead to only one result, the reviewing court need not remand the action to the agency for reconsideration. *See, e.g., Teledyne McCormick-Selph v. United States,* 588 F.2d 808, 218 Ct.Cl. 513 (1978); *see also Grumman Aerospace Corp. v. United States,* 587 F.2d 498, 218 Ct.Cl. 441 (1978) *cert. denied,* 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 283 (1979); *Sherwin v. United States,* 436 F.2d 992, 193 Ct.Cl. 962 (1971). In this case, after carefully reviewing the record and the evidence presented below, we believe that in properly re-allocating the ultimate burden of proof against the government as we hereby do in this order, the only possible conclusion to be reached is that the government has failed to sustain its burden of proof requiring that judgment be entered in favor of the plaintiffs. The holding of the I.B.L.A. on this point is reversed.

### D. *Performance of Annual Work; Proof and Timeliness*

■ Bona fide and good faith effort to perform annual work is required to satisfy the annual assessment work requirements. As noted above, adherence to the work requirement preserves the mining claim. Affidavits may be filed showing that the annual work has been performed and when filed in the appropriate office the affidavit is an aid in proof of establishing the fact that annual labor for a given year has been performed. Contrary to the position taken by the department, failure to file affidavits of annual labor does not carry with it any serious penalty. It is the general rule and well-recognized principle that failure to file an affidavit does not work a forfeiture of the claim or constitute evidence that the work in question was not in fact performed. Applicable federal law did not require that an affidavit of annual assessment work be filed or recorded in addition to the performance of $100 of annual work.[20] *See Betsch v. Umphrey,* 270 F. 45 (9th Cir.1921). Furthermore, it was never a part of Colorado statutory or common law mining jurisprudence that failure to file an affidavit of assessment work is evidence of nonperformance of the work. Thus no adverse inference arises from failure to file an affidavit and we reject the government's contention that failure to file such is prima facie evidence that the work was not performed. "[T]he burden of proof would remain with the party asserting forfeiture and would have to be satisfied by clear and convincing proof." 2 American Law of Mining § 45:05(1)(b)(iii) at 45–43 (2d ed. 1984).

Prior to 1976 there was no federal requirement to file affidavits indicating assessment work done on mining claims. As authorized by 30 U.S.C. § 28, local mining districts could enact regulations not in conflict with federal laws. Several states re-

---

**20.** The Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1744 imposed such a requirement prospectively. *See also John R. Carruthers,* 38 I.B.L.A. 77 (1978).

quire the filing of affidavits of annual work. As noted, generally speaking, failure to file such affidavits or a certified copy does not invalidate an otherwise valid claim on federal lands. *Betsch v. Umphrey, supra; Hazzard v. Johnson,* 45 Cal. App. 19, 187 P. 121 (1920); *Murray Hill Min. & Mill. Co. v. Havenor,* 24 Utah 73, 66 P. 762 (1901).

State statutes providing for affidavits indicating performance of annual labor generally do not make filing of affidavits mandatory. Under general mining law and a majority of state opinions on the subject, affidavits merely constitute an evidentiary aid in establishing proof of performance of annual assessment work.

The effect of failing to file an annual work affidavit is well-settled as follows:

> State statutes requiring the filing of affidavits of assessment work are concerned only with the method of proof of performance and ... [during the relevant period] the failure to file an affidavit did not cause a forfeiture. Other evidence could be introduced to prove that the assessment work had in fact been performed. The failure to file affidavits of assessment work did not impair the claim owner's right to secure a patent.

2 American Law of Mining § 45.05(a)(b)(ii) at 45–41, 42 (2d ed. 1984).

■ If in proper form, the affidavit or certified copy of the same is prima facie evidence that the assessment work has been performed. The prima facie case may be rebutted by introduction of evidence that the assessment work was not in fact performed. For example, the Colorado statute dates back to early mining days. It makes the filing of the affidavit discretionary and sets forth its evidentiary effect:

> Such affidavit when recorded shall be prima facie evidence of the performance of such labor or the making of such improvements. The original thereof, or a certified copy of the record of the same, shall be received as evidence accordingly by the courts of this state, and

this class of evidence shall be receivable, where relevant or material, in all causes.

C.R.S. § 34–43–114(2) (1973).

The prima facie effect is stated as follows:

> The prima facie evidentiary effect of filing or failing to file affidavits of assessment work affects only the burden of going forward, and the burden of proof remains unchanged. The prima facie case may be rebutted by introducing evidence that the assessment work was not in fact performed, but the burden of proof would remain with the party asserting forfeiture, and would have to be satisfied by clear and convincing proof.

2 American Law of Mining § 45.05(1)(b)(iii) at 45–43 (2d ed. 1984).

It was never a part of Colorado statutory or common law or mining law jurisprudence that failure to file affidavits of assessment work is evidence of nonperformance of the work. The filing of the affidavit of annual work was never required under Colorado law. Thus, as explained, no adverse inference arises from failure to file an affidavit. We reject the government's contention that failure to file an affidavit is prima facie evidence that the work was not performed.

The I.B.L.A. is in error when it holds that the department can rely on the absence of the recordation of an affidavit of annual work to prove failure of assessment work. *As we stated in the previous section, the burden of proof to establish nonperformance of work is on the department.* The law does not support the Board's holding in *Bohme I, Bohme II, Weber* and *Energy Resources* contest cases that non-recordation of the affidavit gives rise to an inference of nonperformance. To emphasize, we again note that the recordation of the work affidavit merely aids the proponent in showing that the work was performed. It is a rule of evidence and procedure. This concept is not a substantive rule of law and the burden of

proof is not changed by statutory recording provisions.[20A]

By analogy, the provision of the statute is similar to certified copies of birth and death certificates making recitals prima facie evidence of the contents of the document. These recitals are evidence of the presumptive facts but are not conclusive. Certainly the fact of the death of a person is not dependent on recordation of a certified copy of the death certificate. Other evidence is admissible on the point. Annual work affidavits operate in similar fashion. Filing of an affidavit of annual work as it relates to mining claims merely assists the proponents in establishing the fact that work was performed. Likewise, other evidence is admissible on the point and the failure to file such an affidavit in the absence of an express statute does not carry a penalty and is not binding on the question whether work has been performed. Contrary to the position of the department, failure to file an appropriate affidavit certainly does not carry a negative inference. Since there is no statutory requirement to file affidavits of annual work, the absence of an affidavit cannot form basis for an inference of nonperformance of work. The neglect or failure to file an affidavit or proof of work does not leave the claim open to relocation providing that the work has in fact been performed. Performance of annual work has always been subject to oral testimony and other evidence.

■ We now move to another issue. While the point is sharply argued, we hold that the government must file its allegation of nonperformance while a default is present and prior to resumption of work by the claimant or locator. Such a requirement was present prior to the holding in *Hickel v. Oil Shale Corp., supra,* to wit: that a relocation must take place by a relocator during a period of default and before resumption of work.[20B] There is a basic unfairness in the proposition that the government as a contestant can hold back, allow work to go forward and then, upon application for a patent by the claimant, assert nonperformance of annual work occurring several years previously. This practice would of necessity give the government an unfair advantage in allowing work to proceed over the years without any notification to the mining claimant that there was a potential question over performance of annual work. Title 30 U.S.C. § 28 (1970) clearly contemplates that the locator has the right to resume annual labor. *Hickel v. Oil Shale Corp., supra,* provides for substantial compliance with the work requirements and cannot be interpreted to deprive the locator of the opportunity to comply substantially with the assessment work requirement. *Hickel* did not repeal jurisprudence in mining law allowing for resumption of annual work by a locator prior to relocation by another locator.

■ In the situation where a claimant (a) fails to perform assessment work for one or more years and he resumes annual work prior to contest by the government and (b) substantially prosecutes such work

---

**20A.** In this respect, the present case differs from *United States v. Locke,* — U.S. —, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). In *Locke,* the Supreme Court held that the failure to file documents as required by § 314 of the Federal Land Policy Act was sufficient to cause the claimants to lose their property. The statute at issue in *Locke* explicitly provided that failure to file the documents "shall be deemed conclusively to constitute an abandonment" of the claim. *Id.* at —, 105 S.Ct. at 1794. In the present case, the filing of an affidavit is discretionary in Colorado. Thus, a failure to file would merely be evidence that work was not done. Standing alone, it would not be cause for a party to lose their claim.

**20B.** The requirement of rigid performance of annual work urged by the government is seriously undermined by a regulation promulgated and retained by the government:

Failure to make the expenditure or perform the labor required upon a location will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representatives have resumed work after such failure and before relocation.

43 C.F.R. § 3851.3(b) (1983). The rule is a paraphrase of 30 U.S.C. § 28 (1976). See the critical comment on the government's inconsistent position in 2 American Law of Mining § 45.08(2)(b) at 45–70, n. 38 (2d ed. 1984).

until he has performed one or more years work, his claim is protected as though a failure has never occurred.

■■ *Hickel* only gave the government the status of a rival claimant and nothing more. Significantly *Hickel* did not overrule *Wilbur v. United States Ex Rel. Krushnic*, 280 U.S. 306, 318, 50 S.Ct. 103, 105, 74 L.Ed. 445 (1930) and *Ickes v. Virginia-Colorado*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1934). *Krushnic* and *Virginia-Colorado* made it clear that failure to perform annual assessment work does not *ipso facto* forfeit a claim. Failure to perform the annual assessment work renders the claim subject to loss by relocation by the government. However, no relocation can be made if the claimant resumes the work before relocation. *Ickes v. Virginia-Colorado, supra*, 295 U.S. at 646, 55 S.Ct. at 890; *Krushnic, supra* 280 U.S. at 317, 50 S.Ct. at 104. There is nothing in *Hickel* or *United States v. Locke*, —— U.S. ——, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) which would suggest otherwise. *Hickel* gave the government the jurisdiction to determine if a claim had been maintained in accordance with the law. *Virginia-Colorado* expressly states that a mining claim can be maintained in compliance with the law by a resumption of work. 295 U.S. at 646, 55 S.Ct. at 890.

As stated in *Ickes v. Virginia-Colorado Development Corp., supra*, (quoting *Wilbur v. United States Ex Rel Krushnic*, 280 U.S. 306, 318, 50 S.Ct. 103, 105, 74 L.Ed. 445), "[s]uch resumption [of assessment work] does not restore a lost estate ... it preserves an existing estate." 295 U.S. at 646, 55 S.Ct. at 890. It also stated that "[s]uch a resumption would have been an act not in derogation but in affirmance of the original location and thereby the claim would have been 'maintained'". *Id.*

The decision of the Secretary in *Shale Oil Company*, 55 I.D. 287 (1935) fully adopted and made this concept an integral part of mining law. This expressed principle of mining law is substantive and insulated and made immune from later action by the Interior Secretary (and successors) seeking to vitiate the plain meaning of *Shale Oil Company*.

## E. SIGNIFICANT BLM REGULATION (1972) DEALING WITH PERFORMANCE OF ASSESSMENT WORK

The General Mining Law assessment provision, codified at 30 U.S.C. § 28, has been the subject of several Supreme Court cases that we have discussed above. Pivotal cases have held that substantial compliance with the assessment notice requirement was sufficient to satisfy the statute, since "the 'possessory' title of the claimant, granted by 30 U.S.C. § 26, [may] not be disturbed on flimsy or insubstantial grounds." *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 57, 91 S.Ct. 196, 201, 27 L.Ed.2d 193 (1970); *see also Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935) and *Wilbur v. United States Ex Rel Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930).

It is significant that after *Hickel v. Oil Shale Corp.*, (1970) the language of the Bureau of Land Management's assessment work regulation was amended to read that substantial compliance was all that was required.

Before 1972, the regulation provided:

43 C.F.R. § 3851.3 Failure to perform assessment work.

Failure to make the expenditure or perform the labor required upon a location made before or since May 10, 1872 will subject a claim to relocation unless the original locator, his heirs, assigns or legal representatives have resumed work after such failure and before relocation.

After 1972, the regulation provided, and still provides:

43 C.F.R. § 3851.3 Effect of Failure to perform assessment work.

(a) Failure of a mining claimant *to comply substantially* with the requirement of an annual expenditure of $100 in labor or improvements on a claim imposed by section 2324 of the Revised Statutes (30 U.S.C. 28) will render the claim subject to cancellation.

(b) Failure to make the expenditure or perform the labor required upon a location will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representatives have resumed work after such failure and before relocation.

(Emphasis added).

## F. UNITED STATES V. LOCKE[20C]—THE UNITED STATES SUPREME COURT INTERPRETS *HICKEL V. OIL SHALE CORP.* AND THE CONCEPT OF SUBSTANTIAL COMPLIANCE; ANNUAL WORK REQUIREMENT; DOCTRINE OF ABANDONMENT AND EQUITABLE ESTOPPEL

The Lockes and others were miners and owners of ten unpatented mining claims in Nevada. They actively worked the claims since 1960, producing approximately $4,000,000.00 in gravel and building materials. During the time they owned the claim, the Lockes complied with state laws requiring annual filing and assessment work requirements.

In 1976, the government enacted the Federal Land Policy and Management Act, Pub.L. No. 94–579, 90 Stat. 2743 (found at 43 U.S.C. §§ 1701–82) (FLPMA). Section 314(b) of the FLPMA required miners, such as the Lockes, to properly register their unpatented claims with the Bureau of Land Management (BLM) by October 21, 1979. From October 19, 1979, and each calendar year thereafter, the FLPMA also required the filing of an assessment notice showing that $100.00 worth of labor has been performed on the claim during the assessment year. This notice was to be filed "prior to" December 31. 43 U.S.C. § 1744(a). Failure to file the assessment notice "shall be deemed conclusively to constitute abandonment of the mining claim." 43 U.S.C. § 1744(c). The constitutionality of this section was at issue before the Supreme Court

in *United States v. Locke,* —— U.S. ——, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985).

The Lockes properly registered their claim with the BLM by the October 21, 1979 deadline. In 1980, they were told by a BLM employee that the annual assessment notices were to be filed "on or before" December 31 in order to comply with the statute. Based upon this information, they filed the necessary assessment notice on December 31, 1980. Several months later their mining claims were extinguished by the BLM. It was the BLM's position that the Locke's had not met their filing obligation under § 314 FLPMA because they had filed one day late. *Id.* at —— – ——, 105 S.Ct. at 1790.

The United States District Court for the District of Nevada granted summary judgment to the Lockes. *Locke v. United States,* 573 F.Supp. 472 (D.Nev.1983). The court reasoned that § 314 created an unconstitutional irrebuttable presumption that claimants who failed to make a timely filing intended to abandon their claims. The district court held that due process required the miners to be given notice and opportunity to demonstrate that they had not intended to abandon their claims. In the alternative, the district court, relying on *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), held that the miners had substantially complied with the statute. As such, the government could not extinguish their claims.

The Supreme Court reversed in an opinion authored by Justice Marshall and joined by Chief Justice Burger and Justices White, Blackmun, Rehnquist and O'Connor. The Court held that § 314 FLMPA was constitutional. *Id.* at ——, 105 S.Ct. at 1801. In so doing, the Court first determined that the requirement of a filing "prior to December 31 of each year" should be construed as meaning on or before December 30. *Id.* at —— – ——, 105 S.Ct. at 1791–1793. Under this construction of the

---

**20C.** We disagree with the government's contention that *Locke* has added nothing to the earlier decision in *Hickel.* On the contrary, *Locke* is the first significant discussion of the concept of substantial performance since the Court's decision in *Hickel.* *Locke* offers some explanation of when substantial compliance can be used in order to maintain a claim.

statute, the Lockes had filed their assessment notice one day late.

The Court next looked to § 314(c) FLMPA. Section 314 provides that failure to file the assessment notices "shall be deemed conclusively to constitute an abandonment of the claim". The Court concluded that this language made it clear Congress intended to extinguish claims for which timely filings had not been made. Evidence of the claimant's intent to abandon a claim is made irrelevant by § 314(c). *Id.* at ——, 105 S.Ct. at 1795. As such, due process did not require the claimant to be given notice and an opportunity to be heard before the claim was to be forfeited. It was the opinion of a majority of the Court that the statute provided the claimant with adequate notice of what was necessary to maintain a claim. *Id.* at ——, 105 S.Ct. at 1800.

The majority also rejected the argument that the claimants had substantially complied with the filing deadline. *Id.* at ——, 105 S.Ct. at 1796. However, the Court made it clear that it was not overruling the concept of "substantial compliance", as recognized in *Hickel v. Shale Oil Corp., supra*. The Court simply concluded that a filing deadline could not be complied with in any manner by filing one day late. *Id.* at —— – ——, 105 S.Ct. 1796.

The Supreme Court remanded *Locke* to the district court for further findings. One issue the district court is to determine is whether the Lockes can prevail on the theory of equitable estoppel. *Id.* at —— n. 7, 105 S.Ct. at 1790 n. 7. The Court clearly recognized that equitable estoppel is a viable theory to be asserted against the government in the proper case. *See* discussion of *Locke, infra* at § XI–C.

Although Justice O'Connor joined the majority opinion, she also wrote a concurring opinion to emphasize that this might be an appropriate case to assert equitable estoppel against the government. *Id.* at —— – ——, 105 S.Ct. at 1801–1802 (O'Connor, J., concurring). Justice O'Connor noted that the regulations of the BLM and the actions of its employees were partly re-

sponsible for the late filing of the assessment notices. *Id.* at ——, 105 S.Ct. at 1801.

Justice Powell filed a dissenting opinion. He concluded that § 314(c) was too uncertain to have given the Lockes proper notice of what they should have done to protect their property interests. *Id.* at ——, 105 S.Ct. at 1802 (Powell, J., dissenting). As such, he would have found a forfeiture imposed for filing one day late to have been invalid. *Id.* at ——, 105 S.Ct. at 1804. Justice Powell also agreed with Justice Steven's conclusion that the parties had substantially complied with the requirements of the statute. *Id.* at ——, 105 S.Ct. at 1802.

Justice Stevens filed a separate dissenting opinion, in which he was joined by Justice Brennan. According to Justice Stevens, the language of the statute was ambiguous as to when the Lockes were to file their assessment notices. He was of the opinion Congress intended the filing date to be at anytime prior to the end of the calendar year. *Id.* at ——, 105 S.Ct. at 1806 (Stevens, J., dissenting). Relying on *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), Justice Stevens noted that the Lockes had filed their documents only one day late and long before the BLM extinguished their claims. As such, he concluded they had substantially complied with the requirements of the statute.

We draw these principal conclusions from *Locke:*

1. The Supreme Court accepts the concept of substantial compliance as it was recognized in *Hickel;*

2. In contrast to *Locke,* the statute in *Hickel* did not clearly provide for forfeiture of a claim for failure to meet the $100 annual work assessment requirements;

3. A majority of the Court recognizes that there are circumstances in which equitable estoppel would be a proper defense against the actions of the government; and

4. Before the substantive rights of a person can be altered, due process re-

quires, at a minimum, a) a statute or rule be enacted; b) the statute or rule to be published; and c) the persons who are affected by the statute or rule be given a reasonable opportunity to become familiar with the law and to comply with its requirements.

It is noteworthy (and somewhat surprising) that the government now insists upon strict interpretation of the statute dealing with performance of annual assessment work *and at the same time* promulgates and retains regulations under 30 U.S.C. § 28 recognizing substantial compliance as the requisite standard.

## G. SUMMARY—SUBSTANTIAL COMPLIANCE

As we discussed earlier, the Supreme Court in *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), "h[e]ld that token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28 [was] not adequate to 'maintain' the claims within the meaning of § 37 of the Leasing Act". *Id.* at 57, 91 S.Ct. at 201. We have interpreted "token assessment work" to mean minimal, nominal or slight work. The work performed by these claimants was certainly more than minimal or nominal. Substantial sums of money were expended by the claimants before they applied for patents to their claims.

■■■ We are aware that there are years for which there is no evidence of assessment work. However, such a default in the assessment work requirement is insufficient to deprive a claimant of his claim. See *United States v. Locke*, — U.S. —, —, 105 S.Ct. 1785, 1796, 85 L.Ed.2d 64 (1985). Rather, it subjects the mine owner to a case-by-case determination of whether he intended to keep his claim. *Id.* It must be noted that the claimants in *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935) and *Wilbur v. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) had not performed the annual assessment work each year. Yet, their claims were not extin-

guished. In order to determine if less than full compliance with the assessment work requirement evidences an intent to abandon or relinquish these claims, we must look to the amount of work done, as well as the circumstances under which that work was performed.

These claims have existed for over 65 years. They have been maintained during a time when there has been a constant ebb and flow of changes in BLM regulations. Additionally, the history of mining law was such that performance of annual assessment work was important only between rival claimants. There was never a requirement that an affidavit be filed to show that assessment work had been completed in order to maintain a claim. As long as work was resumed before the claim was relocated, a failure to do assessment work was of no consequence to the claimant. The assessment work requirement was disregarded during much of this time, by individuals within the industry, as well as the BLM. Significantly, patents were issued for other claims where claimants had not performed annual assessment work. To further add to the confusion, the 1935 decision by Interior in *Shale Oil Company* reversed prior decisions which had invalidated claims for nonperformance of assessment work.

Under these circumstances, it would be very difficult and arbitrary to establish a bright line and then determine whether the assessment work the claimants performed fell within or beyond that bright line. Furthermore, it would be unfair to establish such a line and then ask these claimants to reconstruct year-by-year, over fifty years worth of work. Since it was not necessary to file an affidavit to show that the work had been done, the absence of an affidavit does little to prove that the work was not done. Many of the witnesses to the assessment work have fading memories or have since died. In 1929, a Commissioner of the General Land Office was unable to locate physical evidence of work only a short time

after the work had been completed.[20D] It is therefore not unreasonable to assume that after more than fifty years, few if any, physical signs of assessment work would remain.

Given a half of a century of confusing and oftentimes contradictory statements regarding the need to perform annual assessment work, we cannot conclude that the work performed by these claimants was merely token, minimal or nominal. As such, we have determined that they have substantially satisfied the requirements of 30 U.S.C. § 28. We are not saying that in other circumstances the lapses of time in performance of assessment work present here would be sufficient to substantially comply with the statute.[20E] We also recog-

**20D.** *See* Appendix which contains a "Stipulation as to Facts Concerning the Performance of Assessment work on the Oyler Claims". This stipulation was accepted into evidence as Exhibit P–346, on July 18, 1978 in the hearing conducted by Administrative Law Judge Sweitzer. *U.S. v. Bohme,* 48 I.B.L.A. 267, 321, 87 I.D. 248 (1980).

**20E.** Only two of these actions involve issues of substantial compliance which are ripe for determination at this time. They are No. 8685 Carbon Nos. 1–5 and Elizabeth Nos. 1, 2, 4–12 claims) and No. 9202 (Oyler Nos. 1–4 claims). The I.B.L.A. decision in *United States v. Bohme,* 48 I.B.L.A. 267, 87 I.D. 248 (1980) (*Bohme I*), found that substantial compliance had been shown for No. 8691 (the Compass claims) and this finding has not been appealed. In No. 8680 (*Tosco*), the issue of substantial compliance was not raised until an amended complaint was filed in 1983. As such, it is not included in the pending cross motions for summary judgment which are before this Court.

For purposes of this litigation, the parties have stipulated to the evidence as to the assessment work done on the Oyler, Carbon and Elizabeth claims. They disagree as to the evidentiary significance of the absence of a recorded affidavit and to the factual conclusions that may be drawn from Interior's reports of field examinations.

*Oyler Claims.* The evidence of the work done on these claims consists mainly of reports filed by the government mineral examiners. A "Stipulation As to Facts Concerning the Performance of Assessment Work on the Oyler Claims" was received as Exhibit P–346 by the ALJ, Judge Sweitzer at the July 18, 1979 administrative hearing. This exhibit is included in the Appendix. This stipulation reflects that far more than token or minimal work was done on these claims. As set forth in the stipulation:

1. In 1918, Interior concluded that these claims had been properly located and perfected by discovery and had been fully maintained so far as annual labor requirements were concerned. Affidavits of labor were filed in 1917 and 1918, evidencing at least $400 worth of development work;

2. During 1919, a total of $2,300.75 worth of work was done on the claims;

3. In 1920, the claims were once again declared valid;

4. A total of $5,186 worth of work was done on the Oyler claims from 1921–1928. Although this results in an average of $162 per claim per year, General Land Office Mining Engineer Warren Sholes allocated the work as follows:

OYLER CLAIMS

| | | | | |
|---|---|---|---|---|
| 1921 | $ 600.40 | $600.40 | $ 600.40 | $ 600.40 | $2,401.60 |
| 1922 | 52.80 | – | 183.80 | 89.00 | 325.60 |
| 1923 | 346.25 | 64.20 | 319.58 | 82.30 | 812.33 |
| 1924 | – | – | 184.27 | 224.20 | 410.47 |
| 1925 | – | – | 370.05 | 144.40 | 514.45 |
| 1926 | – | 40.00 | – | – | 40.00 |
| 1927 | 100.00 | 100.00 | 100.00 | 82.30 | 382.30 |
| 1928 | 100.00 | 100.00 | – | 100.00 | 300.00 |
| | $1,199.45 | $904.50 | $1,760.10 | $1,322.60 | $5,186.75 |

5. A 1930 field investigation resulted in a finding that the annual work had been done for the year ended July 1, 1930;

6. The assessment work requirement was suspended in 1932;

7. In 1933, 1935–1938 and 1949, statutory notices in lieu of work were filed;

8. A 1952 historical sketch of the Oyler claims show additional indicia of the performance of assessment work; and

9. Finally, in August 1956, a final certificate was issued which terminated any subsequent obligation to perform assessment work.

*Carbon and Elizabeth Claims.* The Carbon and Elizabeth claims were located in 1918. The evidence in this contest was based solely on the recorded affidavits of assessment work. The evidence as set forth below, show that claimants have performed more than token or nominal work on their claims:

1. In 1919, a notice in lieu of work was filed;

nize that our conclusion is opposite of that reached by the Commissioner of the General Land Office and Judge Sweitzer (with regard to the Elizabeth and Carbon claims). *See Hickel v. Oil Shale Corp.*, 400 U.S. 48, 57, 91 S.Ct. 196, 201, 27 L.Ed.2d 193 (1970); *United States v. Bohme*, 48 I.B.L.A. 267, 320–322 (1980); *United States v. Bohme*, No. 658, 659, 660 (ALJ Decision, July 17, 1979). However, under the circumstances present before this Court, we are of the opinion that our decision is in keeping with the spirit of the mining laws and the intent of Congress, which was to insure that mining claims did not lay dormant.

## X. EFFECT OF INCOMPLETE NOTICE AND OTHER DEFECTS IN PRIOR CONTEST PROCEEDINGS

In *The Oil Shale Company*, Civil Action 8680, plaintiffs claim that procedural deficiencies relating to service of notice and failure to join indispensable parties in old assessment work contest invalidates the proceedings and renders them ineffective. We agree.

*Union Oil II*, 72 I.D. 313 (1965) sets forth the standards for adequate notice. Quoting headnotes:

In contest proceedings initiated under Circular No. 460 and the Rules of Practice in effect in the early thirties, a post office return receipt for letters bearing notices of contest is not sufficient proof of service if it bears a signature clearly different and inconsistent with the name of the claimant and there is no evidence showing that the party signing the receipt had written authority to sign for the claimant.

Service of notice of contest by registered mail is a form of notice reasonably calculated to give a party knowledge of administrative proceedings and an opportunity to be heard and, consequently, where authorized by statute and the rules of an administrative agency, it satisfies the requirements of due process.

Paragraph 6 of the Department Circular No. 460, 44 I.D. 572, 573 (1916), in effect at the pertinent time, provides as follows:

Notice of the charges may in all cases be served personally upon the proper party by any officer or person or by registered letter mailed to the last address of the party to be notified, as shown by the records, and to the post office nearest to the land. When it is necessary to serve notice on the unknown heirs of a person in interest, the same must be addressed to that person at his address of record and also at the post office nearest the land. Proof of personal service shall be the written acknowledgement of the person served or the affidavit of the person who served the notice, attached thereto, stating the time, place, and manner of service. Proof of service of notice by registered letter shall consist of the report of the register and receiver who mailed the notices, accompanied by the post-office registry receipts or the returned unclaimed registered letters.

■ To constitute a valid contest proceeding, there must be adherence to the notice requirement contained in Circular No. 460 and the provisions set forth in *Union Oil II*. Notice requirements require personal service *or* registered mail sent to the last address of the party to be notified, as shown by the record, *and* to the nearest post office to the land.

■ Registered mail service can be utilized only when the party to be notified had an address "shown by the record." Even when there was an address of record, registered mail service could only be effectuated if letters were sent *both* to the address of record and to the post office nearest the

---

2. Affidavits of assessment work were recorded for the years 1920 through 1926 (except for Carbon No. 5 in 1925);

3. A Final Certificate for the Carbon No. 5–8 claims was issued on January 9, 1926. This certificate terminated any subsequent obligation to perform assessment work on those claims;

4. Affidavits for assessment work were filed for the years 1957 and 1958. Thus, based upon recorded affidavits, at least $14,300 was spent on the Carbon and Elizabeth claims between 1920 and 1958; and

5. A patent application was filed for these claims on September 8, 1959.

land. Service could not be made by registered mail on a contestee who had no address of record with the department, and no contestee in the contests here involved had such addresses of record.

Because mining claims are interests in real property, minimum due process requires appropriate and reasonable notice before an administrative body can adversely affect those rights. As relating to notice, reasonable measures were not followed in the contests involved in this litigation.

Substituted service of notice by registered mail confers no jurisdiction unless in compliance with the applicable statute, regulation or rule. In addition, substituted service cannot form the basis for jurisdiction unless a statute or rule provides accordingly.

 Where no addresses of record are available for contestees (claim holders), as here, service by registered mail does not confer jurisdiction. The additional requirement of *registered mail sent to the post office nearest the land* is also an integral part of substituted personal service. This requirement was not complied with. It should be kept in mind that only *personal* service or *proof of substituted* service by registered mail suffices as adequate service of notice. Substituted service is not the equivalent of personal service unless sent by registered mail to (a) the last address of the party to be notified, as shown by the record *and* (b) to the post office nearest the land. As noted these aspects of substituted service are lacking.

In the instant cases personal service could not be effectuated by registered mail. It is irrefutable that personal service was never made in the relevant contest proceedings. No service of process was made against any contestee in the contests in question (Contests 11757, 11759 and 11761). Departmental decisions affecting these claims were a nullity and had no adverse effect upon the contested mining claim. It should be noted that no addresses of record for contestees were known to the department.

In Contests 11757, 11759 and 11761 (Bute, Atlas and Camp Bird claims) it appears without refutation that the only department efforts made to effect service of process on contestees consisted of the mailing of registered letters containing contest complaints. These were mailed to various addresses believed to be residences of contestees. The source of the purported addresses is not spelled out in the briefs.

Because of lack of realistic addresses of record, attempted service by registered mail was unavailing to constitute valid notice or a service of process. Also, at no time did the government send a registered letter or letter by regular mail to the post office nearest the land.

Thus we hold that the government failed to satisfy the clear requirements of Circular No. 460 relating to substituted service of process.

 Claims can be located by more than one party and a person can hold a claim in association with others. When a claim is located by more than one party, the ownership constitutes a tenancy in common. It has been recognized that co-locators own an undivided interest in the entire claim and performance of annual assessment work by any one co-locator inures to the benefit of co-locators. Performance of annual work by any one co-locator insulates the claim from relocation by parties who are not co-locators.

 Where contest proceedings are instituted by the department *all* claim owners (co-locators) are indispensable parties and must be served with appropriate notice. Failure to notify a co-owner of a contest negates the proceeding as to the entire claim because (a) his interests in the claim may be prejudiced and extinguished in the contest proceeding; (b) he may have performed assessment work that protects the claim from being cancelled; and (c) the work performed by a single co-owner is sufficient to insulate the claim or any portion thereof as to the totality of all co-own-

ers, i.e., the work of a single co-owner inures to the benefit of all co-owners.

While initially rigidly adhering to a contrary position, the Interior Board of Land Appeals now agrees with the basic rule of law that all claim owners are indispensable parties. *United States v. Energy Resources Technology Law, Inc., et al,* 74 I.B.L.A. 117, 131 (1983).

Contest proceedings are similar to actions *in rem* and certainly any party having an interest is indispensable to a full adjudication of the rights of contestants and contestees. There is a close analogy here to quiet title proceedings affecting title to real property. Only parties in an action *in rem* are adversely affected by decrees or court orders entered in such proceedings.

A contest is not effective against a co-owner of a claim not served with notice as provided by law. See analogy to forfeiture notice in *Ballard v. Golob,* 34 Colo. 417, 83 P. 376 (1905).

By way of historical background it should be noted that association placer mining locations authorized by law (30 U.S.C. §§ 35 and 36) permit a group of persons to associate and obtain possessory title to one location of not more than 160 acres. Only one discovery is required, although individual locators would have to demonstrate a valid discovery for each 20 acres. *Union Oil Co.,* 25 L.D. 351 (1897). Only $100 of annual assessment work had to be done on each association location to prevent relocation [2 Lindley on Mines § 628, at p. 1540 (3rd ed. 1914)] and only $500 had to be expended on developing the location as a requisite to patent.

As noted performance of assessment work by any one locator in the association inures to the benefit of all co-locators and prevents relocation by other would-be locators. *See e.g., Mining Co. v. Taylor,* 100 U.S. (10 Otto) 37, 40, 25 L.Ed. 541 (1879).

An important consideration is the ·fact that during the relevant time there frequently existed fractional interests in mining claims. An absurdity would exist if a contest proceeding could affect only parties served with notice and allowed other non-served co-locators to be totally unaffected by the proceedings. Mass confusion in mining law would exist if valid fractional interests remained after contest proceedings were brought seeking cancellation of other fractional interests in the same claim.

Simply stated the department was legally required, but failed, to obtain jurisdiction over *all* co-owners of claims before adjudicating vital charges of failure to perform assessment work.

In summary we hold as follows:

1. Each co-owner of an association placer mining claim is an indispensable party to any contest or proceedings to cancel the claim. Failure to properly effectuate service of process and joinder of all co-owners constitutes a deficit in the proceeding rendering the action invalid. See *United States v. Energy Resources, supra.*

2. All co-owners were not joined and served in the cancellation proceedings arising from assessment work contests against mining claims here involved.

3. Contest decisions where nonjoinder exists cannot be used as a basis for invalidating the oil shale claims in question or reject patent applications arising therefrom.

In Civil Action 8680 (*Tosco*) as well as other like cases, the contest decisions are set aside and plaintiffs in that case and other claim holders similarly situated are entitled to partial summary judgment on the basis here outlined.

4. Fewer than all owners were joined in each of the old assessment work contests against the oil shale mining claim in Civil Action No. 8680.

## XI. THE UNITED STATES IS ESTOPPED FROM ASSERTING INVALIDITY OF OIL SHALE CLAIMS BECAUSE OF NONPERFORMANCE OF ASSESSMENT WORK: THE APPLICATION OF LACHES

### A. *Estoppel Considerations*

In addition to the holdings set forth above, we also hold that the government is

estopped from asserting the invalidity of oil shale claims on the basis of the 1920's and 1930's contest proceedings or on the ground that annual assessment work was not performed. The considerations which mandate the application of equitable estoppel in these cases include (a) the government's rule announced in *Shale Oil Co.*, 55 I.D. 287 (1935) specifically overruling all departmental decisions purporting to invalidate oil shale claims for failure of assessment work requirements; (b) the Department of Interior's subsequent and direct action in implementing that precedent-setting decision; (c) the consistent course of administrative conduct by Interior during the three decades following public announcement of its *Shale Oil* decision; (d) detrimental reliance by the plaintiffs and their predecessors on that decision and the subsequent long-term course of government conduct; and (e) basic elements of fairness and equity in the manner in which the government deals with its citizens, particularly where interests in real property are involved.

 An initial hurdle for a party asserting equitable estoppel against the government is to establish that the acts complained of were committed by government agents while acting within the scope of their authority. *Atlantic Richfield Co. v. Hickel*, 432 F.2d 587, 591–92 (10th. Cir. 1970). That case provides in pertinent part that:

> the doctrine of equitable estoppel binds the Government for the conduct of its agents while they are acting within the scope of their employment. But a corollary to that rule is the established principle that the United States may not be estopped from asserting a lawful claim by the erroneous or unauthorized actions or statements of its agents or employees,

nor may the rights of the United States be waived by unauthorized agent's acts.

There is no question here that the long-standing Interior policy of granting patents regardless of whether assessment work had been performed and holding invalid the early contest proceedings was carried out by department officials acting in their official capacity.

Some of the traditional policy considerations behind the principles of estoppel are associated with those providing the rationale for sovereign immunity. *See, e.g.,* Note, *Equitable Estoppel of the Government*, 79 U.Colo.L.Rev. 551 (1979). These considerations reflect a desire to conserve the public fund (treasury) and resources from depletion or dissipation through the oversight and error of a few government officials. Inherent in the principle is that the resources of the government are held for the use, benefit and welfare of the public at large. But this laudable husbanding of resources cannot be carried so far as to permit the government to deal unfairly with its citizens.

Concern with this latter aspect of governmental estoppel has produced commentary highly critical of the harsh rules in this area.[21] However, as explained herein, the application of the doctrine of estoppel against the government is accepted in our jurisprudence with increased frequency. This covers availability of its use except where the estoppel is created by unauthorized or illegal agent's acts.

### B. *Relevant History of Present Ligitation*

As noted before, we remanded the instant cases to the Department of Interior for further proceedings consistent with the

**21.** Bayer, *Estoppel Against the Government,* 21 U.Chi.L.Rev. 680 (1954); Kelly & Rothenberg, *The Use of Collateral Estoppel by a Private Party in Suits Against Public Agency Defendants,* 13 U.Mich.J.L.Ref. 303 (1980); McDonald, *Contradictory Government Action: Estoppel of Statutory Authorities,* 17 Osgoode Hall L.J. 160 (1979); Meek & Parcel, *Making the Government Fight Fairly: Estopping the United States,* 27 Rocky Mtn.Min.L.Inst. 41 (1982); Saltman, *Estoppel Against the Government: Have Recent Decisions Rounded the Corners of the Agent's Authority Problems in Federal Procurements,* 45 Fordham L.Rev. 497 (1976); *Equitable Estoppel of the Government,* 47 Brooklyn L.Rev. 423 (1981); *see also* Note, *Equitable Estoppel of the Government,* 79 Colum.L.Rev. 551 (1979).

order of the Tenth Circuit. *The Oil Shale Corp. v. Kleppe,* Nos. 8680, etc. (D.Colo. January 17, 1977).

In the administrative proceedings before Administrative Law Judge Harvey C. Sweitzer ("ALJ") in *United States v. Bohme,* 48 I.B.L.A. 267 (1980) (*Bohme I*) following remand, the parties agreed that the only issue ripe for determination was the department's charge that "annual assessment work had not been performed on these claims as required by law." The substantive questions determinative of this issue were whether annual assessment work had been performed on the contested mining claims (or any of them) as required by law and if not, whether some legal or equitable doctrine will excuse such failure of performance. (Decision of ALJ Sweitzer, dated July 19, 1979, at 20.) The ALJ found that annual assessment work had been performed on the Compass and Oyler claims but that such work had not been performed on the Carbon-Elizabeth claims. Thus, it was necessary for the ALJ to determine whether that nonperformance was excused by application of the doctrine of equitable estoppel against the department.

After examining the rationale behind the department's 1935 decision in the *Shale Oil Company,* 55 I.D. 287 (1935), the reversal of that decision in 1964 and the Supreme Court's decision in *Hickel v. Oil Shale Corporation,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), the ALJ concluded that the department could not be estopped from enforcing annual assessment work requirements in these cases. Specifically, the ALJ found that the representations of the department between 1935 and 1964 as to the ability of the department to contest oil shale claims for failure to perform annual assessment work did not amount to "affirmative misconduct." Rather, the ALJ concluded the department was simply mistaken as to what the law required based on its reading of *Wilbur v. Krushnic,* 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and *Ickes v. Virginia-Colorado Development Corp.,* 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). Although he had found that the claimants had detrimentally relied on the representations of the department in failing to perform annual assessment work, the ALJ nonetheless felt "constrained" to find that the department's mistaken interpretation of the law precluded the application of equitable estoppel.

On review of this decision, the Interior Board of Land Appeals ("Board") agreed that the claimants had relied on departmental assurances that the pre-1935 contest proceedings were nullities. The Board did not agree, however, that the claimants did, or could, rely on departmental representations in deciding not to perform annual assessment work after 1935. The Board stated:

> The simple fact is that contestees can point to no decision or Instruction issued by the Department of the Interior that ever purported to hold that a mining claimant was not required under 30 U.S.C. § 28 (1976) to perform annual assessment work. The decision in *Krushnic* and *Virginia-Colorado* dealt not with the question whether oil shale claimants were required to comply with the provisions of Section 28, but whether the United States would be a beneficiary of a failure to perform the assessment work.
>
> * * * * * *
>
> Thus, contestees, in effect, are arguing that an equitable estoppel should lie because they knowingly violated an affirmative obligation under the law in reliance on the fact that they were immune from punishment. They are attempting to resort to equity to absolve themselves from the consequences of their willful violations of the mining law. Among the cardinal principles of equity, however, are the maxims that equity may be invoked only to do equity, and that one who seeks equitable relief must do so "with clean hands." Appellants can show no equitable basis for the invocation of an estoppel to excuse their past failures to perform the annual assessment work mandated by 30 U.S.C. § 28 (1976).

48 I.B.L.A. at 324.

The Board has reaffirmed its negative position with respect to equitable estoppel

in subsequent decisions. *See United States v. Weber Oil Co.,* 68 I.B.L.A. 37 (1982); *United States v. Bohme,* 48 I.B. L.A. 267, 51 I.B.L.A. 97 (1980). Before proceeding with a review of the Board's decision on equitable estoppel, it is necessary to discuss this doctrine and examine the recent developments in its application against the government.

### C. Legal Analysis of Equitable Estoppel

1. Perhaps the first pronouncement on the application of equitable estoppel against the government was in *Lee v. Munroe and Thornton,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813). In *Lee* the Supreme Court refused to estop the government on the basis of the acts of an agent acting outside his authority. To do so, the Court felt, might promote collusions between government agents and private parties against the interests of the United States. *See also Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. City and County of San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); *Wilbur National Bank of Oneonta v. United States,* 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798 (1935); *Sutton v. United States,* 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *Pine River Logging Co. v. United States,* 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164 (1902); *Hart v. United States,* 95 U.S. (5 Otto) 316, 24 L.Ed. 479 (1877). Rather than relying on a fear of collusion from its agents, the Supreme Court in the most recent cases emphasizes that estoppel will not lie where the agent does "what the law does not sanction or permit." *United States v. City and County of San Francisco,* 310 U.S. 16, 32, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940); *Wilbur National Bank v. United States,* 294 U.S. 120, 124, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935); *see also Utah Power & Light Co. v. United States,* 243 U.S. 389, 408, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Thus, the only clear indication from the Supreme Court on this question is that "unauthorized" conduct will not work as estoppel. *See* Berger, *Estoppel Against the Government,* 21 U.Chi.L.Rev. 680, 684 (1954).

2. In our view, the long line of Supreme Court decisions on equitable estoppel does *not* stand for the proposition that the government can *never* be estopped by the acts of its agents. In fact, the Court has intimated as much in a series of recent cases. *See Heckler v. Community Health Services of Crawford,* —— U.S. ——, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *INS v. Miranda,* 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961). In *Schweiker v. Hansen,* the Court refused to estop the Social Security Administration from denying retroactive benefits to the respondent on the basis of erroneous statements made by a SSA field representative. There was no allegation that the SSA agent was acting outside the scope of his authority in making the statements. Rather than holding that the government can never be estopped by the conduct of its agents, authorized or not, the Court, in a *per curiam* opinion, stated:

> This Court has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits. In two cases involving denial of citizenship, the Court has declined to decide whether even "affirmative misconduct" would estop the Government from denying citizenship, for in neither one was "affirmative misconduct" involved. *INS v. Hibi, supra,* [414 U.S.] at 8–9 [94 S.Ct. at 21–22]; *Montana v. Kennedy, supra* [366 U.S.] at 314–315 [81 S.Ct. at 1340–1341].

450 U.S. at 788, 101 S.Ct. at 1471.[22]

Moreover, the Supreme Court recently remanded *United States v. Locke,* —— U.S.

---

**22.** In *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), the Supreme Court acknowledged that equitable estoppel is a

——, —— 105 S.Ct. 1785, 1790, 85 L.Ed.2d 64 (1985) expressly for the purpose of allowing the district court to determine if the government could be estopped from invalidating and extinguishing the miners' property interests. Justice O'Connor noted that previous decisions by the Court did not preclude application of estoppel in cases such as *Locke. Id.* at —— – ——, 105 S.Ct. at 1801–1802 (O'Connor, J. concurring).

3. As a result of the Court's decisions in *INS v. Hibi, supra,* and *Schweiker v. Hansen, supra,* several lower federal courts have expressly embraced the "affirmative misconduct" requirement as an element of equitable estoppel when the doctrine is asserted against the federal government. *See e.g. Pratte v. N.L.R.B.,* 683 F.2d 1038 (7th Cir.1982); *Aiyadurai v. I.N.S.,* 683 F.2d 1195 (8th Cir.1982); *Akharin v. I.N.S.,* 669 F.2d 839 (1st Cir.1982); *United States v. Ruby Co.,* 588 F.2d 697 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *Watkins v. United States Army,* 551 F.Supp 212 (W.D.Wash. 1982); *Sigmon Fuel Co. v. T.V.A.,* 531 F.Supp. 80 (E.D.Tenn.1982); *Lowey v. Watt,* 517 F.Supp. 137 (D.D.C.1981).

While the trend appears to be towards an expanded consideration of equitable estoppel in cases involving the federal government by utilizing an "affirmative miscon-

duct" requirement, some courts have been unwilling to depart from the traditional "sovereign/propriety" distinction.[23] *See Housing Authority of Elliott County v. Bergland,* 749 F.2d 1184 (6th Cir.1984); *General Accounting Office v. General Accounting Office Personnel Board,* 698 F.2d 516, 526–27, n. 57 (D.C.Cir.1983); *Rogers v. T.V.A.,* 692 F.2d 35, 37–38 (6th Cir. 1982); *see generally,* Davis, *Administrative Law Treatise,* §§ 17.01, 17.03 and 17.-04 (1982 Supp.). The United States Court of Appeals for the Tenth Circuit has followed the Ninth Circuit in applying equitable estoppel against the federal government. In *Sweeten v. United States Department of Agriculture,* 684 F.2d 679 (10th Cir.1982), the Tenth Circuit held:

> In addition to establishing the traditional elements of estoppel, the appellants must show affirmative misconduct by the government or its agents to establish estoppel against the government in an action concerning boundaries of land granted in a federal land patent. *United States v. Ruby Co.,* 588 F.2d 697 (9th Cir.1978), *cert. denied,* 442 U.S. 917 [99 S.Ct. 2838, 61 L.Ed.2d 284] (1979).

684 F.2d at 682.[24]

It is this current state of the law of equitable estoppel that controls our consid-

---

recognized principle of law in today's federal jurisprudence.

Another case which supports this view is *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951). While not evaluated on the basis of an estoppel theory, the Supreme Court held that "elementary fairness" required a decision to grant the petitioner citizenship. 341 U.S. at 47, 71 S.Ct. at 556.

*See* rationale behind estoppel running against the government in *Heckler v. Community Health Services of Crawford County, Inc.,* —— U.S. ——, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). In *Heckler,* authorities supporting recognition that estoppel may run against the government are listed.

**23.** The lower federal courts have always been more willing to find an estoppel in cases involving the government, relying on such distinctions as the offensive and defensive use of estoppel, *United States v. Stinson,* 125 F. 907 (7th Cir. 1903), *aff'd,* 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724 (1905), or whether the government was acting in its sovereign or proprietary capacity,

*United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir.1970).

**24.** Doubt as to whether estoppel could be asserted in a case involving public lands appears to have been resolved by *Sweeten v. United States Department of Agriculture,* 684 F.2d 679 (10th Cir.1982) and other Tenth Circuit cases. *See e.g., Albrechtsen v. Andrus,* 570 F.2d 906 (10th Cir.1978); *Hunter v. Morton,* 529 F.2d 645 (10th Cir.1976). In *Hunter,* the Court stated: "[w]e do not say that [the doctrine of estoppel] can never be applied as to public lands ..." 529 F.2d at 649. In fact, the Circuit has stated that "[e]stoppel, if applicable at all, can lie only against an agency to which Congress has delegated the authority to dispose of lands held in trust for the public ..." *City & County of Denver v. Bergland,* 695 F.2d 465, 482 (10th Cir.1982).

The Tenth Circuit has approved the application of estoppel against the Department of Interior. *See Nevada Power Co. v. Watt,* 711 F.2d 913 (1983) and cases cited therein.

Other cases approving the application of the doctrine of estoppel against the government re-

eration of the issue in this case. In addition to the traditional elements of estoppel, we must find that the department's conduct in this case was within the scope of its authority, *Atlantic Richfield Co. v. Hickel,* 432 F.2d 587 (10th Cir.1970), and that such conduct can properly be characterized as "affirmative misconduct." *Sweeten,* 684 F.2d 679 (10th Cir.1982); *see also Lurch v. United States,* 719 F.2d 333 (10th Cir.1983).

■ 4. The traditional elements of estoppel are (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his detriment or injury (detrimental reliance). *See, e.g., Che-Li Shen v. INS,* 749 F.2d 1469 (10th Cir.1984); *Lurch v. United States,* 719 F.2d 333, 341 (10th Cir. 1983); *City and County of Denver v. Bergland,* 695 F.2d 465, 482 (10th Cir. 1982); *Sweeten v. United States Department of Agriculture,* 684 F.2d 679, 682 n. 5 (10th Cir.1982); *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

Stated differently:

the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse" and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.

*Heckler v. Community Health Services of Crawford,* —— U.S. ——, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984), *quoting* III J. Pomeroy, *Equity Jurisprudence* § 805, at 192 (S. Symons ed. 1941); *see also Wilbur National Bank v. United States,* 294 U.S. 120, 124–25, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935).

We recognize that there are considerations of public policy when a party seeks to apply principles of estoppel against the government. *See e.g., Heckler v. Community Health Services,* —— U.S. ——, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Tennessee v. Dole,* 749 F.2d 331 (6th Cir.1984); *Home Savings & Loan Association v. Nimmo,* 695 F.2d 1251, 1260 (10th Cir.1982) (McKay, J. dissenting). These considerations have not been overlooked in our determination of the vitality and application of estoppel against the government in this litigation.

Since the early 1900's the department has evinced a growing interest in the potential of the vast oil shale reserves of the Rocky Mountain region. The department recognized as much in 1916 when it classified most of the land within the Green River Formation as valuable mineral lands. In its Instructions of 1920, the department made definitive the belief that the oil shale deposits were valuable. The department was also aware of the amount of annual assessment work being performed on the numerous oil shale claims located prior to 1920. Between 1920 and 1935 the department undertook contest proceedings against many of these claims for failure to perform such work. When it invalidated those contest proceedings in 1935[25], the department knowingly engaged in a consistent course of conduct for the next 28 years. To find that the department did not know the "facts" would be to ignore over 40 years of continuous involvement in the development of the oil shale reserves. The department was indeed a central figure in the dissemination of oil shale information.

It is equally clear that the department intended its conduct to be acted upon by oil shale claimants. The department has the primary responsibility for the administration, enforcement, promulgation of rules and regulations and interpretation of this country's laws dealing with the public domain. Between 1920 and 1960, the depart-

lating to the administration of public lands are *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970) and *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir.1970).

**25.** *The Oil Shale Company,* 55 I.D. 287 (1935).

ment issued patents on more than 2,000 oil shale claims, all apparently in complete conformance with departmental directives, instructions and regulations. Therefore, the first two elements of equitable estoppel are present.

■ We also find that these claimants were ignorant of the "true" facts and were thus entitled to rely on the department's conduct between 1935 and 1960. As a general rule, persons dealing with the government are charged with knowledge of and are bound by statutes and lawfully promulgated regulations, despite their reliance on incorrect information received from government agents. *See e.g., Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981); *Cheers v. Secretary of Health, Education and Welfare,* 610 F.2d 463 (7th Cir.1977). This rule has less impact, however, when those persons are dependent upon a governmental agency to interpret its own complex body of rules and regulations. *California Pacific Bank v. Small Business Administration,* 557 F.2d 218, 224 (9th Cir.1977).

Plaintiffs, as oil shale claimants, are among the class of persons most dependent upon the department's interpretations and statements with respect to the mining laws. The language of *Krushnic* and *Virginia-Colorado,* upon which the department based its 1935 decision, was not susceptible to easy interpretation, particularly as to how it may affect the department's earlier position in the contest proceedings. The department believed those decisions foreclosed its authority to proceed against oil shale claimants for their failure to perform annual assessment work. When the department continued to act in accordance with its interpretation for the next 28 years, oil shale claimants were entitled to rely on the department and cannot now be charged with the knowledge that the interpretation was erroneous.

The question whether these oil shale claimants failed to perform annual assessment work on their claims in actual reliance on the department's conduct is somewhat more problematic. The department maintains that there is no evidence that any conduct or statement of the department ever presumed to abrogate the requirements of 30 U.S.C. § 28 and, therefore, the claimants always had a statutory responsibility to perform the assessment work. This proposition is incorrect for two reasons.

*First,* with the passage of the Mineral Leasing Act of 1920 (30 U.S.C. § 181, *et seq.)* it was clear that oil shale claims were no longer subject to relocation by adverse claimants on the basis of the original locator's failure to perform assessment work. Such a relocation would not constitute a "valid claim existent at the date of passage" of the Mineral Leasing Act. *See* 30 U.S.C. § 193. When the department determined that it could not contest oil shale claims for nonperformance of assessment work, the requirement that such work be performed became unenforceable and, in our view, largely illusory.

Even if we were to accept the department's assertion that its decision in *The Shale Oil Company,* 55 I.D. 287 (1935), did not negate a claimant's ·duty to perform assessment work, a *second* reason exists to support a finding of reliance. The department's conduct after 1935 clearly evidences a belief that performance of assessment work was no longer considered to be a *condition precedent* to issuance of a patent on a claim located prior to 1920. Between 1935 and 1961 the department issued patents on 106 different applications, amounting to a total of 768 oil shale claims in Colorado.[26] Significantly, 507 of these claims had been declared null and void in department contest proceedings prior to 1935 for nonperformance of assessment work. In processing those patent applications, the department pursued a constant

---

**26.** Many of these claims were located in the Green River Formation, approximately 2,600 sq. miles of which lies in Colorado, 9,200 sq. miles in Wyoming, and 4,700 sq. miles in Utah. Dur-

ing this same period, the department issued patents on over 2,000 claims throughout the entire Green River Formation.

course of action in recognition that none of the pre-1935 decisions based solely on the ground of nonperformance of assessment work were effective to invalidate oil shale claims.

The department's policy in this regard was expressed in correspondences, public pronouncements, annual reports and in official action, including the actual processing of patent claims. We find that these claimants, and the mining industry at large, were entitled to rely, and did in fact rely, on both the statements and conduct of the department in failing to perform annual assessment work. We do not find that these claimants "knowingly violated" an affirmative obligation to perform such work, (as was held by the Board in *Bohme I, supra*). In this regard, we support and adopt the extensive and thorough findings of ALJ Sweitzer on the question of these claimant's detrimental reliance. *See* Addendum B, Decision of ALJ Sweitzer, dated July 19, 1979.

5. Having found the traditional elements of estoppel to be present in this case, we must now determine whether the department's conduct is properly characterized as "affirmative misconduct." *Sweeten v. United States Department of Agriculture*, 684 F.2d. 679 (10th Cir.1982); *see also Housing Authority of Elliott County v. Bergland, supra.* While a precise definition of "affirmative misconduct" is not readily at hand, several propositions are clear. First, the presence or absence of affirmative misconduct must be decided on a case-by-case basis. *Lavin v. Marsh*, 644 F.2d at 1382-83. Second, affirmative misconduct for equitable purposes can be present when the government acted (for example, gave incorrect information rather than failed to act or failed to warn someone that his or her conduct is illegal. *Jablon v. United States*, 657 F.2d 1064, 1067 n. 5 (9th Cir.1981); *Watkins v. United States Army*, 551 F.Supp. 212, 221 (W.D.Wash. 1982). The "misfeasance/nonfeasance" distinction appears to predominate in the cases which utilize the affirmative misconduct requirement.

Less clear, however, is the nature or severity of the affirmative action which will qualify as "misconduct." In this case, the ALJ concluded that the department's conduct between 1935 and 1960 was the result of a mistake of law and could not be characterized as misconduct. The ALJ's conclusion reflects too narrow a view of the law of estoppel, even as it applies against the government. It must be remembered that estoppel is an equitable doctrine which requires the judicial consideration of the relative equities of the parties. While several courts have discussed misconduct in terms of misrepresentation or concealment, *see United States v. Ruby Co.*, 588 F.2d. 697, 704 (9th Cir.1978) *cert. denied* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979) actual fraud has never been a requirement for the assertion of estoppel. In its historical sense, fraud, when referring to the conduct of the party to be estopped, was actually only "unconscientious or inequitable" behavior. *See United States v. Georgia-Pacific Company*, 421 F.2d 92, 97 n. 5 (9th Cir.1970); 2 Pomeroy, *Equity Jurisprudence* § 803, at 1639-42 (4th ed. 1918).

In addition, we do not believe that the Supreme Court, in suggesting "affirmative misconduct" as an element of estoppel, intended that a government agent must engage in an intentional misrepresentation or concealment before his conduct could estop the government. Such a requirement would be irreconcilable with the Court's long-standing rule that the government cannot be estopped by the unauthorized conduct of its agents. *See Federal Crop Insurance Corp. v. Merrill, supra.* It is hard to imagine a situation where the conduct of an agent can be both intentionally tortious *and* authorized by the government. Therefore, we conclude that for the estoppel doctrine to be applied against the government, the conduct must be within the scope of the agent's authority and must be an affirmative act which, on a balance of all the equities, amounts to "unconscientious or inequitable" behavior. Assuming all other elements of estoppel are present,

as they are in this case, even conduct based on a mistake of law will qualify as "affirmative misconduct" if the refusal to estop the government will work an inequitable or unjust result.

The Court is not unmindful that estoppel of the government is an extraordinary remedy, to be applied with the greatest care and circumspection. After careful consideration of the facts surrounding the instant cases, and painstaking study of the relevant precedents, we believe that this estoppel is both appropriate and proper.[27]

Analysis of the facts before us, in the light of these precedents, indicates that estoppel has strong application here, since the administrative acts giving rise to the estoppel were authorized and in every sense legal. The authority of the Secretary to retroactively rescind the findings of completed contest proceedings was affirmed in *Knight v. United Land Association*, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891). Thus, his action in the *Shale Oil* case was authorized and legal. Further in view of the decision in *Virginia-Colorado*, the departmental policy followed in implementing the *Shale Oil* ruling, (dismissal of contest proceedings and issuance of patents) was not only proper, but required as a legal interpretation of the opinion of the Supreme Court.

The department's administrative acts were also "affirmative" acts, including: (1) the Secretary's 1935 holding in *Shale Oil, supra*, which, in response to the ruling in *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935), specifically overruled all departmental decisions purporting to invalidate oil shale claims for failure of assessment work requirements; (2) the subsequent dismissal, adverse to the government, of contest proceedings pending against these and other oil shale claims; and (3) the systematic issuance of patents from 1935 to 1962 to other oil shale claim owners whose claims had purportedly been invalidated for assessment work failure prior to *Virginia-Colorado*.

By our holding, department is estopped from pursuing action and a course of conduct at variance from those actions here outlined occurring from 1935 to 1962.

The fact that the Supreme Court later determined that the department's 1935 decision was incorrect, *see Hickel v. Oil Shale Corporation*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), does not lessen the severity of the department's consistent and pervasive misstatement or misrepresentation of the law between 1935 and 1961. As stated by one court:

Not every form of official misrepresentation will be considered sufficient to estop the government. *See* 2 Davis, Administrative Law Treatise, Section 17.01 et. seq. *Yet some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement.* Cases where the Secretary of the Interior has been held collaterally estopped from disavowing official advice include *Seaton v. Texas Co.*, 256 F.2d 718 (D.C.Cir.1958); *Chapman v. El Paso Natural Gas*, 204 F.2d 46 (D.C.Cir.1953).

*Brandt v. Hickel*, 427 F.2d 53, 56 (9th Cir.1970) (emphasis supplied); *See also Johnson v. Williford*, 682 F.2d 868, 872 (9th Cir.1982).

For more than 28 years the department affirmatively represented that it would not contest oil shale claims on the grounds of

---

**27.** A recent Supreme Court case states the issue in these words:

[t]hough the arguments the Government advances for the rule [that estoppel may never be applied against the government] are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standards of decency, honor and reliability in their dealings with their Government.

*Heckler v. Community Health Services of Crawford County, Inc.*, —— U.S. ——, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

nonperformance of annual assessment work. Consistent with these representations, the department issued numerous patents for claims on which no such work had been performed. In reliance on this and other conduct of the department, many claim owners, including claimants here also did not perform annual assessment work on their claims. Equitable estoppel "underlies the doctrine that an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Heckler v. Comm. Health Services of Crawford,* — U.S. —, 104 S.Ct. 2218, 2224 n. 12, 81 L.Ed.2d 42 (1984). It would indeed run afoul of the "basic fairness of the administration decision making process" to now allow the department to repudiate 28 years of action and attempt to invalidate these claims for nonperformance of assessment work.

Ultimately, as estoppel is an equitable doctrine, we must consider the relative equities in the imposition of estoppel against the government in these cases. While it is true, as the Supreme Court observed in *Utah Power & Light,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917) that "[a] suit by the United States to enforce and maintain its policy respecting [public] lands which it holds in trust for all the people stands upon a different plane ... from the ordinary private suit to regain the title to real property ..." 243 U.S. at 409, 37 S.Ct. at 391, it is also true that estopping the government by conduct *not sanctioned* by law (as was attempted in that case) is a far cry from holding the government to its word, as given in the lawful, authorized statements of its executive high level administrative agents.

Perhaps most important of these equitable considerations is the concern that we do not allow transactions between the government and its citizens to become subject to whimsical, unilateral, reversals at administrative will. As Justice Jackson has stated, "It is very well to say that those who deal with the Government

should turn square corners. But there is no reason why square corners should constitute a one-way street." *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 387–388, 68 S.Ct. 1, 4–5, 92 L.Ed. 10 (1947) (Jackson, J., dissenting).

### D. *Findings and Conclusions Regarding Estoppel*

Upon consideration of the facts and circumstances of this case, we find and conclude that the department's affirmative conduct during the relevant period is properly characterized as unconscientious and inequitable behavior and, therefore, it properly falls within activity designated as "misconduct." It is necessary to lay to rest the continuous spectre of chaotic and piecemeal title challenges these and other like cases may present. Thus, the Court believes it is entirely proper and indeed necessary for reasons outlined to estop the United States from asserting the invalidity of these claims based either on the present revival of the pre-1935 contest proceedings or the nonperformance of annual assessment work since 1935.

We note that even when public lands are involved, the doctrine of equitable estoppel against the government is well recognized. This principle is articulated in an annotation dealing with the acquisition or disposal of interests in real property: "despite any public interest involved ... the government might be estopped, on equitable principles, to assert a claim or defense, where a private party relied to his detriment upon statements or conduct of government officers or agents made in connection with negotiations or agreements to which their authority extended." Annotation, *Modern Status of Applicability of Doctrine of Estoppel Against Federal Government and Its Agencies,* 27 A.L.R. Fed. 702, 736 (1976).

The Court is mindful of Justice Holme's observation that "men must turn square corners when dealing with the govern-

**1208**

ment."[28] But given the complexity of the government and its ever-increasing interaction with private parties, it would be well to remember Justice Jackson's gloss on the observation that "there is no reason why square corners should constitute a one-way street."[29]

### E. Application of the Doctrine of Laches

■■■■■ We have concluded that the doctrine of equitable estoppel applies in this litigation. The doctrine of laches is equally applicable.

Laches is an equitable doctrine whereby the lapse of time bars relief where by reason of the delay, some prejudicial change has occurred in the conditions or relation which would make it inequitable to enforce a claim or remedy. Simply stated, laches applies when there is neglect to do a thing or perform an act at the proper time or within a reasonable period given the totality of circumstances.[30]

■■■ In the present case it is wholly inequitable for the government to assert now, after the passage of forty to fifty years since the initial contest proceedings, that the plaintiffs have no claim to the land in question and to force the plaintiffs to defend their title based on such ancient actions.

■■■■■ The doctrine of laches is an affirmative defense "requiring a showing of lack of diligence of plaintiff and prejudice to the defendant." *Roberts v. Morton*, 549 F.2d 158 (10th Cir.1977). *See also Costello v. United States*, 365 U.S. 265, 282, 81

S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). The elements of laches in this circuit are (1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another. *Herald Company v. Seawell*, 472 F.2d 1081, 1099 (10th Cir.1972). We are also of the view that laches may be established against the government in this instance by the same showing of affirmative misconduct which makes it subject to estoppel. *See United States v. Ruby Co.*, 588 F.2d 697, 705 n. 10 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Interior, being in full control of its proceedings and policy-making role from the start of the acts complained of in this suit, was the only entity *with* full knowledge of the facts and the plaintiffs' and their predecessors' efforts towards performing the annual assessment work. Furthermore, Interior maintained its written policy of not denying patents in spite of the nonperformance of annual assessment work for three decades, knowing full well that claimants were either not performing or not recording the performance of annual assessment work because they believed it to no longer be a valid requirement.

In *United States v. Eaton Shale Co.*, 433 F.Supp. 1256 (D.Colo.1977), the doctrine of laches was applied against the department in similar circumstances of prejudicial delay arising from the department's treatment of an oil shale claimant. There, the department had sued to annul Eaton's oil shale patents or, in the alternative, to

---

**28.** *Rock Island, Ark. & La. R.R. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920) (Holmes, J.)

**29.** *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947) (Jackson, J. dissenting).

**30.** The considerations which contributed to the creation of the laches defense are well and simply stated in an opinion of the United States Court of Appeals for the District of Columbia Circuit:

Laches is founded on the notion that equity aids the vigilent and not those who slumber on their rights. Several aims are served by requiring the reasonable diligence of plain-

tiffs in pursuing their legal rights. Plaintiffs are encouraged to file suits when courts are in the best position to resolve disputes. As claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome.

*National Association for the Advancement for Colored People v. N.A.A.C.P. Legal Defense & Educational Fund, Inc.*, 753 F.2d 131 (D.C.Cir. 1985) (Bazelon, J.).

impose a constructive trust on the lands at issue. The court held, as an independent ground for rejecting the department's claims, that the action was barred by laches. The rationale in that case applies here to the inordinate delay by the department in the bringing of the assessment work charges in these contests; "[t]he passage of an entire generation has placed Eaton at a disadvantage in defending this suit, because of the unavailability of witnesses, difficulty in locating essential documents, and inability to reconstruct facts over the past quarter of a century." 433 F.Supp. at 1273. The court noted in a footnote that "[i]ndeed, the government's theory of this case compels Eaton to defendant a murky situation of a half century ago." *Id.*, n. 10.

To the same effect, the ALJ concluded in *United States v. Weber*, 68 I.B.L.A. 37 (1982) that, as a result of the department's unjustified decades of delay in bringing the additional charges:

> the original locators, those who made the investigations, those who could testify with first-hand knowledge, and with particularity, have died... Self-serving, hearsay, conclusionary statements cannot be confirmed or rebutted unless all of the circumstances of their making can be determined. Fairness and equity to the present owners mandates that these allegations be brought within a reasonable time period when the facts can be fairly obtained.

68 I.B.L.A. at 164.

Early mining cases as well recognize the principle of laches. *See Patterson v. Hewitt*, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214 (1904); *Brown v. Wilson*, 21 Colo. 309, 40 P. 688 (1894).

An innate sense of fairness, as well as common sense, mandates that the government not be allowed to repudiate such widespread land interests maintained on the basis of the written policies dictated and followed by the government itself for well over a quarter of a century.

## XII. APPLICABILITY OF THE TEN-ACRE RULE

The department contends that certain 10-acre tracts in the claims in Civil No. 8691 are non-mineral in character and thus non-patentable. We disagree.

■ The ten-acre mining rule arises in this way: although a single discovery of a valuable mineral deposit will perfect an entire 160-acre association placer mining claim, such a claim may contain ten-acre subdivisions that thus are not mineral in character because they are not inferred to contain locatable mineral deposits. The department has taken the position that only lands that are mineral in character are eligible for issuance of patent, and as a rule of convenience has utilized the ten-acre rule as representing the smallest legal subdivision with respect to which a decision should be made as to mineral character and patentability. *See McCall v. Andrus*, 628 F.2d 1185, 1188 (9th Cir.1980); *United States v. Williamson*, 75 I.D. 338, 344–345 (1968). Claimants—here plaintiffs—contend that it is not necessary to determine the validity of the ten-acre rule, because the ten-acre tracts in question satisfy that rule.[31]

Contestees further contend that there is no dispute that only a single discovery is necessary for a 160-acre association placer mining claim; further, that the discovery test is not applicable to each particular ten-acre tract. The principal difference between the discovery test and the mineral-in-character test is that discovery requires actual exposure of mineral, whereas the mineral-in-character test can be wholly satisfied by geologic inference; for example,

---

**31.** Section 35 of Title 30 of the United States Code provides that "[c]laims usually called 'placers' ... shall be subject to entry and patent, under like circumstances and upon similar proceedings, as are provided for vein or lode claims ..." A single discovery perfects a lode as well as a placer claim, and the entire lode claim is patentable even though portions are non-mineral. *Ferrell v. Hoge* (on review), 29 L.D. 12, 13 (1899). It can be argued that cases such as *Ferrell v. Hoge* which deny patentability of non-mineral ten-acre portions of placer claims in fact conflict with 30 U.S.C. § 35.

from mineral exposures on lands outside of a ten-acre tract. Assurance of a profitable mine is not required, merely a reasonable prospect of developing a paying mine. *Chrisman v. Miller*, 197 U.S. 313, 322, 25 S.Ct. 468, 470, 49 L.Ed. 770 (1905); *Castle v. Womble*, 19 I.D. 455, 457 (1894).

The Department of Interior in 1916 adopted specific criteria to determine the quantity and quality of oil shale necessary to render land mineral in character. (*See* Ex. G–98.) These criteria addressed such matters as the vertical thickness of oil shale beds, the average oil yield content and the depth of the beds below the surface of the land.[32]

■ All of the ten-acre tracts at issue[33] here were classified as mineral in character in 1916, and continue to be so classified to this day. The 1916 classification criteria and their subsequent application in the processing of patent applications or in contests to determine the validity of oil shale mining claims were an integral part of the department's consistent application of the principles of the mining laws to the unique geology of the Green River Formation for the 44-year period from 1916 until 1960 or 1961, when the department determined to deny the patentability of all oil shale mining claims.

Significantly, the 1916 classifications were expressly held by the basic oil shale Instructions of May 10, 1920, as establishing, prima facie, "the value of lands so classified for mining purposes ..."[34]. Furthermore, as First Assistant Secretary

Finney said in 1928, "the department has long held that lands classified as valuable for oil shale ... were prior to the passage of the leasing act open to mineral entry under the mining laws...."[35] citing among other things the 1920 *Instructions*. *Andrus v. Shell Oil Co., et. al.*, 446 U.S. 657, 673, 100 S.Ct. 1932, 1941, 64 L.Ed.2d 593 (1980), specifically concluded that "the original position of the Department of the Interior, enunciated in the 1920 Instructions and in *Freeman v. Summers*, is the correct view of the Mineral Leasing Act as it applies to the patentability of those claims. "The best evidence of the 1920 standard of patentability is the 1920 Interior Department practice on the matter." *Id.* at n. 12. That practice is persuasive here. One questioning the non-mineral character of the claim would have the burden of going forward to rebut the prima facie classification of the claim as mineral by the department in its 1916 mineral classification.

A timely treatise is helpful on the point: Under the 10-acre rule, it is not necessary that there be an actual discovery or disclosure of mineral on each ten acres, as the mineral character of the tracts may be inferred from the nature of the actual discovery, the character of the deposit and formation, the surrounding geological conditions and other facts and circumstances of the case. Citing *Crystal Marble Quarries Co. v. Dantice*, 41 I.D. 642 (1913).

*American Law of Mining*, § 35.13(2) at 35–60 (2d ed 1984) citing *Crystal Marble*

---

**32.** The study of the Oil Classification Board which resulted in the Director's classification of the oil shale lands of the Green River Formation were brought to fruition by the written recommendation of the Chief Geologist of the United States Geological Survey ("U.S.G.S.") on January 12, 1916, that oil shale lands in northwestern Colorado and northeastern Utah be withdrawn from mineral entry under the mining laws. (Ex. C–23.)

**33.** The tracts at issue are located on the Southwest claim and the Northwest claim, two claims in the "Compass" Group, in Civil Action No. C–8691. The tracts at issue on the Southwest claim are the SW ¼ SW ¼ SW ¼ SE ¼ SW ¼, located in Section 27, T. 7 S., R. 98 W., 6th P.M.,

Garfield County, Colorado. The tracts at issue on the Northwest claim are the NE ¼ NW ¼, E ½ NW ¼ NW ¼, located in Section 27, T. 7 S., R. 98 W., 6th P.M., Garfield County, Colorado.

**34.** An agricultural entryman had the burden of controverting the *prima facie* effect of classification. The department's consistent practice was to deny such entrymen oil shale where the 1916 criteria were satisfied. *See, e.g., Brennan v. Udall*, 251 F.Supp. 12 (D.Colo.1966), *aff'd*, 379 F.2d 803 (10th Cir.), *cert. denied*, 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967).

**35.** *Smallhorn Oil Shale Refining Co. and Frederick C. Crampton*, 52 I.D. 329 (1928).

*Quarries Co. v. Dantice,* 41 I.D. 642 (1913).

Thus, by its own standards existing at the time of passage of the 1920 Mining Act the claims covering the lands in question were classified as mineral. We so find.

The 1916 classification is an official government report carrying with it factual validity. See Rule 803, Fed.Rules of Evid.

The ten-acre issue surfaces here in several contests because the department now refuses to follow *Shell* or seeks to engraft unwarranted conditions on the holding of *Shell.* Moreover the department seeks to establish its own classification criteria applicable to the ten-acre tracts in question. The department ignores the fact that by its own classifications the ten-acre tracts are classified as mineral in character. This classification has existed without regard to quantity of oil shale contained within the ten-acre tract and without regard to how far below the surface oil shales are found.

The department does not dispute that the ten-acre tracts were classified in 1916 as mineral in character. Nor does the department contend that there is no oil shale within the tracts or that the oil shale is insufficient to warrant classification under the 1916 criteria.

We note that in assessing the importance of the ten-acre question the rule applies to an extremely small portion of the oil shale reserves of the Green River Formation.

We have previously alluded to the mistaken position of department exaggerated view that only the Parachute Creek Member is mineral in character. This is an unwarranted self-proclaimed extension of *Shell* having no support in *Shell* or *Freeman v. Summer.* This position is also at variance with the prior consistent department practice including the 1920 department Instructions the Supreme Court held in *Shell* were expressly ratified by Congress.

The question of what is valuable oil shale land has been settled by department's prior consistent administrative practice and Congressional ratification.

A reasonable and practical way to decide the mineral character in the ten-acre issue in this litigation is to apply the 1916 classification. Where the record does not indicate in any detail the precise extent and richness of the oil shale reserves in a ten-acre tract but the tract has been classified by the department as mineral in character, the prima facie effect of that classification carries the day and controls—unless effectively rebutted by evidence to the contrary.[36] That evidence is lacking here.

We conclude that the tracts in question (Civil Action No. 8691) are mineral in character and eligible for patent.

In support of our holdings are these considerations:

1. In 1916 the Department of the Interior adopted specific criteria to determine the quantity and quality of oil shale necessary to render land mineral in character. These criteria addressed such matters as the vertical thickness of oil shale beds, the average oil yield content and the depth of the beds below the surface of the land.

2. On May 23, 1916, the United States Geological Survey classified specified lands in Colorado to be valuable as minerals, including all ten-acre tracts at issue on the Southwest and Northwest "Compass" claims.

3. The geology of the Compass claims is quite similar to that of the claims sustained on the mineral-character issue in *United States v. A.R. Bailey, et. al.,* Contest No. 3213 (June 22, 1923). The test in *Bailey* was the application of the 1916 United States Geological Survey classification standards.[37]

4. The test of the mineral value of oil shale lands under the ten-acre rule is

---

**36.** Plaintiffs argue that if a ten-acre tract had not been classified as mineral in character, the burden should be on a claim owner to show that the tract does in fact satisfy the classification criteria.

**37.** *Winegar* Exhibit C–363; documents in *United States v. A.R. Bailey,* Contest No. 3213 (June 22, 1923).

In *Bailey,* the First Assistant Secretary of Interior Finney adjudicated the question whether the

the 1916 classification standard which creates a prima facie classification; one who contests the classification has the burden of going forward with evidence to rebut the prima facie classification. The prima facie classification has not been rebutted in the evidence presented before the Administrative Law Judge.

5. In addition to the prima facie effect of the 1916 classification another independent basis exists to establish the mineral character of the land. Evidence supports the mineral character of the tracts in question. The January 27, 1960, mineral report by Ralph Spengler on the Southwest and Northwest claims shows that the contested areas of the claims in question are mineral in character and thus not excludable under the ten-acre rule.

6. There is no substantial evidence to the contrary that the tracts are mineral in character.

## XIII. ORDER

### A

Civil Action No. 8680 (*Tosco et al. v. Hodel*)

It is Ordered, Adjudged, and Decreed as follows:

1. All contest decisions voiding, for nonperformance of assessment work, the oil shale mining claims involved in this action and owned by plaintiffs, were vacated by the Interior Department in *The Shale Oil Company*, 55 I.D. 287 (1935). Such decisions include: the decisions of the Commissioner of the General Land Office in Contest 11757 dated May 4, 1928, July 3, 1931 and November 3, 1931, involving the Bute Placer Mining Claims Nos. 1–19 inclusive, 21–28 inclusive and 30–48 inclusive; the decisions of the Commissioner of the General Land Office in Contest 11759 dated May 4, 1928 and October 8, 1931, involving the Atlas Placer Mining Claims Nos. 1–3 inclusive, 7, 9, 10, 12, 17 and 18; and the decisions of the Commissioner of the General Land Office in Contest 11761 dated May 4, 1928 and October 20, 1931, involving the Camp Bird Placer Mining Claims Nos. 1–20 inclusive.

The oil shale placer mining claims that are owned by the plaintiffs and that are involved in this action and their legal descriptions, as set forth in the location certificates, are detailed in the judgment entered herein.

2. After having vacated the contest decisions, the Interior Department pursued a

---

lands in contest were non-mineral in character. He reviewed the testimony noting that the lands had no value for agriculture, timber, coal, or minerals other than oil shale, that the claimant's witnesses had testified that there were numerous thin beds of shale beginning at an elevation of about 6,200 feet that "may be profitably worked in the future", that "the testimony clearly shows the existence of a 3½ foot bed of shale at an elevation of about 6,450 feet, which on test yielded 16 gallons to the ton" warranting classification as mineral land under the Geological Survey's classification regulations. The testimony also showed that the shale beds in the locality are "practically horizontal ... regular and persistent ... there are no faults or other disturbances to interrupt their continuity", and that certain portions "are admitted by the Government to contain the higher and richer beds of the Middle Green River Formation, and discovery thereon was conceded by the Government witnesses." He then ruled that lands lying below the 6,400 foot contour on the survey topographic map were "nonmineral in character, and that the lands lying above that elevation

contained valuable deposits of oil shale and are chiefly valuable therefore." *Winegar* Exhibit C–363 at 8–11.

He directed the Commissioner to eliminate from the contested oil shale locations all ten-acre subdivisions of non-mineral lands "in accordance with the usual practice" and stated that "the topographic map of the Geological Survey, which was accepted as correct by both parties to the contest, will be used as the basis for such elimination." *Id.* at 8–12

*Winegar* Exhibit G–10: Geological Survey Map OM–114: According to Geological Survey Maps in evidence, the surface of the Northeast and Southeast claims lies between 6,400 feet and 7,500 feet of elevation. The claims thus meet the standard set forth by Secretary Finney in *United States v. A.R. Bailey, supra*.

Exhibit D–101A: January 27, 1960, Mineral Report on the four Compass claims: The Northeast and Southeast claims are underlain chiefly by the "lower shale members" of the Green River Formation. Samples of these oil shale strata were taken from outcroppings on the Southeast claim.

consistent policy, evidenced by official statements, regulations and departmental action, of asserting that these old contest proceedings had been vacated and were of no further effect to invalidate oil shale mining claims or prevent their being patented. This course of conduct on the part of the Interior Department was neither erroneous, unauthorized nor improper, but represented the implementation of the Interior Secretary's and the department's understanding of *Wilbur v. Krushnic,* 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and *Ickes v. Virginia-Colorado Development Corp.,* 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). This course of conduct by departmental executives on the highest level involved formulation, promulgation and maintenance of interpretative and legislative rules that have the force and effect of law and could not be capriciously and retroactively repudiated by the Interior Department in 1964, and cannot now be retroactively reversed.

3. The Interior Department, and its respective secretaries, is estopped from now retroactively reversing its official position regarding the ineffectiveness of the old contest decisions, and cannot now deny issuance of patents on these claims based on the old contest proceedings which voided the claims for nonperformance of assessment work.

4. There were defects in service of process under the rules and regulations of the department in effect at the critical period. Therefore, the contest decisions thereunder were null and void when rendered by virtue of these defects. In addition, the decisions were null and void for (a) failure to obtain jurisdiction over all co-owners who were indispensable parties in those proceedings and (b) failure to state a proper claim of lack of substantial compliance with assessment work requirements.

5. For an entirely separate reason, the contest proceedings are ineffective, null and void. The Interior Department and its respective secretaries, are barred by the doctrine of laches from asserting the effectiveness of the contest decisions.

6. For the reasons outlined, the contest decisions cannot be used as the basis for rejecting any patent application filed by plaintiffs or their successors in interest for any of the said oil shale claims in this action.

7. Pursuant to Federal Rules of Civil Procedure 54(b) and 58, entry of judgment is deferred pending expeditious completion of the administrative processing of the patent applications for any or all of the above-named claims (including Mineral Entry Nos. C–25406, C–25407, C–25408 and C–25409, currently involved in Colorado Contests 689, 690, 694 and 695, *United States v. Energy Resources Land Technology, Inc., et al.*), and judicial review of any and all objections by the Interior Department to the patentability of such claims as may remain when such administrative processing has been completed.

8. The Court retains jurisdiction for the purposes of implementing its order set forth herein.

### B

Civil Action No. 8685, *Umpleby, et al. v. Hodel*

Civil Action No. 8691, *Napier, et al. v. Hodel*

Civil Action No. 9202, *Brown, et al. v. Hodel*

It is Ordered, Adjudged, and Decreed as follows:[37A]

1. All contest decisions voiding, for nonperformance of assessment work, the oil shale claims involved in these actions and owned by plaintiffs, were vacated by the Interior Department in *The Shale Oil Company,* 55 I.D. 287 (1935).

(a) The decisions in Civil Action No. 8685 (Umpleby) include: the decision of the Commissioner of the General Land Office in Contest 12029 dated July 30, 1930, and

---

**37A.** Unless otherwise noted, the order applies to claims in all three cases. Certain holdings are directed, however, to respective cases and claims.

the decision of the Assistant Secretary of the Interior dated November 29, 1930, affirming the aforesaid decision of the Commissioner of the General Land Office.

The oil shale mining claims that are owned by the plaintiffs and that are involved in Civil Action No. 8685 are the Carbon Oil claims. Holdings directed exclusively to the Shale Placer Mining Claims inclusive and the Elizabeth Oil Shale Placer mining claims 1–2 and 4–12 inclusive are indicated.

(b) The decisions in Civil Action No. 8691 (Napier) include the decision of the Commissioner of the General Land Office in Contest 12972 dated December 23, 1931.

The oil shale mining claims that are owned by the plaintiffs and that are involved in Civil Action No. 8691 are the "Compass" Placer Mining Claims, known, individually, as the Northwest, the Northeast, the Southwest and the Southeast Claims. Their legal descriptions are set forth in the judgment entered herein.

(c) The decisions in Civil Action No. 9202 (Brown) include: the decision of the Commissioner of the General Land Office in Contest 12039 dated December 2, 1931, and the decision of the Assistant Secretary of the Interior dated March 10, 1932, affirming the aforesaid decision of the Commissioner of the General Land Office.

The oil shale mining claims that are owned by the plaintiffs and that are involved in this action are the Oyler Oil Shale Placer Mining Claims 1–4 inclusive described more fully in the judgment entered herein.

2. After having vacated the said decisions, the Interior Department pursued a consistent policy, evidenced by official statements, regulations and departmental action, of asserting that these old contest proceedings had been vacated and were of no further effect to invalidate oil shale mining claims or prevent their being patented and that the performance of $100 of assessment work each year was irrelevant to perfecting or maintaining the validity of a pre-Mineral Leasing Act oil shale placer claim as against the United States (except insofar as necessary to satisfy the requirement that $500 of development work be performed prior to patent). This course of conduct on the part of the Interior Department was neither erroneous, unauthorized nor improper, but represented the implementation of the Interior Secretary's and department's understanding of *Wilbur v. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and *Ickes v. Virginia-Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). It was also consistent with Interior Department regulations on the effect of nonperformance of annual assessment work, which were not changed until September, 1972. This course of conduct by department executives on the highest level, involved formulation, promulgation and maintenance of interpretative and legislative rules that have the force and effect of law and could not be capriciously and retroactively repudiated by the Interior Department in 1964, and cannot now be retroactively reversed.

3. The Interior Department, including the respective secretaries, is estopped from now retroactively reversing its official position regarding the ineffectiveness of the old contest decisions and the irrelevance of performing annual assessment work to maintaining the validity of oil shale claims as against the United States, and cannot now deny patents on these claims on the basis of the old contest proceedings which voided the claims for nonperformance of assessment work, or on the basis of the nonperformance of assessment work in any year at least through 1972.

4. (a) The old assessment work contest decisions were also null and void when rendered because they failed to allege a proper claim of lack of substantial compliance with assessment work requirements.

(b) The 1931–33 assessment work contest decisions failed to charge a failure of "substantial compliance" with annual assessment work and thus failed to state a valid claim for relief. These administrative proceedings are open to judicial review and for

reasons expressed are overruled, reversed and set aside.

5. Given the regulatory history of oil shale placer mining claims, and under persuasive decisional law, the performance of an aggregate of $500 of development work by the claim owners constituted substantial compliance with assessment work requirements. In addition, at each claim except where otherwise noted, the amount of annual assessment work performed constitutes substantial compliance with annual assessment work requirements. The Interior Department failed to meet its burden of establishing a lack of substantial compliance with assessment work requirements by relying on the absence of recorded evidence of assessment work, as there was no requirement to record evidence of such work.

6. The Interior Department's charge against the claims in question for alleged lack of substantial compliance with assessment work requirements was not brought during a period of default, as required by law.

7. The Interior Department, including respective Secretaries, is barred by the doctrine of laches from asserting the effectiveness of the old assessment work contest decisions or, at least through 1972, failure substantially to comply with assessment work requirements, even if those alleged bases of claim invalidity were not, as they are, defective on other grounds.

8. Discoveries of a valuable mineral on claims in Civil Action No. 8685 are valid under decisional law, namely *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) and *Freeman v. Summers*, 52 L.D. 201 (1927). In Civil Action No. 8685 the Interior Department erroneously determined that these claims are invalid for lack of a sufficient discovery under *Freeman v. Summers*, 52 L.D. 201 (1927). The proper construction of the *Freeman* discovery rule under *Andrus* is that where a claim is known by geologic inference or otherwise to be underlain by the rich oil shale beds of the Green River Formation, the finding of oil shale (that is,

marlstone yielding any oil on destructive distillation) on the surface of the claim, however lean, constitutes a valid discovery. In Civil Action No. 8685 the Interior Department erroneously determined that these claims are invalid for lack of a sufficient discovery under *Freeman v. Summers*, 52 L.D. 201 (1927). This incorrect determination by Interior and Interior Board of Land Appeals is based on a construction of *Freeman* requiring a surface exposure of the "Parachute Creek Member" of the Green River Formation within the boundaries of a claim. That construction of the discovery rule embodied in *Freeman* is not founded on a proper interpretation of the law. It is in conflict with (a) the clear meaning of *Freeman v. Summers*, 52 L.D. 207 (1927), (b) consistent application to the contrary by the Interior Department until 1961, (c) and the test in *Freeman v. Summers* which was ratified by Congress in 1930–31, which was subject to consideration and approved by the Supreme Court in *Andrus v. Shell Oil Co., et al.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

9. The principles of discovery embodied in *Freeman* and consistently applied to oil shale claims by the Interior Department until 1961 were neither erroneous, unauthorized nor improper. They involved the formulation, promulgation and maintenance of interpretative and legislative rules that have the force and effect of law, and therefore could not be capriciously and retroactively reversed.

10. The Interior Department, including the respective secretaries, is estopped from now retroactively reversing its official pre-1961 discovery requirements for issuance of patents to oil shale claims, embodied in *Freeman*, and cannot now deny patents to these claims on the basis of recently developed, more restrictive standards of discovery.

11. (a) Accordingly in Civil Action No. 8685, the action of the Interior Department in denying mineral patent, to the Carbon Claims 1–5 and Elizabeth Claims 1–2 and 4–12, rejecting Mineral Application C–030979 on the basis of the aforesaid old

assessment work contest decisions; on the basis of failure substantially to comply with annual assessment work requirements; and on the basis of lack of discovery, was erroneous and is hereby overruled. The Carbon and Elizabeth claims satisfy the discovery criteria of *Andrus v. Shell Oil Co., et al., supra.*

(b) The claim owners have satisfied all valid requirements for patent of the Carbon Claims 1–5 and Elizabeth Claims 1–2 and 4–12 inclusive. The I.B.L.A. applied improper tests for discovery. Its holdings are overruled, reversed and set aside. This matter is, therefore, remanded to the Interior Department for expeditious completion of processing of the application to patent these claims.

12. In Civil Action No. 8691 the Northeast and Southeast Claims were recently determined to be null and void by the Interior Department for lack of sufficient discovery under *Freeman v. Summers,* 52 L.D. 201 (1927). This determination is erroneous. Discovery on these claims was, and is, legally sufficient under the rules of discovery consistently applied by the Interior Department from before 1920 to 1961. Oil shale of the Green River Formation has been found on these claims and the claims satisfy the 1916 Classification Criteria of the United States Geological Survey used for determining lands valuable for oil shale.

13. (a) As relating to Civil Action No. 8691, (Napier) certain ten acre portions of the Northwest and Southwest claims were determined by the Interior Department to be non-mineral in character. This determination is erroneous and is hereby overruled and reversed. We conclude that the contested 10 acre tracts are mineral in character under the 1916 Classification Criteria of the United States Geological Survey used for determining lands valuable for oil shale. No part of the Northwest or Southwest claims are legitimately excluded from patent under the ten acre rule.

(b) Accordingly, the action of the Interior Department in denying mineral patent to the Compass Claims, rejecting Mineral Application C–028751 on the basis of any of the aforesaid old assessment work contest decisions; on the basis that the Northeast and Southeast Claims are invalid for lack of discovery; and on the basis that portions of the Northwest and Southwest Claims are non-mineral in character, was erroneous and is hereby overruled, reversed and set aside.

We conclude that all of the Compass Claims satisfy discovery requirements and valid discoveries were made on the Northeast and Southeast Claims.

(c) The claim owners have satisfied all valid requirements for patent of the Compass Claims. This matter is, therefore, remanded to the Interior Department for expeditious completion of processing of the application to patent these claims.

14. As it relates to Civil Action No. 9202 (Brown), the Interior Department's charge against the Oyler Claims 1–4 for alleged lack of substantial compliance with assessment work requirements was not brought during a period of default, as required by law.

15. (a) For the reasons stated above, in Civil Action No. 9202, the action of the Interior Department in denying mineral patent to the Oyler Claims 1–4, rejecting Mineral Application C–012327 on the basis of the aforementioned old assessment work contest decisions and on the basis of failure to substantially comply with annual assessment work requirements, was erroneous and is hereby overruled.

(b) The claim owners have satisfied all valid requirements for patent of the Oyler claims 1–4. This matter is, therefore, remanded to the Interior Department for expeditious completion of processing of the application to patent these claims.

16. The court expressly finds and concludes that the actions and orders of the Secretary of Interior as detailed in *United States v. Bohme, et al.,* 48 I.B.L.A. 267 and 51 I.B.L.A. 97 (1980) are not supported by substantial evidence in the record, are contrary to law and are arbitrary and capricious. The actions of the Secretary, and

predecessors constitute an abuse of discretion and are reversed, vacated and nullified and held for naught.

17. Unless expressed to the contrary herein, the holdings of Interior Board of Land Appeals in *United States v. Bohme, et al.,* 48 I.B.L.A. 267, and 51 I.B.L.A. 97 (1980) are reversed.

18. Jurisdiction is retained by this Court for the purpose of entry of such further orders and directions as may be necessary or appropriate for the construction or implementation of this order.

19. The plaintiffs' motion for summary judgment is granted. The defendant's motion for summary judgment is denied.

### APPENDIX

This Stipulation was received into evidence as Exhibit P–346 on July 18, 1978, during the administrative hearing of *United States v. Bohme,* 48 I.B.L.A. 267, 87 I.D. 248 (1980).

### STIPULATION AS TO FACTS CONCERNING THE PERFORMANCE OF ASSESSMENT WORK ON THE OYLER CLAIMS

1. By letter dated January 28, 1918, the Commissioner of the General Land Office ordered an investigation into mining locations and other entries within the limits of the Naval Oil Share Reserve No. 1, Colorado No. 1, created by Executive Order dated December 6, 1916.

2. Among the mining locations directed to be investigated in this inquiry were the Oyler claims nos. 1–4.

3. The investigation of the Oyler claims was conducted by C.F. Leuenberger and C.L. Duer. The two agents worked on these investigations and their reports for a month or more and tried to be as thorough as possible in the time it took to ascertain the facts for their reports (Letter dated November 29, 1918 from McEniry to the Commissioner, pages 3–4).

4. Agents Leuenberger and Duer submitted a "favorable report" on the Oyler claims nos. 1–4 to the Commissioner of the General Land Office dated November 12, 1918. In that report, they set forth the following facts among others:

(a) the original locations were made September 25, 1916 and recorded on October 3, 1916;

(b) the locators included James Doyle, who had interests in the Sheridan and La Paz claims and Mr. J.L. Herwick of Grand Valley, Colorado, who was a "highly respected citizen" (Report of November 12, 1918, page 3);

(c) Herwick stated to the agents that a discovery was made on each of the Oyler claims prior to location: "an opening was made on each of the four Oyler placers, samples taken and the oil content of the shale proven by the application of heat." The agents went over the claims on horseback and found open cuts on each of the claims, took a sample of shale from each and determined by application of heat that they were oil bearing. The agents concluded that "if mining of oil shale for shipment were undertaken, these open cuts would be good points of beginning and, therefore, may be consistently considered as development work" (Id., page 4);

(d) the agents noted that J.L. Herwick signed an affidavit that labor and money had been expended on each of the four Oyler claims for the year 1917 in the amount of at least $100 per claim;

(e) with respect to the Oyler claims, the agents concluded that "the preliminary requirements regarding discovery, location, notices, as well as subsequent assessment work, have been complied with" (Id., page 6);

(f) the agents were informed by a representative of the United States Geological Survey that "it was well-known that bona fide oil shale placer locations existed within the confines of this shale reserve at the time it was created but that it was placed wherever it least interfered with bona fide locations" (Id., pages 7–8);

5. The agents' overall conclusions expressed in their report were the following:

"From our investigation we are of the opinion that the Oyler placers are bona fide locations and that the requirements of the mining laws have been met up to the present time, and we would recommend that no adverse action be taken regarding these claims but that when application is filed for patent, a further examination be made to determine whether or not the requirements of the mining laws have been fulfilled." (Id., page 10).

6. By affidavit recorded November 7, 1918, N.E. Beck stated under oath that a least $400 of work or improvements were made upon and for the benefit of the Oyler claims nos. 1–4 in the year 1918 by or at the expense of J.L. Herwick, one of the owners (Abstract, item no. 23).

7. By affidavit recorded December 29, 1919, D.R. Carroll stated under oath that at least $2,300.75 worth of work or improvements were performed on the Oyler claims nos. 1–4 in the year 1919 by or at the expense of the owners of the claims (Abstract, item no. 26).

8. In 1920 an investigation was made into the continued validity of the Oyler claims, resulting in a declaration of continued validity. However, the extent or aspects of this examination are not known.

9. A subsequent report on the status of oil shale mining claims within the boundaries of the Naval Oil Shale Reserves in Colorado prepared under the date of February 11, 1926 is referred to in a letter dated July 8, 1926 from E.C. Finney, First Assistant Secretary of the Interior, to the Secretary of the Navy. That report, which may contain additional evidence with respect to the performance of assessment work on the Oyler claims, has not been found or produced in recent years and appears not to be available.

10. In April 1927, Assistant Mineral Examiner Warren R. Sholes was assigned the Oyler claims nos. 1–4 for field investigation and report. Sholes made two examinations of the claims, the purpose and object of which, according to Sholes' testimony taken in Contest 12039, was "To determine whether the claims were valid under the mining laws as to discovery, staking, annual assessment work, etc. with the end in view to clear title thereto, if such were not the case." (Deposition of Warren R. Sholes, Int. 10). In a later report on the Oyler claims made by Sholes in 1957, he stated that the 1929 report "was the result of an extensive survey for the principal purpose of locating and determining the value of the assessment work done for the claims" (Report of February 12, 1957, page 2).

11. Sholes submitted a report dated February 28, 1929 covering his examination addressed to the Commissioner of the General Land Office. Although Sholes' 1929 report notes the filing of affidavits with respect to labor and improvements performed or made in the years 1917–1919, his report is confined to a discussion of work done in the years 1921–1928. Sholes' 1929 report reflects facts obtained in statements or depositions from Charles Cook, H.A. Hansen, J.D. Freeman, Fred Satterfield and Ray Hungerford, who had done assessment work on the Oyler claims at various times between 1920 and 1926.

12. In his 1929 report Sholes noted that he was unable to locate open cuts in the northerly portions of the ground although he was informed that some had been dug, "the reason being undoubtedly because of the heavy timber." (Report of February 28, 1929, page 11).

13. The 1929 report lists four open cuts on Oyler No. 1, fifteen cuts or holes on Oyler No. 2, six cuts or pits on Oyler No. 3 and five cuts or pits on Oyler No. 4.

14. Sholes assigned a total value of $500.30 to the four cuts on Oyler No. 1 but discounted the value of the fourth cut and concluded that "only a total of $456.30 is the amount applicable toward the development of Oyler No. 1." Sholes assigned a total value of $169.25 to the improvements on Oyler no. 2. He discounted a further $21.20 of work which had been performed. (Report of February 28, 1929, page 19). With respect to the six cuts or pits on Oyler No. 3, Sholes concluded that "the

improvements on this claim all have a tendency to develop it, and total around $1,044.40 in value." (Report of February 28, 1929, page 22). With respect to the five cuts on Oyler No. 4, Sholes concluded that "All the cuts on this claim have been shown to be of value in the development of the claim ... The total value, then, credited towards the development of this claim is $580.00." (Report of February 28, 1929, pages 24–25).

15. In a subsequent trip over the claims in October 1928, Sholes examined additional assessment work done in the years 1927 and 1928. His report shows that an additional cut or hole was made or enlarged on each of the Oyler claims in each of those two years at a cost per claim per year of at least $100. Sholes credited that expenditure for each of the claims in each of those years except for his conclusion that the hole enlarged on Oyler no. 4 in 1927 was not of benefit to the claim and that the hole dug on Oyler no. 1 in the spring of 1928 was not of benefit to that claim. (Report, pages 27–28).

16. In his February 28, 1929 report, Sholes stated that on October 25, 1928 he made an examination of "the trail and road which were built in 1920 for the benefit of the Oyler group." According to Sholes' deposition testimony, taken in Contest 12039, the trail was "locally known as the 'Oyler trail.'" (Int. 21) The trail and road in the aggregate were 3.3 miles long and Sholes estimated the total cost to be $2,421.25 based on his own experience as a road engineer but setting the estimates "very high" in order to cover possible adversity on account of high wages, severe weather conditions, etc. Sholes allocated one-quarter of this expenditure to the benefit of each of the four Oyler claims. (Report, pages 29–30). In a supplemental report dated April 29, 1929, Sholes stated that the trail benefited all the claims "as it can easily be completed over the escarpment ... without an unreasonable expenditure."

17. The following is a tabulation by claim and by year of the expenditures credited to each of the four Oyler claims in the 1929 report of Sholes:

| | No. 1 | No. 2 | No. 3 | No. 4 | Total |
|---|---|---|---|---|---|
| 1921 | 600.40 | 600.40 | 600.40 | 600.40 | 2,401.60 |
| 1922 | 52.80 | — | 183.80 | 89.00 | 325.60 |
| 1923 | 346.25 | 64.20 | 319.58 | 82.30 | 812.33 |
| 1924 | — | — | 186.27 | 224.20 | 410.47 |
| 1925 | — | — | 370.05 | 144.40 | 514.45 |
| 1926 | — | 40.00 | — | — | 40.00 |
| 1927 | 100.00 | 100.00 | 100.00 | 82.30 | 382.30 |
| 1928 | 100.00 | 100.00 | — | 100.00 | 300.00 |
| | 1,199.45 | 904.60 | 1,760.10 | 1,322.60 | 5,186.75 |

(See report pages 37–38).

18. In May 1930, Examiner E.J. Keefe of the General Land Office was assigned to examine the four Oyler claims and to post the four claims if he found that assessment work had not been resumed on the claims. In a report to the Commissioner of the General Land Office dated February 25, 1931, Keefe reported on his investigation. Keefe was informed by Karl Rosenberg, an engineer who had charge of the work on these claims for the owners for several years, and Harry Brown, who was interested in the claims, that the assessment work had been done for the year ended July 1, 1930. Keefe corroborated these statements through inquiry in the vicinity and found that in May or June 1930 Rosenberg had a crew of men doing assessment work for these claims. Mining Engineer Berry of the General Land Office, who was over the Oyler claims in the fall of 1930, advised

Keefe that he had seen new evidence of work done on or for the Oyler claims. Keefe did not specify the extent or value of the work done on the Oyler claims for 1930 (Report dated February 25, 1931, page 2).

19. By letter dated September 3, 1931 to J. Arthur Moore, Chief of the Field Division, Examiner Keefe reported that an examination of the Oyler claims on August 28, 1931 disclosed that assessment work for the year ended July 1, 1931 was not done and that on August 28, 1931 the claims were posted with notice of forfeiture for failure to perform that work.

20. On December 2, 1931, the Commissioner of the General Land Office held the Oyler claims invalid for failure to perform assessment work for the year 1931. On March 10, 1932 the decision of the Commissioner was affirmed on appeal by Assistant Secretary Edwards.

21. By letter dated October 31, 1935, the Secretary of the Interior advised the Secretary of the Navy with respect to oil shale mining claims situated within the Naval Oil Shale Reserves that the Supreme Court's decision in *Ickes v. Virginia-Colorado Development Corporation* held that the United States was without authority to challenge the validity of an oil shale claim for failure to perform or resume annual assessment work. Referring to a previous letter to the Secretary of the Navy in 1933 listing the claims, including the Oyler claims, which had been made the subject of assessment work contests, the Secretary of the Interior stated: "All previous action taken upon such charges in the cases referred to therefore is without effect and void. The status of the claims so far as this Department is concerned is that they are subsisting claims which, if located on valid discoveries of mineral by qualified locators, segregate the land against its subsequent withdrawal for Naval Oil Shale reserves unless the claims have been abandoned."

22. On September 30, 1955 application for patent on the four Oyler claims was made by Pacific Oil Company. On August 28, 1956 mineral final certificate on the four Oyler claims was issued and, under the general regulations of the Department of the Interior then in effect, any obligation to perform assessment work on the claims was terminated.

23. Because of the effects of weathering over time, a current physical examination of the surface of the claims cannot be relied upon to determine the number or extent of all of the opencuts or other assessment work that may have been performed on the Oyler claims in the past.

24. The abstract of title shows that the following affidavits or notices in respect of assessment work or in lieu thereof have been filed with respect to the Oyler claims:

| Year | Affiant | Document |
|------|---------|----------|
| 1917 | J.L. Herwick | Affidavit Of Labor, that "at least $100 of work or improvements" were made or performed on each of the Oyler Nos. 1–4 (Abstract, Item No. 12) |
| 1918 | N.E. Beck | Affidavit Of Labor, that "at least $400 of work or improvements were made upon and for the benefit of" the Oyler claims (Abstract, Item No. 23) |
| 1919 | D.R. Carroll | Affidavit Of Labor, that "at least $2300.75 worth of labor or improvements" were made or performed on the Oyler claims (Abstract, Item. No. 26) |
| 1923–24 | H.A. Hansen | Affidavit Of Labor, that "at least $100 worth of work or improvements" were made on each of the Oyler claims (Abstract, Item No. 46) |
| 1925 | H.A. Hansen | Affidavit Of Labor, that "at least $100 worth of work or improvements" were made on each of the Oyler claims (Abstract, Item No. 44). |

| Year | Affiant | Document |
|------|---------|----------|
| 1932–33 | Harry L. Brown | Notice (of intention to hold and retain) under Act of May 18, 1933 (Abstract, Item No. 50) |
| 1934–35 | Harry L. Brown | Affidavit Of Labor, giving notice of desire to hold the Oyler claims under Act of Congress (S.2536) approved June 1935. (Abstract, Item No. 51) |
| 1935–36 | Harry L. Brown | Notice Of Intention To Hold Mining Claims (Abstract, Item No. 52) |
| 1936–37 | Harry L. Brown | Notice Of Intention To Hold Mining Claims (Abstract, Item No. 53) |
| 1937–38 | Harry L. Brown | Notice Of Intention To Hold Mining Claims (Abstract, Item No. 54) |
| 1938–39 | Harry L. Brown | Notice Of Intention To Hold Mining Claims, stating that "the claimants hereby claim all benefits of a Supreme Court decision favoring such holding" (Abstract, Item. No. 55) |
| 1949 | Harry L. Brown | Statutory Notice In Lieu of Annual Labor pursuant to Act of Congress approved June 17, 1949. (Abstract, Item No. 58) |